**LAW OFFICES OF JAN MEYER**
**& ASSOCIATES, P.C.**
Richard Elem, Esq.
1029 Teaneck Road, Second Floor
Teaneck, New Jersey 07666
Telephone: 201-862-9500
Email: relem@janmeyerlaw.com

*Liaison Counsel for Lead Plaintiff and the Proposed Class*

[Co-Lead Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, Individually and on Behalf of All Others Similarly Situated, | Case No.: 2:19-cv-08237-SDW |
| Plaintiff, | Hon. Susan D. Wigenton |
| vs. | |
| CONDUENT INC., ASHOK VEMURI, and BRIAN WEBB-WALSH, | |
| Defendants. | |

## <u>AMENDED CLASS ACTION COMPLAINT</u>

i

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................... 6

III. PARTIES ............................................................................................................ 7

IV.  SUBSTANTIVE ALLEGATIONS ................................................................... 8

    A. CONDUENT AND ITS OPERATIONS ...................................................... 8

        (i)   Conduent's Spinoff from Xerox ..................................................... 8

        (ii)  Description of Conduent's Business................................................ 8

        (iii) Conduent's Automated Tolling Business ........................................ 9

        (iv)  Conduent's Transportation Business Was Material to
              the Company's Operations ............................................................ 10

        (v)   Conduent Represented to Investors That to Generate Profitable Growth,
              the Company Needed to Significantly Rely on Technology ........... 11

        (vi)  Defendants Touted the Company's Tolling Operations as an Example of
              How the Company Planned to Utilize Technology to Support Its Clients....... 12

    B. CONDUENT ANNOUNCES THE STRATEGIC TRANSFORMATION
       PROGRAM............................................................................................... 14

        (i)   The Transformation Program Remains "On Track" Through the First
              Quarter of 2017............................................................................. 15

        (ii)  The Transformation Program Remains On Track Through the Second
              Quarter of 2017............................................................................. 16

        (iii) The Transformation Program Remains On Track Through the Third
              Quarter of 2017............................................................................. 17

    C. CONDUENT ANNOUNCES THAT IT COMPLETED THE INITIAL PHASE OF
       THE COMPANY'S STRATEGIC TRANSFORMATION AND ISSUES FY2018
       GUIDANCE............................................................................................... 18

    D. DEFENDANTS REASSURE INVESTORS THAT CONDUENT'S TOLLING
       ISSUES WOULD NOT IMPACT THE COMPANY'S FINANCIAL FORECAST.. 21

    E. THROUGHOUT THE CLASS PERIOD, DEFENDANTS WERE AWARE THAT
       CONDUENT HAD NOT ADDRESSED TECHNOLOGY ISSUES, WHICH
       NEGATIVELY IMPACTED THE COMPANY'S CORE BUSINESSES ................ 22

i

(i)   Defendant Vemuri Knew or Recklessly Disregarded that Conduent Lacked the IT Resources Necessary to Support Clients ...................................................... 22

(ii)   Defendants Knew or Recklessly Disregarded that Conduent Did Not Address Legacy IT Issues Because Conduent's Technology Caused Extended Service Interruptions for the Company's Tolling Clients ............................................... 23

(iii)   Defendants Knew or Recklessly Disregarded that Conduent Did Not Address Its IT Infrastructure Because Conduent's Tolling Clients Withheld Payment to Conduent and Assessed Financial Penalties for the Company's Service Failures ................................................................................................. 24

(iv)   A Former Conduent Employee Confirmed that Defendants Knew or Recklessly Disregarded that Defendants Had Not Addressed the Company's Legacy Technology Issues ............................................... 28

F.   DEFENDANTS REVEAL THAT TECHNOLOGY ISSUES WERE NOT ADDRESSED ................................................................................................. 30

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 31

A.   FEBRUARY 21, 2018 – FY 2017 FOURTH QUARTER EARNINGS .. 31

B.   MAY 9, 2018 – FY 2018 FIRST QUARTER EARNINGS ..................... 33

C.   JUNE 8, 2018 – CONDUENT'S ANALYST DAY ................................ 35

D.   AUGUST 8, 2018 – FY 2018 SECOND QUARTER EARNINGS .......... 36

E.   THE TRUTH IS REVEALED ON NOVEMBER 7, 2018 ...................... 38

VI.   ADDITIONAL SCIENTER AND FALSITY ALLEGATIONS ..................................... 41

A.   The Fraud Impacted Conduent's Core Operations ................................. 43

B.   Post-Class Period Revelations Demonstrating Scienter ....................... 45

VII.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ................................... 46

VIII.   LOSS CAUSATION/ECONOMIC LOSS ................................................................. 47

IX.   CLASS ACTION ALLEGATIONS ................................................................. 49

COUNT I ................................................................................................................. 50

COUNT II..................................................................................................................... 53

PRAYER FOR RELIEF............................................................................................... 54

JURY TRIAL DEMANDED ....................................................................................... 55

1.      Lead Plaintiff Oklahoma Firefighters Pension and Retirement System, Plymouth County Retirement Association, Electrical Workers Pension Fund, Local 103, I.B.E.W., and Employees' Retirement System of the Puerto Rico Electric Power Authority (collectively, "Lead Plaintiff"), by and through their undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning the Lead Plaintiff certifications, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief is based upon, among other things, Co-Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, court filings, and interviews with former Conduent, Inc. ("Conduent" or the "Company") employees.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

2.      Lead Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      This is a securities fraud class action on behalf of all persons who purchased Conduent common stock on the open market on a U.S. stock exchange between February 21, 2018 and November 6, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class").

4.      Conduent provides business process services, including managing operations involving high volume, repeatable, and individualized digital interactions on behalf of its clients.

5.      One of the Company's core business segments is Transportation Services, which primarily provides support for toll collection, public transit, parking, and photo enforcement. During the Class Period, Conduent reported the Government Services and Transportation Services segments together as a business segment called "Public Sector."

6.      As part of the Company's toll-collecting operations, Conduent offers a system that eliminates toll booths altogether called all-electronic tolling or cashless tolling.  Using the all-electronic tolling system, technology supported by Conduent's platform reads an in-vehicle transponder or the vehicle's license plate to identify the vehicle and bill the vehicle owner for the toll.

7.      Prior to the Class Period, Defendants pointed to the Company's Public Sector business, and specifically its electronic tolling operations, as an example of how the Company was successfully utilizing platform-based technology to support its clients who rely heavily on automation technology.

8.      In early 2017, in order to become the technology focused company that Defendant Vemuri envisioned, Conduent began what it called a "Strategic Transformation."  The initial phase of the Strategic Transformation included evaluating the Company's third-party vendor contracts and inventorying/mapping the Company's IT infrastructure, in order to prepare to transfer the Company's data from a group of data centers to two consolidated data centers.

9.      Prior to the Class Period, Defendants consistently reported to investors that the Strategic Transformation was on track as "contract remediation is progressing" and  investments in IT infrastructure would continue to ramp throughout the year 2017.

10.      The Class Period begins on February 21, 2018, when Defendant Vemuri informed investors that the Company cleared the initial stage of the Company's Strategic Transformation. Defendant Vemuri informed investors that the consolidation of the Company's IT and network infrastructure was now underway and that in 2017 the Company had "addressed our sub-optimized IT-related workforce and vendor relationships."

11.     On the same call, Defendant Vemuri led investors to believe that the Company had created an inventory of the Company's IT infrastructure, a critical map needed to transfer the Company's data to the its new data centers, by stating that "[d]uring our first year, we needed to inventory and rationalize our technology portfolio."

12.     Unbeknownst to investors, however, Defendants had not addressed its sub-optimized IT vendor relationship and the Company lacked the systems inventory of the Company's legacy IT infrastructure that Defendants misled investors to believe had been completed during 2017.

13.     The same sub-optimized legacy third-party IT vendor was responsible for inventorying and mapping Conduent's systems.  An accurate systems inventory was critical to the Company's data center transfer and, consequently, for keeping its existing operations that rely on the data center, including the Company's platform-based tolling operation running.  The systems inventory would allow Conduent to see what live processes, current software, and applications were running in its current data center environment.  If the inventory is incomplete or inaccurate, operations such as tolling will not run correctly when data is transferred to a new facility.

14.     Despite disclosing that Strategic Transformation was in the next phase, Defendants knew that Conduent's legacy third-party IT vendor did not inventory the legacy systems and that Conduent did not have an accurate systems inventory.  A former senior Conduent employee who worked on the data center transfer during the Class Period reported that, at the time Conduent was assuring investors that the strategic transformation was proceeding as planned, Conduent was experiencing major problems with the data center transfer.

15.     Defendants also knew that issues with its legacy third-party IT vendor had not and could not be addressed because the vendor could not map Conduent's systems inventory. According to the same former Conduent employee, as a result of this legacy vendor's continued suboptimal performance, Conduent took over direction of the data center migration in or around June 2018 and began working with the vendor to manually map the Company's infrastructure.

16.     The problems with the Strategic Transformation were also apparent to Defendants when Conduent attempted to switch over operations from its legacy data center to begin operating out of the new data center.  The failure to accurately inventory the system caused massive issues with its network, which resulted in outages on Conduent's tolling platform. These outages impacted nearly all of Conduent's E-ZPass tolling clients on the east coast. During these outages, Conduent's platform did not process drivers' tolls for its clients.

17.     The tolling agencies from several states including New York, Maryland, New Jersey, and Texas withheld revenue from or fined Conduent.   These tolling agencies communicated each financial penalty to Conduent, which resulted from Conduent's failure to meet its service requirements under its tolling contracts with those agencies.

18.     Defendants, however, continued to inform investors that any issue with the tolling authorities was isolated and immaterial.  Defendants concealed throughout the Class Period that their failure to address issues with the Company's legacy third-party IT vendor responsible for inventorying Conduent's IT infrastructure was causing system-wide problems stemming from the failed data center migration.

19.     August 8, 2018 was the first time Defendants acknowledged that the Company was experiencing performance issues concerning tolling.  However, these "performance" issues were downplayed to investors as immaterial to the Company's business.

20.     Defendant Vemuri was specifically asked by an analyst if the tolling issues were indicative of larger problems with the Strategic Transformation.  In response, Defendant Vemuri said he would not discuss specifics, but that the absence of larger IT problems should be apparent from the fact that Conduent reaffirmed its financial guidance.

21.     During the same call, Defendants failed to disclose the root cause of the issues with the Company's IT infrastructure and misrepresented that the performance issues were isolated to a single client.  Defendants also failed to disclose that the Company was accruing financial penalties from its tolling clients as a result of the Company's failure to provide service as required under its contracts.

22.     Following Defendants' August 8, 2018 statements to the market that the Company's technology issues affecting its tolling clients would not impact the Company's financial forecast, Conduent's stock price increased approximately 5.4% from the previous day's closing price.

23.     The truth about the Company's legacy IT issues was revealed on November 7, 2018, when Conduent surprised the market by revealing that the Company's earnings per share and revenue were below analysts' expectations.  Additionally, the Company cut its FY2018 revenue guidance 2.5%, lowered adjusted EBITDA [earnings before interest taxes depreciation and amortization] guidance 4.4% and lowered adjusted free cash flow guidance by 12.8%.

24.     Defendant Vemuri disclosed that "continued suboptimal performance from an inherited legacy technology vendor'" including the vendor's "inability to deliver on service level agreements" and a "poorly structured contract which [Conduent] inherited," as well as the Company's "outdated and historically under-invested legacy IT infrastructure" were material issues causing the Company to lower its guidance.

25.     During the ensuing earnings call, Defendant Vemuri admitted that the Company continued to experience major service delivery issues to Transportation Services clients.

26.     Analysts were shocked by this revelation, as during the Class Period Defendants assured the market that the technology issues had already been addressed and that the system was fully inventoried.  BMO Capital Markets reported that these legacy issues must have been known to management for some time and should have been communicated to the market earlier. *See* ¶ 157.

27.     As a result of the revelations, on November 7, 2018, Conduent's common stock price fell $5.60 per share, or over 29%, to close at $13.62 per share on very heavy volume.

## II.     JURISDICTION AND VENUE

28.     The claims asserted herein arise under Sections 10(b) (15 U.S.C. §78j(b)) and 20(a) (15 U.S.C. §78t(a)) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

30.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged federal securities violations have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.

31.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate communications, and the facilities of a national securities exchange.

III.   **PARTIES**

32.   Lead Plaintiff, as set forth in the certifications submitted with its motion for appointment of Lead Plaintiff, incorporated by reference herein, purchased Conduent common stock during the Class Period.

33.   Defendant Conduent is a New York corporation with its principal executive offices located in Florham Park, New Jersey.  Conduent's common stock trades on the New York Stock Exchange under the symbol CNDT.

34.   According to the Company's 2017 Annual Report, Conduent provides business processing services with expertise in transaction-intensive processing, analytics and automation. "Conduent's services include support for electronic toll collection…[and managing] key processes on behalf of [its] clients including fee collecting, compliance and violation management, notifications, statements and reporting."

35.   Defendant Ashok Vemuri served as the Chief Executive Officer of Conduent and was a member of its board of directors at all relevant times.

36.   Defendant Brian Webb-Walsh served as the Chief Financial Officer of Conduent at all relevant times.

37.   Defendants Vemuri and Webb-Walsh are sometimes referred to herein as the "Individual Defendants."  Both of the Individual Defendants:

(a)   had intimate knowledge of every aspect of Conduent's business, including the tolling business;

(b)   directly participated in the management of the Company;

(c)   were directly involved in the day-to-day operations of the Company at the highest levels;

(d)   were privy to confidential proprietary information concerning the Company and its business and operations;

(e)     were directly or indirectly involved in drafting, producing, reviewing or disseminating the false and misleading statements and information alleged herein;

(f)     were aware that Conduent's tolling operations were part of Conduent's core business operations;

(g)     were aware of or recklessly disregarded the ongoing technology problems Conduent was experiencing in the Company's tolling business;

(h)     were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(i)     approved or ratified these statements in violation of the federal securities laws.

38.     Defendant Conduent and the Individual Defendants are referred to as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     CONDUENT AND ITS OPERATIONS

#### (i)     Conduent's Spinoff from Xerox

39.     In or around January 2016, Xerox Corporation ("Xerox") announced plans to divide into separate publicly traded companies: one containing its document management business – Xerox – and another housing its business process service operations – Conduent (previously known as Business Process Outsourcing or BPO).

40.     In or around June 2016, Xerox named Defendant Vemuri as CEO of Conduent.

41.     On December 31, 2016, Conduent fully separated from Xerox and began to operate as an independent, publicly traded company.

#### (ii)     Description of Conduent's Business

42.     Conduent provides business process services, including managing operations involving high volume, repeatable, and individualized digital interactions on behalf of its clients.

8

Examples of these digital interactions include payments, collections, benefit administration, and end-user communication services.

43.     The Company primarily operates through three segments:  (a) Commercial, which provides business processing services such as communications, human resource management, finance, and accounting services to commercial industry clients; (b) Government Services, which provides similar services as in the Commercial segment, but to U.S. federal, state and local, and foreign governments; and (c) Transportation, which primarily provides support for electronic toll collection, public transit, parking, and photo enforcement.

44.     During the Class Period, the Government Services and Transportation segments were grouped into a single segment called "Public Service."

### (iii)     Conduent's Automated Tolling Business

45.     The Company's Transportation business manages electronic tolling operations for state and local government clients. This includes supporting the platform that recognizes and validates an in-car transponder in real time (*e.g.* the E-ZPass tag used by several states along the east coast) to raise the barrier at the toll location, as well as performing the back office financial reconciliation, financial processing, and billing distribution.

46.     Conduent also supports a system that eliminates toll booths altogether called all-electric tolling ("AET").  With the AET system, instead of stopping or slowing down at a toll booth, vehicles pass under an automated toll checkpoint where Conduent's technology either:  a) reads the transponder to collect the toll, or b) uses license plate recognition to identify the vehicle and bill the vehicle owner for the toll.  The AET system is designed to reduce road congestion by tolling moving vehicles.

47.     According to the Company's 2017 and 2018 Annual Reports, throughout the Class Period, Conduent managed approximately 50% of the automated tolling systems in the United States.

> **(iv)    Conduent's Transportation Business Was Material to the Company's Operations**

48.     Defendant Vemuri stated in the Company's second quarter 2017 earnings release on August 9, 2017, during the Company's second quarter earnings call with investors, that Defendants had identified Transportation as a "core business[]" moving forward.

49.     On August 9, 2017, Defendant Webb-Walsh also told investors that Transportation was a core business, stating:

> But as we come into the next quarter, there should be more clarity around core and noncore.  And we continue to talk about some core businesses such as transportation, HR, outsourcing, our workers comp business, our compliance business and financial services business.  We've talked about those as core, and we continue to believe they are core.

50.     According to Conduent's 2017 Annual Report, the Company's Public Sector segment, which at the time included Conduent's Transportation business, generated revenues of $2.2 billion in 2017, representing 36% of the Company's total revenues.

51.     Of the $2.2 billion of Conduent's Public Sector revenue, 39% or approximately $858 million came from the Company's Transportation business.  Accordingly, in 2017, Transportation accounted for approximately 14% of the Company's total revenues.

52.     On February 21, 2018, during the Company's fourth quarter earnings call with investors, Defendant Webb-Walsh highlighted the significance of Conduent's Transportation business, noting that Transportation revenues remained flat, while the Public Sector segment as a whole declined 7% year-over-year.

53.     During the same call, Defendant Webb-Walsh stated that while he expected "the first couple of quarters [of 2018 revenue]" would be limited in the Public Sector segment, the Company "expect[s] transportation [revenue] inside of Public Sector to grow in 2018."

54.     In 2018, Conduent reclassified its business segments and began to report revenues from its Transportation business in its own segment called Transportation Services.

55.     According to Conduent's 2018 Annual Report, the Company's Transportation Services segment generated $729 million in 2018, representing 13.5% of the Company's total revenues.

56.     The Company's tolling business accounted for 41%, or approximately $299 million, of Conduent's Transportation Services segment revenue.   Accordingly, for the year 2018, tolling accounted for approximately 5.5% of the Company's total revenues.

### (v)     Conduent Represented to Investors That to Generate Profitable Growth, the Company Needed to Significantly Rely on Technology

57.     Following the Company's separation from Xerox, Defendant Vemuri stated that the Company's goal was to "win business that is highly repeatable, and supported by platform-based offerings."   To accomplish this goal, Conduent acknowledged that it had to become a company that significantly relies on technology to service its clients.

58.     On June 8, 2017, during the Robert W. Baird Global Consumer, Technology & Services Conference, Alan Katz, Conduent's Vice President of Investor Relations explained this transition to investors, stating:

> [W]e're moving from more of a siloed organization where we have technology that we implement in certain clients and not in all clients.  We're moving away from that and we're going to utilize technology across the board.  Again, moving towards platform-based offerings...

59.     On November 8, 2017, during the Company's third quarter earnings call, Defendant Vemuri acknowledged that at that time "[o]ver 60% of [Conduent's] business is delivered from platform-enabled services, and I see room for increasing that moving forward."

60.     In a May 1, 2018 interview in Strategy + Business magazine, Defendant Vemuri reiterated this sentiment stating that to generate profitable growth, Conduent "must have leading technology and software platforms" to help clients manage the interactions with the people they serve, and "[Conduent's] execution and delivery of these services must be exceptional."

### (vi)     Defendants Touted the Company's Tolling Operations as an Example of How the Company Planned to Utilize Technology to Support Its Clients

61.     On June 8, 2017, Alan Katz, Conduent's Vice President of Investor Relations, spoke to investors at the Robert W. Baird Global Consumer, Technology & Services Conference about how the Company was going to utilize technology and its platforms to grow Conduent's business.

62.     Specifically, Katz held out the Company's Public Sector business, particularly electronic tolling, as a model IT and platform-based solution for growing and scaling all of Conduent's business segments:

> So if you look at our public sector business, I think this is really a good example of how we've successfully implemented platform-based solutions where we're about to leverage IP, IT and expand across multiple clients and grow the business. I'll point out a couple of really good examples.  So electronic tolling. We're in the top 2 electronic tolling platform – tolling providers in the country.  We operate in multiple countries, actually.  And I'm sure lots of you are familiar with E-ZPass, we run E-ZPass tolling up and down the East Coast.  This is a platform that we're able to just go to multiple clients and we can reuse probably between 80% and 90% of the platform…So its investing in platforms like that, that will allow us to grow the business and expand to numerous clients.  And again, the goal is to make the business simple, repeatable, scalable and more IP and IT based.

63.     On November 8, 2017, during the Company's third quarter earnings call, Defendant Vemuri stated that the Company's Public Sector segment "illustrates the

characteristics of our core business model where technology platform assets are combined with a variety of business services to support a range of distilled interactions with the constituents of our clients."

64.     On November 14, 2017, Katz and David Amoriell, Conduent's Executive Vice President & President of Public Sector also spoke to investors at the JPMorgan Ultimate Services Investor Conference about the Company's shift in focus towards technology-centric platform offerings for its clients.

65.     When providing a summary of Conduent's businesses, Amoriell also highlighted the Company's public sector business as an example of how Conduent is already deploying technology successfully:

> [Speaking about] the public sector - [w]e have the platforms, the intellectual capital to be competitive there and really the focus there is around our platforms and bundled offerings we're taking to our clients…It's allowed us to drive good margins in this business, right? It's a segment that's grown about 5%, give or take a percent point, depending upon whether it's transportation or the state local or federal government marketplace, right.  But it's a business, I think, well positioned to go forward in terms of the technology and the domain expertise that we have.

66.     At the beginning of the Class Period, on February 21, 2018, during the Company's fourth quarter earnings call, Defendant Vemuri stated "[i]n terms of portfolio, 2017 was focused on clarifying our sources of value creation and defining our core."

67.     On the same call, Defendant Vemuri continued to call out the Company's Public Sector business as the model for Conduent's future, stating: "[p]ublic sector in many ways best exemplifies those characteristics we define as core: Technology platform solutions supported with a range of corresponding business services…Going forward, we will be targeting growing segments like transportation…."

13

**B.** **CONDUENT ANNOUNCES THE STRATEGIC TRANSFORMATION PROGRAM**

68.     On February 22, 2017, during Conduent's first conference call with investors since becoming an independent entity, Defendant Vemuri announced the Company's "Strategic Transformation" program and told investors that as the Strategic Transformation program progresses, "Conduent will suddenly look like a very different Company than the one recently separated from Xerox."

69.     Defendant Vemuri explained that the purpose of the Strategic Transformation was to address an unfocused portfolio, redundant systems, inconsistent processes, unreliable management information, and improve the Company's operations.

70.     Key areas of focus during the first phase of the Company's Strategic Transformation, included: (i) transitioning to more reliant automation and platform based offerings for clients; (ii) contract reformation; (iii) IT infrastructure improvements; (iv) inventorying and rationalizing the Company's technology portfolio; and (v) conducting a strategic review of the Company.

71.     Also on the February 22, 2017 call, in regards to the Company's contract reformation process, Defendant Vemuri emphasized the importance of reliable performance:

> Number one, it is also incumbent upon us to ensure that we are delivering to the contract that we have signed.  We are driving a higher degree of automation and better processes, delivering them with appropriate optimal solutions.  Delivering them from the right locations, and ***ensuring that the quality of the service delivered does not invite penalties.***  (Emphasis added).

72.     Additionally, in 2017, as part of the Strategic Transformation, Conduent began consolidating its data centers.  This consolidation involved migrating Conduent's data from several of the Company's existing data centers to a few centralized locations.

14

73.     According to a former employee, Conduent entered into a contract with Atos SE ("Atos") to provide third-party IT support for its businesses prior to the Class Period.  As part of the migration process, Atos was tasked with providing technical resources, including an inventory of Conduent's legacy IT infrastructure necessary for the data center transfer. Atos also produced and executed data migration plans that were reviewed by Conduent.

74.     Prior to the beginning of the Class Period, Defendants routinely updated investors on the Company's progress of the Strategic Transformation throughout 2017.

### (i)     The Transformation Program Remains "On Track" Through the First Quarter of 2017

75.     On May 10, 2017, during the Company's first quarter earnings call, Defendant Vemuri informed investors that Conduent's Strategic Transformation "continues to be on track."

76.     Defendant Vemuri also noted that Conduent was "strengthening our relationships with our core technology partners and revisiting our contract obligations to ensure mutual balance and benefit."

77.     During the same call, Defendant Webb-Walsh reiterated that the "transformation initiatives remain on track," stating that "contract remediation is progressing" and that investments in IT infrastructure and business intelligence were underway and would continue to ramp through the year.

78.     Additionally, Defendant Vemuri made it clear that they had completed their review of the Company following their exit from Xerox:

> So clearly as we stood the Company up and we looked at our portfolio of business, we looked at our contracts, we established a much more tighter discipline in terms of deal qualification and criteria of the kind of businesses that we want to get into.  We began to see the picture of what the business really looks like in terms of its sustainability, in terms of growth opportunities.  We have completed our exercise with regards to all business segments.

79.     Defendant Vemuri concluded by stating "[w]e have better visibility and business intelligence in terms of how our own company operates, how we make decisions, how we price deals, et cetera.  And we are driving towards a culture of One Conduent."

### (ii)     The Transformation Program Remains On Track Through the Second Quarter of 2017

80.     On August 9, 2017, during the Company's second quarter earnings call, Defendant Vemuri updated investors on the progress of the Company's Strategic Transformation:

> I will go into more detail on our Strategic Transformation progress.  As I have described previously, Conduent inherited a sprawling fragmented and costly operational structure that restrained our execution and competitiveness.  Aligning our cost structure and operational footprint with industry benchmarks is foundational to our turnaround plan.  We are getting our arms around this opportunity, and the results are starting to show.

81.     Defendant Vemuri also reminded investors that "[s]trategic transformation is essential to this first phase of our turnaround plan."

82.     During the same call, Defendant Webb-Walsh confirmed that Conduent was focused on improving the Company's internal systems and had made the necessary hires that would ensure the Company could run:

> We have been investing in our people, platforms and internal systems.  We have hired the talent that we need to lead the organization from both a functional and operational perspective.

83.     Additionally, when discussing the Company's business divestitures as part of the contract remediation process, Defendant Vemuri admitted that whether Conduent "[has] the appropriate IT and talent and technology" was a consideration when determining if Conduent should continue a client relationship.

        (iii)     **The Transformation Program Remains On Track Through the Third Quarter of 2017**

84.    On November 8, 2017, during the Company's third quarter earnings call, Defendant Vemuri updated investors on the progress of the Company's Strategic Transformation:

> During the third quarter, we made major strides in centralizing our technology ecosystem, including standardizing our internal systems, investing in tolls and consolidating disparate internal platforms. Collectively, this work is contributing to a more agile, productive and contemporary work environment.

85.    During the same call, Defendant Vemuri also explained to investors how the Company's Strategic Transformation efforts would benefit the Company's core businesses including Transportation:

> The process of streamlining our portfolio is enabling higher focus around businesses we consider core to the future of Conduent…They are segments where we can differentiate on the basis of our technical, domain and process expertise. And most importantly, they are in line with our vision for how we create value for our clients, managing and operating digital interactions with the people they service at massive scale where each interaction is personalized, secure, compliant, on-demand and on brand, whether it's a payment, disbursement, question or transaction.

86.    Additionally, Defendant Vemuri stated that the "Public Sector illustrates the characteristics of our core business model where technology platform assets are combined with a variety of business services to support a range of distilled interactions with the constituents of our clients."

87.    Defendant Vemuri also reiterated to investors that Conduent had the "team, resources and offerings" to be a "best-in-class provider of technology-enabled business service solutions" for its clients.

**C.    CONDUENT ANNOUNCES THAT IT COMPLETED THE INITIAL PHASE OF THE COMPANY'S STRATEGIC TRANSFORMATION AND ISSUES FY2018 GUIDANCE**

88.    On the first day of the Class Period, February 21, 2018, during the Company's fourth quarter earnings call, Defendants represented to investors that Conduent had exited the initial phase of its Strategic Transformation, Defendants had defined the Company's core business moving forward, and the Company was "on the right path to generate profitable growth" in 2018.

89.    On February 21, 2018, Defendants issued Conduent's FY2018 revenue and adjusted EBITDA guidance and confirmed that investors should expect an acceleration of growth in the coming year.  Conduent's FY2018 guidance advised that investors should expect revenue in the range of $5.625 billion to $5.799 billion and adjusted EBITDA in the range of $707 million to $733 million.

90.    Defendant Webb-Walsh also stated that projected FY2018 EBITDA growth of between 8% and 12% was due in part to the positive results of the Company's Strategic Transformation program, and lower revenue projections were the result of changes to accounting standards for revenue recognition.

91.    Defendants also advised investors that during the initial phase of the Strategic Transformation process the Company had cured many of the inefficiencies stemming from legacy elements left over from Xerox.

92.    Importantly, Conduent represented to investors that it had eliminated sub-optimal third-party vendors.   Specifically, Defendant Vemuri stated that "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships.  Next we expect to see benefits from the platform rationalization work completed last year."

93.     On the same call, Defendant Vemuri highlighted the Company's progress at building its capabilities as a technology company.  Specifically, Defendant Vemuri represented to investors that Conduent now had a map of its IT infrastructure, which would allow it to start investing in IT infrastructure upgrades, stating "[d]uring our first year, we needed to inventory and rationalize our technology portfolio.  Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology."

94.     On May 9, 2018, the Company announced its financial results for the first quarter. In the Company's first quarter earnings announcement, Conduent updated its guidance ranges for FY2018.  Conduent reduced its FY2018 revenue guidance to between $5.44 billion and $5.64 billion and its adjusted EBITDA guidance to between $672 million and $698 million.

95.     On the ensuing May 9, 2018 first quarter earnings call, Defendant Webb-Walsh stated that these reduced guidance figures were caused by the Company's strategic divestiture of businesses deemed non-core that were scheduled to close in the following quarter.  Additionally, Defendant Webb-Walsh stated that but for the Company's strategic divestiture "the guidance ranges that we provided during the last earnings call would not have changed."

96.     On the same call, Defendants reported that Public Sector revenue "was down 5% sequentially as a result of some lower volumes from some transportation clients."  However, the Company remained positive with respect to its Transportation business, stating that the Company "still expect[s] to show growth in this area of the business in 2018 as a large tolling contract is expected to ramp by the end of Q2."

97.     Additionally, Defendant Vemuri provided an update on the Company's Strategic Transformation, stating "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well."

19

98.     Defendants did not cite IT infrastructure issues, third-party vendor performance issues, or client delivery issues as reasons for revising Company's FY2018 guidance on May 9, 2018.

99.     On June 8, 2018, at Conduent's Analyst Day, the Company updated its guidance ranges for FY2018.  Conduent reduced its FY2018 revenue guidance to between $5.41 billion and $5.61 billion and its adjusted EBITDA guidance to between $662 million and $688 million.

100.    Once again, as stated during the Company's first quarter earnings call on May 9, 2018, Defendant Webb-Walsh informed investors that the changes to the Company's guidance resulted from a strategic divestiture.  Defendant Webb-Walsh continued that Conduent "still expect[s] to grow organically in Q4 of this year."

101.    Defendants did not cite IT infrastructure issues, third-party vendor performance issues, or client delivery issues as reasons for revising Company's FY2018 guidance on June 8, 2018.

102.    During the presentation, Defendant Vemuri updated investors on the Company's progress on updating its IT infrastructure, stating:

> We're also aggressively attacking our IT infrastructure with a goal of consolidating down to 2 primary data centers and a single network backbone by 2020.  We've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves.

103.    During the Company's presentation, Defendants did not disclose to investors that it was experiencing problems with the data center migration or that its third party vendor had proven incapable of recreating the legacy systems inventory that was critical to migrating the data to new data centers.

### D. DEFENDANTS REASSURE INVESTORS THAT CONDUENT'S TOLLING ISSUES WOULD NOT IMPACT THE COMPANY'S FINANCIAL FORECAST

104.    On August 8, 2018, the Company announced its financial results for the second quarter.   In the Company's second quarter earnings announcement, Conduent affirmed its FY2018 revenue and adjusted EBITDA guidance from the Company's Analyst Day of June 8, 2018.

105.    During the ensuing August 8, 2018 second quarter earnings call, Defendant Vemuri acknowledged that the Company was experiencing performance issues on a tolling contract for a government client.   Defendant Vemuri provided minimal details about the source of the problem, but reassured investors that Conduent had "the capability to efficiently resolve these issues" and that the Company was "dedicating all necessary resources to meet our contractual commitments"

106.    During the same call, when discussing the impact of any issues concerning the tolling contract on the Company's financials, Defendant Webb-Walsh directly stated "we don't anticipate it having an impact on our ability to meet our guidance."

107.    Following Defendants' statement to the market that the Company's technology issues affecting its tolling clients would not impact the Company's financial forecast, Conduent's stock price increased $1.01 to close at $19.47 on August 8, 2018, an increase of approximately 5.4% from the previous day's closing price.

**E.**     **THROUGHOUT THE CLASS PERIOD, DEFENDANTS WERE AWARE THAT CONDUENT HAD NOT ADDRESSED TECHNOLOGY ISSUES, WHICH NEGATIVELY IMPACTED THE COMPANY'S CORE BUSINESSES**

**(i)**     **Defendant Vemuri Knew or Recklessly Disregarded that Conduent Lacked the IT Resources Necessary to Support Clients**

108.     From its first days as a standalone company in 2017, Defendant Vemuri knew that Conduent lacked the modern IT resources necessary to support his technology dependent, platform-based service model.

109.     Defendant Vemuri stated that in 2017 there were approximately 20 data center outages, as well as mainframe outages, during Conduent's first 60 days of operation according to a later May 1, 2018 interview reported in *Strategy + Business* magazine.  Defendant Vemuri stated that he was deeply involved in overseeing Conduent's technology and was surprised that Conduent was operating its business using what he called a "1990s ecosystem" of mainframes and data centers, while "everybody else had moved to off-premise systems, moved into the cloud."

110.     According to the same May 1, 2018 interview in *Strategy + Business* magazine, Defendant Vemuri claimed that during Conduent's first 60 days of operation, but prior to the spinoff from Xerox, he met with approximately 25 of Conduent's top clients and learned that the Company had problems managing its data.

111.     On November 8, 2017, over 11 months into operation as a stand-alone company, during the Company's third quarter earnings call, Defendant Vemuri acknowledged that Conduent was still constrained by its IT, stating, "[t]he highly fragmented structure we inherited include[ed] a disjointed IT infrastructure that has impeded productivity and performance as an organization."

22

112.    Defendant Vemuri spearheaded the Strategic Transformation, overseeing how to update the Company's legacy systems.

> **(ii)    Defendants Knew or Recklessly Disregarded that Conduent Did Not Address Legacy IT Issues Because Conduent's Technology Caused Extended Service Interruptions for the Company's Tolling Clients**

113.    During the Class Period, Conduent experienced issues providing its AET processing services to several of its tolling clients because Defendants had not addressed legacy IT issues.

114.    Conduent manages the cashless tolling system for the New York State Thruway Authority (the "Thruway Authority").  On May 15, 2018, the Thruway Authority announced that, throughout 2018, Conduent's system failed to process tolls on several of New York's bridges and roads across the state, including the Mario M. Cuomo Bridge connecting Rockland and Westchester Counties and the Grand Island Bridge in Erie County.

115.    Conduent's failure to efficiently process tolls for the Thruway Authority resulted in late bills being issued, which included excessive fines for users.  As a result, on May 15, 2018, the Thruway Authority issued a press release announcing an amnesty program to absolve New York drivers of more than 281,000 violations worth more than $1.4 million for the Mario M. Cuomo Bridge that were caused by processing issues with Conduent's cashless tolling system. The Thruway Authority confirmed that Conduent knew of these issues, stating that it was working with Conduent "to simplify the Tolls by Mail website."

116.    Conduent knew on June 4, 2018 that the Florida Department of Transportation's ("Florida DOT") tolling systems, which Conduent supported, were due to go offline for system updates.  According to a later *Miami Herald* article dated February 19, 2019, Conduent's update caused a month long system outage.  While the systems were down, tolls were not being posted

to users' accounts.   The extended outage created a backlog of approximately 170 million transactions and the processing delays resulted in customers being mischarged late fees.

117.    On July 11, 2018, New York State Comptroller Thomas P. DiNapoli issued a press release stating that since cashless tolling was expanded to all nine crossings managed by Conduent for the Triborough Bridge and Tunnel Authority ("TBTA") the number of unbilled tolls increased dramatically.

118.    Specifically, the New York State Comptroller stated that during "the first eight months of 2017, there were nearly 200,000 unbilled tolls, up from 47,240 in 2016.  In monetary terms, in 2016 when the Henry Hudson Bridge was the only TBTA crossing using cashless tolls, unbilled transactions totaled $259,820.  By August 20, 2018, when all of TBTA's crossings had instituted cashless tolling, that number rose to $1.6 million."

119.    On July 30, 2018, Florida Senator Bill Nelson and Michigan Senator Gary Peters sent a letter to Joseph Simons, Chairman of the Federal Trade Commission ("FTC"), calling on the FTC to investigate Conduent for its "pattern of mismanaging cashless tolling systems." Senators Nelson and Peters identified reports of issues with cashless tolling systems in several states including, Florida, Michigan, California, Texas, New Hampshire, and Maryland.

> **(iii)    Defendants Knew or Recklessly Disregarded that Conduent Did Not Address Its IT Infrastructure Because Conduent's Tolling Clients Withheld Payment to Conduent and Assessed Financial Penalties for the Company's Service Failures**

120.    Defendants knew Conduent's contracts included provisions that allowed the tolling clients to withhold payment for service failures or assess financial penalties against the Company for failing to meet the benchmarks established in the contracts for transaction posting or invoice processing.

121.    The Texas Department of Transportation ("TxDOT") penalized Conduent by fining the Company on seven separate occasions during the Class Period for failing to meet key performance indicators established in TxDOT's contract with Conduent.

122.    According to monthly letters sent to Timothy Souder, Conduent's program manager containing key performance indicator results from Yolanda Turk, Contract Administration Manager, Toll Operations Division for TxDOT, for the months of March through October 2018, TxDOT assessed over $944,303 in penalties to Conduent for the Company's failure to meet key performance indicators, including $196,890 in April 2018 for missing 618,192 tolling transactions.

123.    Conduent's contract to provide services to New Jersey E-ZPass tolling agencies including the New Jersey Turnpike Authority, South Jersey Transportation Authority, Delaware River Port Authority, Delaware River and Bay Authority, Burlington County Bridge Commission, and Delaware River Joint Toll Bridge Commission (collectively, the "NJ Agencies") also allowed the NJ Agencies to assess financial penalties for non-performance.

124.    In July 2018, Conduent Vice President Thomas Dorazio executed a fourth addendum to Conduent's service contract with the NJ Agencies (the "Fourth Addendum"), recognizing that the NJ Agencies were exercising the contractual right to assess financial penalties for non-performance against Conduent.

125.    Pursuant to the Fourth Addendum, the New Jersey Turnpike Authority assessed $4,413,056 in penalties for violations and failure to meet key performance indicators established in the contract, and claimed $307,000 for lost tolls from October 2017 through March 2018.  The remaining NJ Agencies assessed an additional $455,217.59 in penalties and claimed $138,522 in lost tolls.

25

126.    Altogether, the NJ Agencies demanded payment of $5,313,795.59 from Conduent for failing to meet the requirements of the service contract from October 2017 through April 2018.  Pursuant to the Fourth Addendum, payment was due on execution.

127.    According to Section 2.41(b) of Conduent's contract with the Florida DOT, in the event of "uncertainty of [Conduent's] ability to perform the services [under the contract]" the Florida DOT may suspend all payments to Conduent.

128.    On July 16, 2018, the Florida DOT exercised the provision under Section 2.41(b) against Conduent and announced that the department would be withholding all future payments to Conduent under its $287 million contract until the SunPass system was fully operational.

129.    Florida DOT Secretary Mike Dew stated on July 16, 2018 that "[t]he delays in providing a fully functional SunPass system is completely unacceptable to FDOT and to our customers."  Additionally, the Florida Department of Transportation vowed to hold Conduent accountable to the fullest extent possible under the contract.

130.    On August 14, 2018, the *Orlando Weekly* reported that the Florida DOT would also be fining Conduent $800,000 in damages for the issues caused to the tolling system during Conduent's June 2018 system upgrade.

131.    Conduent knew the Thruway Authority's contract with Conduent contained several provisions that allowed the Thruway Authority to suspend payment to Conduent.

a.    Under Article 8.01(b) of the Thruway Authority's contract, "[w]hen, in the opinion of the [Thruway] Authority, reasonable grounds for uncertainty exist with respect to the Contract's [i.e. Conduent's] ability to perform the Services or any portion thereof, the Authority may…(i) treat such failure as a repudiation of the

26

Agreement…and (iv) suspend the Contractor's performance hereunder."

b.    Additionally, under Article 8.04(b) of the Thruway Authority's contract, in the event of unsatisfactory performance, Conduent "shall reimburse the Authority for any revenue, which the Authority identifies as having been lost due to the fault of the Contractor."

c.    Furthermore, under Article 3.01, the Thruway Authority's obligation to pay Conduent is "contingent upon the Authority's finding that the Contractor has performed in a competent and professional manner satisfactory to the Authority."

132.    Under the Thruway Authority's contract, the Thruway Authority also has the power to assess penalties for failure to meet performance standards.  On July 17, 2018, an article published by wamc.org quoted State Senator Carlucci as saying that the Thruway Authority had fined Conduent approximately $470,000 for non-performance.   The same article published an email statement from the Thruway Authority in response stating "[u]nder the existing contract, Conduent has been – and will continue to be – penalized financially each and every time they underperform."

133.    During the Class Period, Defendants knew that the Maryland Transportation Authority ("MDTA") was exercising its right to withhold payment from Conduent for non-performance related to Conduent's technology failures.  For example, on October 30, 2018, Gerald Noonan, Contract Manager for the MDTA sent a letter to Conduent Program Manager

Thomas Krueger informing Conduent that it would be withholding $1.9 million designated for a project that was due on June 1, 2018 and still incomplete (150 days late).

134.   The Michigan Department of Transportation's ("Michigan DOT") contract with Conduent similarly contained a provision that allowed it to withhold payment.  Section 12.4 of the Michigan DOT's contract with Conduent states "the State may, without waiving any other rights under this Contract, elect to withhold payments due to Contractor under this Contract such amounts that are in dispute for Deliverables or services that do not comply with the performance elements set forth in the Contract."

> ### (iv)   A Former Conduent Employee Confirmed that Defendants Knew or Recklessly Disregarded that Defendants Had Not Addressed the Company's Legacy Technology Issues

135.   A former senior Conduent employee assigned to work on the 2018 data center transfer for Conduent's Transportation segment stated that the project was doomed from the outset, because (i) Conduent's legacy IT infrastructure compromised the functionality of the Company's applications during the transition; and (ii) Atos lacked the knowledge and skill to effectively support the transfer process.

136.   CW1 was Vice President of Enterprise Architecture for Conduent from approximately March 2017 until March 2019. CW1 worked remotely and reported to Kevin Gahan, Conduent's Senior Vice President, IT Solutions, who reported to Chief Information Officer, Carol Kline. As Vice President of Enterprise Architecture, CW1 helped put together the IT group's business plan for Conduent's data center migration.  The IT business plan included information on cost estimates, cost savings, and information related to IT infrastructure replacement.  Additionally, CW1 participated in the execution of the data center migration.

137.    Prior to and during the data center migration, CW1 attended monthly governance meetings with Atos personnel to review Severity 1 or "Sev. 1" IT incidents.  CW1 stated that these meetings were also attended by Bev Chamberlin, Conduent's Vice President and Head of Business Information Office, IT Strategy and Process, Kevin Gahan, Conduent's Senior Vice President, IT Solutions, and Rick Dastin, Conduent's Chief Technology and Product Officer.  CW1 explained that Sev. 1 incidents were those that impacted multiple customers or had a significant impact to Conduent's business.  CW1 stated that outages were in a special category called Sev. 1+.  According to CW1, during his tenure as Vice President of Enterprise Architecture there were anywhere from 6 to 12 Sev. 1 incidents per month.

138.    According to CW1, Atos misstated its ability to acquire the requisite systems knowledge to execute the data center migrations effectively.  CW1 stated that Conduent lacked a systems inventory and documentation about the Company's legacy IT infrastructure.  CW1 stated that, in its Statement of Work, Atos was responsible for deploying a software program to recreate the inventory, but by summer 2018 Atos was only able to identify about 14 percent of Conduent's systems.

139.    CW1 stated that as a result of Atos's failure to create the inventory, Conduent began directing the data center migration.  CW1 stated that proceeding without Atos's inventory required Conduent to work with Atos to manually review the legacy IT infrastructure and map all of the systems that were to be transferred (*e.g.* servers, circuits, firewalls).  According to CW1, there were problems with firewalls and load balancers that were unaccounted for in the legacy systems.  CW1 explained that when Conduent performed the network cutover during the data center migration all of the gateways into the new data center were supposed to transition,

but the unaccounted for firewall and load balancers impacted the transition, thereby causing the network outages that impacted Conduent's tolling customers.

### F. DEFENDANTS REVEAL THAT TECHNOLOGY ISSUES WERE NOT ADDRESSED

140. On November 7, 2018, in a press release announcing Conduent's third quarter financial results and revising its FY2018 earnings and revenue guidance, the Company revealed that the underlying issues impacting tolling client service had materially impacted the Company's financial performance.

141. On November 7, 2018, Conduent reported $1.304 billion in revenue, a decrease of 11.9% compared to the prior year quarter and about 2.8% below analyst expectations. Conduent also reduced its FY2018 earnings and revenue guidance. The Company cuts its Adjusted EBITDA about 4% to $640 to $650 million (from $662 to $688 million) and cut its revenue guidance 2.5% to $5.34 to $5.40 billion (from $5.41 to $5.61 billion).

142. The Company admitted that the reduced guidance was because of legacy technology issues stating that "[o]ur updated guidance reflects technology and infrastructure performance issues which are being addressed."

143. During the November 7, 2018 earnings call Defendant Vemuri admitted that Conduent had not addressed issues with its legacy third party vendors. Vemuri stated that part of the reason for the reduced FY2018 guidance was due to failures by a legacy third-party vendor (i.e. Atos):

> [W]e have had continued suboptimal performance from an inherited legacy technology vendor. The performance issues stem from the vendor's inability to deliver on service level agreements, lack of responsiveness to Conduent's needs, and poorly structured contracts which we inherited. We had our first planned data center migration in Q3 and during this migration we uncovered issues ***that cause significant disruption to our client delivery and operations and resulted in penalties to Conduent.*** (emphasis added).

144.    Following the November 7, 2018 disclosures, numerous analysts slashed price targets and downgraded the stock.   A November 7, 2018 BMO Capital Markets report took Conduent to task for misleading the market about the Company's problems, in particular its vendor issues:

> **Lots of problems?**   Conduent spelled out five problems with its business: 1) longer sales cycle and ramp time; *2) vendor problems affecting operations; 3) underinvestment in legacy IT infrastructure;* 4) low European penetration outside of customer care contracts; and 5) deals slipping to future quarters.   *We are surprised that Conduent disclosed so many problems and think management could have shared some of these issues with investors at an earlier time.   For example, we think the issue with the IT providers has likely been a problem for some time.* (Emphasis added).

145.    Morgan Stanley agreed in a November 7, 2018 analyst report, lowering its 2018 and 2019 revenue projections to $5.37 billion (from $5.48 billion) and $4.74 billion (from $4.78 billion), respectively, its 2018 and 2019 EBITA estimates to $642 million and $647 million, respectively, and moving its price target to $16.   In the same November 7, 2018 analyst report, Morgan Stanley cited both the vendor contracts and IT infrastructure issues as reasons for lowering their expectations:

> **Legacy technology troubles.**   Issues around legacy technology both inherited subcontractor contracts as well as underinvestment in infrastructure, caused delays in delivery performance.    CNDT's poorly structured vendor contracts impacted the company's ability to deliver on service level agreements, resulting in penalties to CNDT.   Separately, legacy IT infrastructure caused disruptions to operations, which negatively impacted client delivery.

146.    On November 7, 2018, Conduent's common stock price fell $5.60 per share, or over 29%, to close at $13.62 per share.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    FEBRUARY 21, 2018 — FY 2017 FOURTH QUARTER EARNINGS

147.    On February 21, 2018, Conduent issued a press release providing a full-year outlook for FY2018.   In the press release, Conduent stated FY2018 revenue would be in the

range of $5.625 billion to $5.799 billion and adjusted EBITDA in the range of $707 million to $733 million.

148.     On the Company's fourth quarter earnings call with investors on February 21, 2018, when discussing Conduent's exit from the initial phase of the Company's Strategic Transformation program, Defendant Vemuri stated that "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships.  Next we expect to see benefits from the platform rationalization work completed last year."

149.     During the 2018 fourth quarter earnings call, Defendant Vemuri also stated "[d]uring the first year, we needed to inventory and rationalize our technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology."

150.     During the 2018 fourth quarter earnings call, Defendant Webb-Walsh also stated that the Company "expect[s] transportation [revenue] inside of Public Sector to grow in 2018."

151.     The statements in ¶¶ 147-150 were false and misleading, or omitted material facts when made because: (i) Defendants had not "addressed" the Company's sub-optimized IT-related workforce and vendor relationships, as evidenced by Atos's inability to create a critical inventory of Conduent's legacy IT infrastructure (*see* ¶¶ 103, 138-139, 169-170); (ii) according to Defendant Vemuri, Conduent was constrained by its sub-optimized contract with Atos from realizing the benefits of the Strategic Transformation (*see* ¶¶ 172-173); (iii) Conduent lacked a systems inventory of the Company's legacy IT infrastructure necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138); (iv) Conduent's vendor, Atos was unable to create the systems inventory necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138-139); (v) Conduent's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos (*see* ¶¶ 137-139; *see also* ¶¶

32

114-119); (vi) Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients (*see* ¶¶ 121-134); (vii) Defendants failed to disclose that the underlying IT infrastructure could not support the Company's core businesses (*see* ¶¶ 137-139, 171-174, 182-188, 190-191); (viii) Conduent's service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos were impacting what Conduent defined as its core business (*see* ¶¶ 137-139, 169-170, 172-173, 182-188); and (ix) Defendants' forecasts were false and misleading because Conduent's IT infrastructure could not support the Company's core businesses.

### B.    MAY 9, 2018 – FY 2018 FIRST QUARTER EARNINGS

152.    On May 9, 2018, the Company announced its financial results for the first quarter. In the Company's first quarter earnings announcement Conduent updated its guidance ranges for FY2018.  Conduent reduced its FY2018 revenue guidance to between $5.44 billion and $5.64 billion and its adjusted EBITDA guidance to between $672 million and $698 million.

153.    On the Company's first quarter earnings call with investors on May 9, 2018, Defendant Webb-Walsh stated that but for the Company's strategic divestiture "the guidance ranges that we provided during the last earnings call would not have changed."

154.    During the 2018 first quarter earnings call, Defendants reported that Public Sector revenue "was down 5% sequentially as a result of some lower volumes from some transportation clients."  However, the Company remained positive with respect to its Transportation business, stating that the Company "still expect[s] to show growth in this area of the business in 2018 as a large tolling contract is expected to ramp by the end of Q2."

155.    During the 2018 first quarter earnings call, Defendant Vemuri provided an update on the Company's Strategic Transformation, stating "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well."

156.    The statements in ¶¶ 152-155 were false and misleading, or omitted material facts when made because: (i) Conduent's IT consolidation was not "progressing well" because Atos was unable to create a critical systems inventory (*see* ¶¶ 98, 138); (ii) Conduent took over direction of the data center consolidation from Atos and had to attempt to manually map the Company's legacy IT infrastructure (*see* ¶¶ 98, 139); (iii) Defendants had not "addressed" the Company's sub-optimized IT-related workforce and vendor relationships, as evidenced by Atos's inability to create a critical inventory of Conduent's legacy IT infrastructure (*see* ¶¶ 103, 138-139, 169-170); (iv) according to Defendant Vemuri, Conduent was constrained by its sub-optimized contract with Atos from realizing the benefits of the Strategic Transformation (*see* ¶¶172-173); (v) Conduent lacked a systems inventory of the Company's legacy IT infrastructure necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138); (vi) Conduent's vendor, Atos was unable to create the systems inventory necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138-139); (vii) Conduent's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos (*see* ¶¶ 137-139; *see also* ¶¶ 114-119); (viii) Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients (*see* ¶¶ 121-134); (ix) Defendants failed to disclose that the underlying IT infrastructure could not support the Company's core businesses (*see* ¶¶ 137-139, 171-174, 182-188, 190-191); (x) Conduent's service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos were impacting what Conduent defined as its core business (*see* ¶¶ 137-139, 169-170, 172-173, 182-188); and (xi) Defendants' forecasts were false and misleading because Conduent's IT infrastructure could not support the Company's core businesses.

### C.     JUNE 8, 2018 —CONDUENT'S ANALYST DAY

157.    On June 8, 2018, at Conduent's Analyst Day conference call with investors, the Company updated its guidance ranges for FY2018.  Conduent reduced its FY2018 revenue guidance to between $5.41 billion and $5.61 billion and its adjusted EBITDA guidance to between $662 million and $688 million.

158.    During the June 8, 2018 Analyst Day conference call, Defendant Webb-Walsh stated that "the only change we are making to [the Company's] guidance are as a result of [a strategic]…divestiture."   Defendant Webb-Walsh continued that Conduent "still expect[s] to grow organically in Q4 of this year."

159.    During the June 8, 2018 Analyst Day conference call,  Defendant Vermuri updated investors on the Company's progress on updating its IT infrastructure, stating:

> We're also aggressively attacking our IT infrastructure with a goal of consolidating down to 2 primary data centers and a single network backbone by 2020.  We've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves.

160.    The statements in ¶¶ 157-159 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that the Company had "taken back our critical network infrastructure as well as our client-facing application" due to Atos's suboptimal performance (*see* ¶¶ 101, 138); (ii) Defendants failed to disclose that Conduent had experienced network issues during the data center consolidation process stemming from the Company's failure to create an inventory of the Company's legacy IT infrastructure (*see* ¶¶ 101, 138); (iii) Defendants had not "addressed" the Company's sub-optimized IT-related workforce and vendor relationships, as evidenced by Atos's inability to create a critical inventory of Conduent's legacy IT infrastructure (*see* ¶¶ 103, 138-139, 169-170); (iv) according to Defendant Vemuri, Conduent was constrained by its sub-optimized contract with Atos from realizing the benefits of the

Strategic Transformation (*see* ¶¶ 172-173); (v) Conduent lacked a systems inventory of the Company's legacy IT infrastructure necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138); (vi) Conduent's vendor, Atos was unable to create the systems inventory necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138-139); (vii) Conduent's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos (*see* ¶¶ 137-139; *see also* ¶¶ 114-119); (viii) Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients (*see* ¶¶ 121-134); (ix) Defendants failed to disclose that the underlying IT infrastructure could not support the Company's core businesses (*see* ¶¶ 137-139, 171-174, 182-188, 190-191); (x) Conduent's service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos were impacting what Conduent defined as its core business (*see* ¶¶ 137-139, 169-170, 172-173, 182-188); and (xi) Defendants' forecasts were false and misleading because Conduent's IT infrastructure could not support the Company's core businesses.

### D. AUGUST 8, 2018 — FY 2018 SECOND QUARTER EARNINGS

161.   On August 8, 2018, Conduent announced its financial results for the second quarter. In the Company's second quarter earnings announcement, Conduent reaffirmed its FY2018 revenue guidance of between $5.41 billion and $5.61 billion and its adjusted EBITDA guidance of $662 million and $688 million, provided during the Company's June 8, 2018 Analyst Day conference call.

162.   On August 8, 2018, during the Company's second quarter earnings call with investors, Defendant Vemuri addressed the Company's issues with tolling service, stating:

> Before turning to the highlights of our second quarter, I want to address a matter that has been in the press recently around our performance on a tolling contract with a state government agency. Confidentiality agreements prevent us from

36

going into specifics. However, I will note that issues tend to arise in the implementation phase of the startup and ramp of a new tolling system, particularly one that involves transitioning multiple legacy systems to a new and updated integrated state-wide system. ***We have the capability to efficiently resolve these issues, and are dedicating all necessary resources to meet our contractual commitments.*** We are an industry leader in the automated tolling space across the United States with a strong performance track record, and are confident in our ability to address this issue, and are making good progress toward our mutually agreed-upon timelines. (Emphasis added).

163. During the 2018 second quarter earnings call, when questioned by analysts about the potential impact of the tolling issues, Defendant Webb-Walsh stated that it would not impact the Company's financial projections and affirmed that Company's June 8, 2018 guidance:

> Bryan C. Bergin – Cowen and Company, LLC, Director – Research Division – And then as far as the public tolling contract, does the increased resources to complete the work imply somewhat pressured margin there versus expectations? Just trying to understand the implications here on the financials…
>
> Webb-Walsh– In terms of the tolling contract, we typically don't comment on the financials around one specific contract. We're obviously working to remediate the situation. But what I will say is we just confirmed our guidance in revenue, free cash flow and adjusted EBITDA. So at this time, we don't anticipate it having an impact on our ability to meet our guidance.

164. The statements in ¶¶ 161-163 were false and misleading, or omitted material facts when made because: (i) Defendants failed to disclose that the Company's service issues were not isolated to one state government agency, but rather several of the Company's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos (*see* ¶¶ 137-139; *see also* ¶¶ 114-119); (ii) Defendants had not "addressed" the Company's sub-optimized IT-related workforce and vendor relationships, as evidenced by Atos's inability to create a critical inventory of Conduent's legacy IT infrastructure (*see* ¶¶ 103, 138-139, 169-170); (iii) according to Defendant Vemuri, Conduent was constrained by its sub-optimized contract with Atos from realizing the benefits of the Strategic Transformation (*see* ¶¶ 172-173); (iv) Conduent lacked a systems inventory of the Company's legacy IT infrastructure

necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138); (v) Conduent's vendor, Atos was unable to create the systems inventory necessary to consolidate the Company's data centers (*see* ¶¶ 103, 138-139); (vi) Conduent's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos (*see* ¶¶ 137-139; *see also* ¶¶ 114-119); (vii) Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients (*see* ¶¶ 121-134); (viii) Defendants failed to disclose that the underlying IT infrastructure could not support the Company's core businesses (*see* ¶¶ 137-139, 171-174, 182-188, 190-191); (ix) Conduent's service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos were impacting what Conduent defined as its core business (*see* ¶¶ 137-139, 169-170, 172-173, 182-188); and (x) Defendants' forecasts were false and misleading because Conduent's IT infrastructure could not support the Company's core businesses.

## E.      THE TRUTH IS REVEALED ON NOVEMBER 7, 2018

165.    On November 7, 2018, in a press release announcing Conduent's third quarter financial results and revising its FY2018 earnings and revenue guidance, the Company revealed that the underlying issues impacting tolling client service had materially impacted the Company's financial performance.

166.    Conduent reported adjusted net income of $61 million for the third quarter, or $0.28 per diluted share, about 1.4% below analyst expectations.  Similarly, Conduent reported $1.304 billion, a decrease of 11.9% compared to the prior year quarter and about 2.8% below analyst expectations.

167.    The Company reduced its FY2018 earnings and revenue guidance.  The Company cuts its Adjusted EBITDA about 4% to $640 to $650 million (from $662 to $688 million) and cut its revenue guidance 2.5% to $5.34 to $5.40 billion (from $5.41 to $5.61 billion).

168.    In its November 7, 2018 press release, Conduent stated that "[o]ur updated guidance reflects technology and infrastructure performance issues which are being addressed."

169.    During the third quarter earnings call on November 7, 2018, Defendant Vemuri stated that part of the reason for the reduced FY2018 guidance was due to failures by a legacy third-party vendor (i.e. Atos) that resulted in penalties to the Company:

> [W]e have had continued suboptimal performance from an inherited legacy technology vendor.  The performance issues stem from the vendor's inability to deliver on service level agreements, lack of responsiveness to Conduent's needs, and poorly structured contracts which we inherited.

170.    During the third quarter earnings call, Defendant Vemuri further disclosed that the vendor's failure "caused [sic] significant disruption to our client delivery and operations and resulted in penalties to Conduent."

171.    Defendant Vemuri also cited during the call failures in Conduent's IT infrastructure was part of the reason for the reduced guidance:

> [O]ur outdated and historically under-invested legacy IT infrastructure has caused major disruptions to our operations and impacted client delivery performance. We are investing in our IT infrastructure to ensure our IT performance is in line with our client's expectation

172.    Defendant Vemuri also admitted that Conduent was locked into a relationship with its legacy vendor, Atos, to provide infrastructure support and he was aware that [Atos] had been unable to meet its obligations while responding to analysts during the call:

**Puneet Jain – JP Morgan Securities, Inc.**

I guess the operational issues that you mention it seems like a lot of them stem from the infrastructure subcontractor that you use.  So my question there is how much of a charge or penalties that you [are] to incur in 4Q can be passed on to that subcontractor [sic].  And as you reassess in sourcing of some of that work, how fast can you address some of those issues?  It seems like the core for 2019, core revenue for 2018 has been rebased lower.  So do you expect these issues to continue into next year as well?

**Vemuri:**

Number one is that we did inherit a very challenged infrastructure both from a network perspective, the quality of the assets *and unfortunately a contract that necessitated us to continue to work with the service provider that we had engaged with prior to the formation of Conduent.* We have addressed just like we address the client facing application issue with another large service provider that [we] work with outsource to our prior to the formation of Conduent last year similarly - we have addressed this issue for the last six months to seven months. *As we have progressed from more labor intensive work to digital technology work, the impact of the nonperformance of this has become severely amplified resulting in penalties* as Brian mentioned as well as detriment of Revenue that's one of the reasons that we gave for the change in guidance. (Emphasis added).

173. Defendant Vemuri reiterated that the Company was long aware that it was constrained by the limitations of its existing infrastructure and sub-optimized vendor relationship:

**Jim Suva – Citigroup Inc.:**

Thanks. Ashok, you've been there now for quite a bit of time, and you successively did a lot of divestitures. But I guess the surprising thing of laying out five different issues now, I think is catching investors in the stock off, off guard today of the reaction. *Things like outdated infrastructure and stuff shouldn't be a surprise today, and now they're really kind of coming out. So what did you uncover, or is this just a new look under the covers or a new chapter, or how should we think about, why now as opposed to 12 months, 14 months, 15 months, 18 months ago?* (Emphasis added).

**Vemuri:**

From an infrastructure and network perspective, the work was started last year it takes time for it to sort of unravel or for the results to good or bad to become to be revealed. *And since we were constrained by the service provider that we used -- we were EE challenged, and this out of [sic] blow up in our face if you will or got amplified, as we moved more and more of our capabilities and our business from labor base to more technology base and the amplification became extremely apparent in our results as you have seen in this particular quarter. This is not a new issue. We've been addressing this for a while. The impact of this has suddenly accelerated and got amplified. We've been working on it.* This has forced us to make the changes much more quickly. Those changes have already been made. We've hired talent within the company. We've hired external experts and vendors and professionals who can help us in this journey because *trust me we understand the impact of this on not only our financials, but the impact it has on our clients' performance and our ability to deliver the services*

40

*to them.* (Emphasis added).

174.    Following the November 7, 2018 disclosures, numerous analysts slashed price targets and downgraded the stock.   A November 7, 2018 BMO Capital Markets report took Conduent to task for misleading the market about the Company's problems, in particular its vendor issues:

> **Lots of problems?** Conduent spelled out five problems with its business: 1) longer sales cycle and ramp time; *2) vendor problems affecting operations; 3) underinvestment in legacy IT infrastructure;* 4) low European penetration outside of customer care contracts; and 5) deals slipping to future quarters.  *We are surprised that Conduent disclosed so many problems and think management could have shared some of these issues with investors at an earlier time.  For example, we think the issue with the IT providers has likely been a problem for some time.* (Emphasis added).

175.    Morgan Stanley agreed in a November 8, 2018 analyst report, lowering its 2018 and 2019 revenue projections to $5.37 billion (from $5.48 billion) and $4.74 billion (from $4.78 billion) respectively, its 2018 and 2019 EBITDA estimates to $642 million and $647 million, respectively, and moving its price target to $16.  In the same November 7, 2018 analyst report, Morgan Stanley cited both the vendor contracts and IT infrastructure issues as reasons for lowering their expectations:

> **Legacy technology troubles.**  Issues around legacy technology both inherited subcontractor contracts as well as underinvestment in infrastructure, caused delays in delivery performance.   CNDT's poorly structured vendor contracts impacted the company's ability to deliver on service level agreements, resulting in penalties to CNDT.  Separately, legacy IT infrastructure caused disruptions to operations, which negatively impacted client delivery.

176.    On November 7, 2018, Conduent's common stock price fell $5.60 per share, or over 29%, to close at $13.62 per share.

## VI.    ADDITIONAL SCIENTER AND FALSITY ALLEGATIONS

177.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the

investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.

178.    Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Conduent's FY2018 guidance, third-party vendor capabilities, ability to provide service given the Company's IT infrastructure, the revenue being withheld for non-performance and financial penalties incurred for non-performance, their control over, or receipt or modification of Conduent's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

179.    Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

180.    Defendants, because of their positions with Conduent, made or controlled the contents of the Company's public statements during the Class Period.  The Individual Defendants were provided with or had access to the information alleged herein to be false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and

misleading.   As a result, the Individual Defendants are responsible for the accuracy of Conduent's corporate statements and are therefore responsible and liable for the representations contained therein.

181.   In addition to the Individual Defendants, other members of Conduent's senior management, including Chief Information Officer, Carol Klein, Vice President and Head of Business Information Office, IT Strategy and Process, Bev Chamberlin, Senior Vice President, IT Solutions, Kevin Gahan, and Chief Technology Officer, Rick Dastin, knew the true facts regarding Conduent's FY2018 guidance, third-party vendor capabilities, ability to provide service given the Company's IT infrastructure, revenue being withheld for non-performance or financial penalties incurred for non-performance.   The knowledge of these senior officials is attributable to Conduent.

### A.    The Fraud Impacted Conduent's Core Operations

182.   Defendants' false and misleading statements and omissions concern part of Conduent's core operations.   During the initial stage of the Company's Strategic Transformation process, Defendants plainly acknowledged that Transportation was one the Company's core businesses, stating "we continue to talk about some core businesses such as transportation…".

183.   During the Class Period, the Company's core Transportation business involved managing back office tolling operations for state and local government clients.   The Company managed over 50% of electronic tolling payments in the United States, utilizing the type of platform-based technology that Defendants repeatedly stated was central to the future of the Company, and derived a material portion of the Company's Class Period revenue from its tolling business.

184.    On multiple occasions Defendants represented to investors that the Company's Public Sector business, and in particular tolling, was the definition of Conduent's core business model.

185.    Indeed, on June 8, 2017, at the Robert W. Baird Global Consumer, Technology & Services Conference, the Company highlighted its tolling business for investors as an example of the service Conduent wanted to deliver to its clients, stating:

> So if you look at our public sector business, I think this is really a good example of how we've successfully implemented platform-based solutions where we're about to leverage IP, IT and expand across multiple clients and grow the business. I'll point out a couple of really good examples.  So electronic tolling.  We're in the top 2 electronic tolling platform – tolling providers in the country.  We operate in multiple countries, actually.  And I'm sure lots of you are familiar with E-ZPass, we run E-ZPass tolling up and down the East Coast.  This is a platform that we're able to just go to multiple clients and we can reuse probably between 80% and 90% of the platform…So its investing in platforms like that, that will allow us to grow the business and expand to numerous clients.  And again, the goal is to make the business simple, repeatable, scalable and more IP and IT based.

186.    During the Class Period, the Individual Defendants themselves confirmed their personal involvement and awareness of the details concerning the issue central to their fraud: Conduent's inability to reliably deliver service to the Company's tolling clients.

187.    During an August 8, 2018 conference call, Defendant Vemuri preemptively tried to address the issues experienced by Conduent's tolling clients with investors and analysts, following widespread news about service outages.  On this call, the Individual Defendants demonstrated that they had intimate knowledge of the tolling issues:

> **Vemuri:**
>
> I want to address a matter that has been in the press recently around our performance on a tolling contract with a state government agency.  Confidentiality agreements prevent us from going into specifics.  However, I will note that issues tend to arise in the implementation phase of the startup and ramp of a new tolling system, particularly one that involves transitioning multiple legacy systems to a new an updated state-wide system.

\*      \*      \*

**Bryan C. Bergin – Cowen and Company, LLC:**

And then as far as that public tolling contract, does the increased resources to complete the work imply somewhat pressured margins there versus expectations? Just trying to understand the implications here on the financials…

**Webb-Walsh:**

In terms of the tolling contract, we typically don't comment on the financials around one specific contract. We're obviously working to remediate the situation. But what I will say is we just confirmed our guidance in revenue, free cash flow and adjusted EBITDA. So at this time, we don't anticipate it having an impact on our ability to meet our guidance.

188.     Individual Defendants acted knowingly by misleading investors as to the financial impact from the IT issues in the Company's tolling business.

## B.     Post-Class Period Revelations Demonstrating Scienter

189.     On February 13, 2019, the *Miami Herald* published an article regarding issues with Florida's SunPass system that occurred during the summer of 2018.

190.     In the February 13, 2019 *Miami Herald* article, Gerry O'Reilly, a district secretary for the Florida DOT, stated that in 2018, "[Conduent's] system was completely overwhelmed" and "[t]here just wasn't enough horsepower there to process it all." O'Reilly added that the Florida DOT had not paid Conduent since the issues with the system began in June 2018, and that the Florida DOT could ultimately withhold 25% of its bill due to the service problems.

191.     In the same February 13, 2019 *Miami Herald* article, State Representative Mel Ponder echoed O'Reilly stating that in 2018, it "shouldn't have been a surprise" to Conduent that their system was not equipped to handle the millions of tolls incurred by Florida drivers each week. State Senator Janet Cruz added that Florida "picked a company that was unqualified to do

the work" and suggested in 2018 that Florida should perhaps look to replace Conduent with another vendor.

192.    On March 29, 2019, the *Miami Herald* reported that Kevin Thibault, newly appointed Secretary of the Florida DOT, was directing the head of Florida's Turnpike Enterprise, which oversees the state's toll system, to assess the maximum performance penalties allowed under the contract with Conduent – an estimated $4.6 million – for the issues caused during the 2018 system upgrade.

193.    On April 8, 2019, Michael Nevin resigned from the Conduent Board of Directors.

194.    In connection with his resignation, Nevin furnished the Company with a letter explaining the reasons for his departure.  A copy of this letter is attached at Exhibit 17.1 to Conduent's Form 8-K filed on April 11, 2019.

195.    In this letter, Nevin noted that a number of concerns that he had raised related to Conduent's operations, policies and practices had gone unaddressed.  Among his concerns, Nevin stated that Defendant Vemuri was not giving his duties at Conduent his full attention at a time when "negative disclosures by Conduent resulted in the evaporation of almost half the company's stock market valuation in a matter of a few short weeks."  Nevin stated that this was a "glaringly obvious red flag" that was "missed or ignored" by Conduent's Chairman.

196.    On May 8, 2019, Conduent suddenly announced that Vemuri was stepping down as CEO and a member of the Board of Directors, with no successor in place.

197.    On May 22, 2019, Conduent announced that a new executive hire, Scott Doering, was taking over the Company's tolling business.

## VII.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

198.    At all relevant times, the market for Conduent common stock was an efficient market for the following reasons, among others:  (1) the securities were listed and actively traded

on the NYSE, a highly efficient markets; (2) as an issuer of securities, Conduent filed periodic public reports on Form 10-K and 10-Q with the SEC; (3) Conduent regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace.

199.    As a result, the market for the securities promptly digested current info regarding Conduent from all publicly available sources and reflected such information in Conduent's stock price.

200.    Under these circumstances, all purchasers of Conduent common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

201.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## VIII.  LOSS CAUSATION/ECONOMIC LOSS

202.    During the Class Period, as detailed herein, Conduent common stock was artificially inflated due to Defendants' misleading public statements and omissions.  When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Conduent's common stock fell as the prior artificial inflation came out.

203.    As a result of their purchases of Conduent common stock during the Class Period, Lead Plaintiff and other Class members suffered economic loss, i.e., damages under the federal securities laws.

204. The decline in the price of Conduent's common stock after the corrective disclosure on November 7, 2018 was a direct result of Defendants' misrepresentations and omissions being revealed to investors and the market.

205. The decline in the price of Conduent's common stock was also the result of the materialization of concealed investment risks concerning Conduent.

206. The corrective disclosure on November 7, 2018 revealed that Conduent fell short of expectations for revenue in 3Q18 and was revising its previously stated revenue guidance for FY2018 because the Company suffered from sub-optimal performance by its third-party vendor and its own its sub-standard IT infrastructure. These issues impacted Conduent's ability to grow its business and deliver its services to clients. Consequently, those clients had been withholding payment or assessing financial penalties against the Company for non-performance.

207. After the November 7, 2018 disclosures, Conduent's common stock price fell $5.60 per share, or more than 29% to close at $13.62 per share.

208. The November 7, 2018 disclosures caused the concealed investment risk about Conduent to materialize.

209. The timing and the magnitude of the price decline in Conduent securities on November 7, 2018 negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' misstatements. The economic loss, i.e. damages suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of Conduent common shares when the truth about Defendants' misrepresentations was revealed.

## IX.    CLASS ACTION ALLEGATIONS

210.    This is a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class of all persons who purchased Conduent common stock on the open market on a U.S. stock exchange during the Class Period and were damaged thereby.

211.    Excluded from the Class are (1) Conduent, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (2) Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

212.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Conduent common stock traded on the NYSE under the ticker symbol "CNDT."   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of Class members located throughout the United States.   Record owners and other members of the Class may be identified from records maintained by Conduent or its transfer agents and may be notified of this action by mail or other appropriate means, using a form of notice similar to that customarily used in securities class actions.

213.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual member of the Class.   The questions of law and fact common to the Class include: (1) whether Defendants violated the Exchange Act; (2) whether Defendants issued false or misleading statements; and (3) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

214.     Lead Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as complained of herein.

215.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class and securities litigation.  Lead Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of other Class members.

216.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually redress the wrongs done to them.

217.     There will be no difficulty in management of this action as a class action.

## COUNT I

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

218.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

219.     During the Class Period, Defendants carried out a plan, scheme or course of conduct which intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other Class members to purchase Conduent common stock at artificially inflated prices.

220.     In furtherance of this unlawful plan, scheme or course of conduct Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Conduent common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

221.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or participation in the making of, untrue statements of material facts or omitting to state material facts necessary in order to make the statements about Conduent and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

222.     Each of the Individual Defendants' primary liability, and control person liability, arises from the following facts: (i) the Individual Defendants were high-level executives or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities as a senior officer or director of the Company, were privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) the Individual Defendants were advised of, and had access to, other members of the Company's management team and internal financial information about Conduent; and (iv) the Individual

51

Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

223.   Defendants had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with Conduent's business from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by the allegations above, Defendants, if they did not have actual knowledge of the misrepresentations or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

224.   As a result of the dissemination of the materially false or misleading information or failure to disclose material facts, as set forth above, the market price of Conduent's common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and other members of the Class acquired Conduent common stock at artificially high prices and were damaged thereby.

225.   At the time of Defendants' misrepresentations or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other members of the Class and the marketplace known the truth regarding

Conduent, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased Conduent common shares, or, would not have done so at the artificially inflated prices which they paid.

226.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Conduent common stock during the Class Period.

227.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS**

228.    Lead Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

229.    The Individual Defendants acted as controlling persons of Conduent within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to, and did, directly or indirectly, influence or control the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be false and misleading prior to or shortly after these statements were issued

53

and had the ability to prevent the issuance of these statements or cause the statements to be corrected.

230.    Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein, and exercised the same.

231.    As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

232.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of securities during the Class Period.

233.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding damages in favor of Lead Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.


Dated: September 13, 2019

**LAW OFFICES OF JAN MEYER
& ASSOCIATES, P.C.**

/s/ Richard Elem
Richard Elem, Esq.
1029 Teaneck Road, Second Floor
Teaneck, New Jersey 07666
Telephone: (201)-862-9500
Email: relem@janmeyerlaw.com

*Liaison Counsel for Lead Plaintiff and the
Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Michael S. Bigin
Peter J. Harrington
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  bernstein@bernlieb.com
        bigin@bernlieb.com
        pharrington@bernlieb.com

**THORNTON LAW FIRM LLP**
Guillaume Buell
1 Lincoln Street
Boston, MA 02111
Telephone:  (617) 531-3933
Email: gbuell@tenlaw.com

*Co-Lead Counsel for Lead Plaintiff and the
Proposed Class*

**WOLF POPPER LLP**
Robert C. Finkel
Joshua W. Ruthizer
845 Third Avenue
New York, NY 10022
Telephone:  (212) 759-4600
Email:  rfinkel@wolfpopper.com

*Additional Counsel for Lead Plaintiff and the*
*Proposed Class*

**CERTIFICATE OF SERVICE**

I, Richard Elem, hereby certify that on September 13, 2019, a true and correct copy of the annexed AMENDED CLASS ACTION COMPLAINT was served in accordance with the Federal Rules of Civil Procedure with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all parties with an email address of record who have appeared and consented to electronic service in this action.

Dated:   September 13, 2019                    /s/Richard Elem
                                               Richard Elem