**KING & SPALDING LLP**
Israel Dahan
1185 Avenue of the Americas, 36th Floor
New York, NY 10036-2601
Telephone: (212) 556-2100
Fax: (212) 556-2222
idahan@kslaw.com

*Counsel for Defendants*

[*Additional counsel appear on signature page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CONDUENT INC., ASHOK VEMURI, and BRIAN WEBB-WALSH, <br><br> Defendants. | Case No. 2:19-cv-08237-SDW-SCM <br><br> Motion Day: December 16, 2019 |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...............................................................................................1

II.  SUMMARY OF ALLEGATIONS...................................................................3

    A.   Conduent's Business Background ...........................................................3

    B.   Conduent's Annual 2018 Guidance........................................................6

    C.   Plaintiff's Lawsuit.................................................................................8

III. LEGAL STANDARDS.....................................................................................9

    A.   Heightened Pleading Standards.............................................................10

    B.   Standard for Safe Harbor ......................................................................11

IV.  ARGUMENT....................................................................................................12

    A.   The PSLRA Safe Harbor Precludes Liability for All Challenged
        Statements. ............................................................................................12

        1.   The Forward-Looking Statements Were Identified as Such
            and Accompanied by Meaningful Cautionary Language. ...................14

        2.   Defendant's Forward-Looking Statements are Immaterial. ................17

        3.   Plaintiff Fails to Plead Defendants Had Actual Knowledge
            That Any Forward-Looking Statement Was False When
            Made. ..................................................................................................18

    B.   Plaintiff Fails to Plead Falsity with Particularity. ...............................18

        1.   Many Challenged Statements are Immaterial as a Matter of
            Law. ....................................................................................................19

        2.   Plaintiff Fails to Plead Particularized Facts Demonstrating
            Any Statement Was False or Misleading *When Made*. .....................21

            a.   Plaintiff's Inventory Theory.....................................................22

            b.   Plaintiff's Core Business Theory ..............................................26

    C.   Plaintiff Fails to Allege Facts Raising a Strong Inference of
        Scienter. ...............................................................................................29

        1.   Plaintiff Fails to Raise a Strong Inference of Actual
            Knowledge or Severe Recklessness. ..................................................30

        2.   Far More Compelling Inferences of Non-Fraudulent Intent
            Exist. ..................................................................................................35

    D.   Plaintiff Fails to Plead Loss Causation. ...............................................37

V.   CONCLUSION ................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999) ........................................................................18, 29

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010) ........................................................................*passim*

*In re Anadigics, Inc., Sec. Litig.*,
    No. 08-5572 MLC, 2011 WL 4594845 (D.N.J. Sept. 30, 2011),
    *aff'd*, 484 F. App'x 742 (3d Cir. 2012)..............................................................13

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990)..................................................................................24

*Barilli v. Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019) ...............................................................20

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ...............................................................17, 18, 34

*Calif. Pub. Emp. Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) .........................................................................30, 32

*Christian v. BT Grp. PLC*,
    No. 2:17-cv-497-KM-JBC, 2018 WL 3647213 (D.N.J. Aug. 1,
    2018) ....................................................................................................................34

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,
    908 F.3d 872 (3d Cir. 2018) .........................................................................26, 29

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) ..........................................................3, 10, 20, 21

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    442 F. App'x 672 (3d Cir. 2011) ...........................................................31, 33, 34

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...........................................................................10, 11, 38

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ..................................................................28

*In re Exxon Mobil Corp. Sec. Litig.*,
   387 F. Supp. 2d 407 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir.
   2007), *as amended* (Nov. 20, 2007) ......................................................32

*Fain v. USA Techs., Inc.*,
   707 F. App'x 91 (3d Cir. 2017) ..............................................................37

*Glover v. DeLuca*,
   No. 2:03-CV-0288, 2006 WL 2850448 (W.D. Pa. Sept. 26, 2006) ...................39

*In re Hertz Glob. Hldgs. Inc.*,
   905 F.3d 106 (3d Cir. 2018) ..................................................................11

*In re Hertz Global Holdings Inc. Sec. Litig.*,
   No. 13-7050, 2015 WL 4469143 (D.N.J. July 22, 2015).................12, 13, 21, 32

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
   No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) .................................19

*Hoey v. Insmed Inc.*,
   No. CV 16-4323 (FLW), 2018 WL 902266 (D.N.J. Feb. 15, 2018)............21, 35

*Hutton v. McDaniel*,
   264 F. Supp. 3d 996 (D. Ariz. 2017) .......................................................20

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) .................................................38, 39

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ............................................................*passim*

*In re Interpool, Inc. Sec. Litig.*,
   No. 04-321 (SRC), 2005 WL 2000237 (D.N.J. Aug. 17, 2005) .......................35

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
   432 F. Supp. 2d 571 (E.D. Va. 2006) ......................................................27

*In re Lincoln Educ. Servs. Corp. Sec. Litig.*,
   No. 10–460, 2011 WL 3912832 (D.N.J. Sept. 6, 2011)...................................16

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  No. 16-112-GMS, 2017 WL 3891676 (D. Del. Sept. 6, 2017) ..........................22

*Martin v. GNC Holdings, Inc.*,
  No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
  *aff'd*, 2018 WL 6505927 (3d Cir. Dec. 11, 2018) ...................................12, 14, 31

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) ................................................................15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .............................................................30

*MTB Inv. Partners, LP v. Siemens Hearing Instruments, Inc.*,
  No. 12-cv-00340 (SDW) (MCA), 2013 WL 12149253 (D.N.J. Feb.
  19, 2013) ..........................................................................................34

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002) ...............................................................3

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010)...................................13, 32, 38, 39

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
  No. 15-cv-02938-HSG, 2018 WL 3126393 (N.D. Cal. June 26,
  2018) ................................................................................................13

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) ...........................................................22, 31

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)......................................................................21

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ..................................................................17

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ..............................................................33

*In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002) ...............................................................26

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  No. 1:12-cv-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015)...............19, 20

*Sec. Police & Fire Prof'ls of Am. Ret. Fund v. Pfizer, Inc.*,
  No. 10-cv-3105 (SDW) (MCA), 2013 WL 1750010 (D.N.J. Apr.
  22, 2013), *aff'd*, 754 F.3d 159 (3d Cir. 2014) ..................................................23

*In re Synchronoss Sec. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010)....................................................................37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................*passim*

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ..............................................................................33

**Statutes**

15 U.S.C. § 78u-4.........................................................................1, 10, 19, 21, 29

15 U.S.C. § 78u-5.............................................................................11, 12, 14, 18

Fed. R. Civ. P. 9(b) .........................................................................................19

## I.    INTRODUCTION

On February 21, 2018, Conduent Incorporated ("Conduent" or the "Company") issued annual financial projections forecasting its performance for the 2018 fiscal year. The Company, having just completed its first year as an independent publicly-traded company following its spinoff from Xerox Corporation, was still finding its footing in forecasting its future results to the market. Indeed, over the first two quarters of 2018, the Company lowered its originally-projected February guidance twice as it executed certain strategic actions, including divestitures. Then, following the third quarter, the Company revised its forward-looking annual financial guidance downward a third time, and the Company's stock price dropped.

As often occurs following such a stock price drop, a putative securities class action lawsuit was filed. Plaintiff's operative Amended Complaint (Dkt. 18) alleges Defendants knowingly issued false and misleading annual financial guidance for 2018 and otherwise misrepresented the Company's financial prospects. The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.*, ("PSLRA") was enacted to curb reflexive stock drop suits like this one by providing a "safe harbor" for forward-looking statements regarding financial guidance and imposing stringent pleading standards exceeding those of Federal Rule of Civil Procedure 9(b). For the following reasons, the PSLRA requires dismissal of Plaintiff's claims.

*First*, all of the statements Plaintiff challenges are forward-looking and protected by the PSLRA safe harbor. The PSLRA safe harbor protects forward-looking statements if: (1) they are identified as such and accompanied by meaningful cautionary language; (2) they are immaterial; or (3) Plaintiff fails to plead facts giving rise to a strong inference that Defendants actually knew the statements were false when made. The rationale is simple—estimating future financial results is inherently an exercise in speculation. If such forward-looking statements were not absolutely protected by the safe harbor, companies would decline to provide such guidance, eliminating otherwise useful insights into projected future business. Because all three prongs of the safe harbor apply to the challenged statements, Plaintiff's claims should be dismissed.

*Second*, Plaintiff fails to adequately allege that any challenged statements were materially false or misleading *when made*. Not only are many of the statements not actionable as a matter of law because they are puffery or honestly-held opinions, but Plaintiff fails to provide any particularized facts as required under the PSLRA demonstrating that the challenged statements were false or misleading when made.

*Third*, the Amended Complaint does not raise the required "strong inference" that the Individual Defendants made any challenged statement with scienter—the required state of mind of intent to deceive or severe recklessness. There are no

allegations connecting any of the Individual Defendants to knowledge of, much less participation in, the alleged fraud.

*Finally*, Plaintiff fails to adequately plead "loss causation," that the economic losses it claims were proximately caused by the fraud alleged in the Amended Complaint.  For each of these independently sufficient reasons, the Amended Complaint fails to state a claim for relief and must be dismissed.

## II.   SUMMARY OF ALLEGATIONS

### A.   Conduent's Business Background

On December 31, 2016, Conduent spun off from Xerox Corporation, forming an independent company providing business services with expertise in transaction-intensive processing, analytics, and automation.  AC ¶¶ 34, 39–41; 2017 Form 10-K (Ex. 1) at 1.[1]  During the putative Class Period, Ashok Vemuri served as Chief Executive Officer, and Brian Webb-Walsh served as Chief Financial Officer.  AC ¶¶ 35–36.

Following the spinoff, Conduent discussed a number of transformative goals for the newly-independent company.  Among those goals, a key priority for the

---

[1] In ruling on a motion to dismiss, the Court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  This includes SEC filings. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 159 n.3 (3d Cir. 2014); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may take judicial notice of SEC filings, whether or not referenced in complaint).

Company was its Strategic Transformation initiative.  AC ¶ 68; Feb. 22, 2017 Earnings Call (Ex. 2) at 5–6.  During the Company's first earnings call as an independent company, Mr. Vemuri noted the initiative was designed to "deliver a cumulative $700 million in savings."  Ex. 2 at 5.  The initiative focused on a multitude of cost-savings factors, including:  general and administrative expenses focused on "finance, marketing, legal, human resources"; savings in "procurement" including "a very large facility footprint we're trying to shrink"; "trying to work stand up procurement organization and drive savings with our vendors"; and for IT, "it's about consolidating data centers, it's about limiting the number of servers we have, it's about bringing some things in house that we currently outsource[.]" *Id.* at 15; *see* Ex. 1 at 2 ("We continue to execute on our strategic transformation program to deliver cost savings through infrastructure optimization, labor productivity and automation initiatives, restructuring of unprofitable contracts and other efficiencies.").

As the Company reported to investors before, during, and after the putative Class Period, it regularly achieved and exceeded the cost-savings goals of the Strategic Transformation.[2]  Despite lowering its annual financial guidance following

---

[2] *See, e.g.*, AC ¶¶ 68–87; Feb. 21, 2018 Form 8-K (Ex. 3) at Slide 4 ("Strategic Transformation" was "on track" for "~$700M" in cumulative gross savings in 2018); Feb. 20, 2019 Form 8-K (Ex. 4) at 4 (discussing "Successful Execution of Plan" including "~730M" in three-year cumulative savings).

Q1 and during Q2 of 2018, the Company consistently reported after each quarter that it was on track to meet or exceed the projected cost savings.[3]  Even when the Company lowered its annual financial guidance following Q3 of 2018, Mr. Vemuri observed, "We remain on track to deliver on our cumulative cost savings target of $700 million by the end of this year through our strategic transformation initiative." Nov. 7, 2018 Earnings Call (Ex. 9) at 6; Nov. 7, 2018 Form 8-K (Ex. 10) at 5 ("Key Quarterly Highlights" included: "Well positioned to achieve $700 million transformation initiative.").

Concurrently with its focus on cost savings, Conduent actively invested in improvements to its infrastructure and technology following the spinoff.  As the Company turned from 2017 to 2018, for example, Mr. Vemuri observed that the Company's focus on its "cost structure" in 2017 would "enable investments to modernize technology, improve our workplace, and strengthen our positioning as a digital interactions company."  Ex. 3 at 5.  Throughout the putative Class Period,

---

[3] *See* May 9, 2018 Earnings Call (Ex. 5) at 5 (regarding "strategic transformation initiative," Company was "on track to deliver on our cumulative cost savings target of $700 million by the end of this year"); May 9, 2018 Form 8-K (Ex. 6) at Slide 4 ("Remain on-target for cumulative 2018 transformation goal of ~$700M.") Aug. 8, 2018 Earnings Call (Ex. 7) at 5 ("We remain on track to deliver on our cumulative cost savings target of $700 million by the end of this year through our strategic transformation initiative."); Aug. 8, 2018 Form 8-K (Ex. 8) at Slide 4 ("Strategic Transformation" was "on-target for cumulative 2018 transformation goal of ~$700M").

moreover, the Company discussed its continued efforts to invest in infrastructure and technology, including with an "almost $200 million multiyear investment program."[4]  Feb. 21, 2018 Earnings Call (Ex. 11) at 6.  In June 2018, for instance, the Company stated it would "continue to focus on rebuilding the infrastructure on which we run our software and platforms, making them modern, flexible, seamless and intuitive."  Ex. 12 at 10.

**B.     Conduent's Annual 2018 Guidance**

At the start of the putative Class Period, on February 21, 2018, the Company released Q4 2017 financial results and issued forward-looking financial guidance for fiscal year 2018.  AC ¶ 147; Ex. 3 at 2-4, 8-9.  The Company issued annual guidance, not quarterly guidance, and informed investors that its 2018 full-year guidance was issued "in-line with long-term goals."  Ex. 3 at 4.  The Company stated, for instance, that it expected capital expenditures of "2.5% - 3.0% of Revenue in FY 2018."  *Id.* at Slide 23.  As Mr. Vemuri explained, in 2017 the Company "focused around our

---

[4] *See, e.g.*, Ex. 11 at 15 (Mr. Webb-Walsh: "We have investments that are going to ramp in our technology platform investment.  Ashok mentioned the $200 million 3-year program, part of that is CapEx, part of that is OpEx so that will take a lot of our investment."); Ex. 5 at 10 ("As I have mentioned previously, we are aggressively modernizing our technology platforms with almost $200 million of new investment that will incorporate new technologies . . . ."); June 8, 2018 Analyst Tr. (Ex. 12) at 10 ("The most significant achievement we have made since our spin-off has been the almost $200 million we have pledged for platform modernization over the next 3 years."); Ex. 9 at 14 ("We're continuing to spend the $200 million on our infrastructure as well as on our IT applications, and we will continue to do that.").

core business and aggressively addressed our cost structure," which would "enable investments to modernize technology, improve our workplace, and strengthen our positioning as a digital interactions company." *Id.* at 5.

The Company revisited its annual guidance throughout 2018 as it executed strategic initiatives. In its May 9, 2018 first quarter earnings release, for example, the Company lowered annual guidance as a result of strategic divestitures. AC ¶ 152; Ex. 6 at 7. The Company lowered guidance a second time at a June 2018 investor conference in light of further strategic divestitures. AC ¶ 157. The Company reaffirmed the June 2018 guidance in its August 8, 2018 earnings release. AC ¶¶ 104, 161; Ex. 8 at 7.

In its November 7, 2018 earnings release, the Company lowered 2018 annual guidance a third time. As the Company explained, a number of factors coalesced and accelerated in the third quarter, resulting in a lower annual outlook. For example, the Company experienced "lower sales activity" as a result of its "pivot to digital" which, while "disruptive to [the Company's] performance in the short term," was "essential to creating long-term value." Ex. 9 at 5–6. In addition, Mr. Vemuri further acknowledged an "impact from the timing and slippage of deal signings into latter quarters due to rapidly changing investment cycles as our clients focus on increased technology-based processes." *Id.* at 6.

Mr. Vemuri also observed an impact from the Company's IT initiatives and infrastructure. As Mr. Vemuri explained, the Company had its "first planned data center migration in Q3," which uncovered issues that caused "significant disruption to our client delivery and operations and resulted in penalties to Conduent." *Id*. In addition, the Company's "outdated and historically underinvested legacy IT infrastructure . . . caused major disruptions to our operations and impacted client and delivery performance." *Id*. In addition to "continuing to spend the $200 million on our infrastructure as well as on our IT applications," *id*. at 14, Mr. Vemuri noted the Company would pursue "new investments in [its] data centers and networks," and as a result the Company also "increased CapEx outlook for the year" above the level it had previously planned. *See* Ex. 9 at 6; *see also* Ex. 10 at Slide 12 ("Capex of ~4.6% of revenue in Q3 2018. Expected to be ~3.75% of Revenue in FY 2018.").

As Mr. Vemuri explained to investors, "[i]n the short term, lowering guidance is disappointing." Ex. 9 at 8. But the Company was "in transition and transformation, which sometimes results in bumps in the road in the short term." *Id*. Following the release, the Company's stock price declined. AC ¶ 176.

## C.    Plaintiff's Lawsuit

Predictably, this putative securities class action suit followed the drop in the Company's stock price. Dkt. 1. Lead Plaintiff's operative Amended Complaint seeks recompense for the drop, alleging violations of Sections 10(b) and 20(a) of the

-8-

Securities Exchange Act of 1934. Dkt. 18. Plaintiff claims that certain of the Company's public statements issued during the putative Class Period of February 21, 2018 to November 6, 2018 were materially false and misleading. Dkt. 18.

Plaintiff challenges four categories of statements. *See* Chart of Statements Challenged in the Amended Class Action Complaint (Ex. 13). First, Plaintiff challenges statements concerning the Company's annual 2018 financial guidance (the "Guidance Statements). AC ¶¶ 147, 152, 153, 157, 158, 161, 163. Second, Plaintiff challenges statements concerning forecasted growth in the Company's Public Sector and Transportation business segments (the "Forecast Statements"). AC ¶¶ 150, 154. Third, Plaintiff challenges statements concerning progress with certain Company initiatives, including the Strategic Transformation and infrastructure investments (the "Progress Statements"). AC ¶¶ 148, 149, 155, 159. Finally, Plaintiff challenges statements made during the August 8, 2018 second-quarter earnings call regarding progress toward remediation of issues with a specific tolling contract (the "Tolling Statements"). AC ¶¶ 162, 163.

## III.   LEGAL STANDARDS

A claim under Section 10(b) and Rule 10b-5 has six elements: (1) a material misrepresentation or omission of material fact; (2) scienter; (3) a connection with

the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).[5]

## A.     Heightened Pleading Standards

"Because this is a securities fraud case," Plaintiff faces stringent heightened pleading standards. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252–53 (3d Cir. 2009). The PSLRA, enacted "[a]s a check against abusive litigation by private parties," imposes "[e]xacting pleading requirements" in addition to Rule 9(b) that a Section 10(b) claim must satisfy in order to avoid dismissal." *Tellabs*, 551 U.S. at 313.

First, the PSLRA requires that Plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the PSLRA requires that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u-4(b)(2)(A). The required state of mind is scienter, defined to mean conscious behavior or "an extreme departure from the standards of ordinary care[.]"

---

[5] Because Plaintiff fails to sufficiently plead a predicate Section 10(b) violation, its control person claims under Section 20(a) necessarily fail. *See City of Edinburgh*, 754 F.3d at 177.

*Avaya*, 564 F.3d at 267 & n.42.  A "strong inference" of scienter is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Accordingly, the Court must weigh all competing facts and inferences, including those unfavorable to Plaintiff because they suggest nonculpable explanations for Defendants' conduct.  *See In re Hertz Glob. Hldgs. Inc.*, 905 F.3d 106, 114–15 (3d Cir. 2018).  "Omissions and ambiguities count against inferring scienter."  *Avaya*, 564 F.3d at 268 (quotation marks and citation omitted).  Finally, the PSLRA requires the complaint to plead an actual economic loss suffered by the plaintiff that was proximately caused by Defendants' allegedly false or misleading statements, instead of other non-fraud factors that affect a stock's price.  *See Dura*, 544 U.S. at 344–45.

**B.      Standard for Safe Harbor**

The PSLRA provides a "safe harbor" that limits Plaintiff's ability to challenge forward-looking statements.  *See* 15 U.S.C. § 78u-5.  Under the safe harbor, claims based on forward-looking statements are barred if the statement is: (i) identified as forward-looking and accompanied by meaningful cautionary language; (ii) immaterial; *or* (iii) not made with actual knowledge of its falsity.  15 U.S.C. § 78u-5(c)(1).  "The three prongs of the safe harbor are disjunctive," such that a forward-looking statement is protected if it satisfies any one of the three separate

prongs. *See In re Hertz Global Holdings Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143, at *14 (D.N.J. July 22, 2015). The PSLRA specifically provides that the safe harbor is to be considered at the motion-to-dismiss stage. 15 U.S.C. § 78u-5(e).

## IV.   ARGUMENT

### A.   The PSLRA Safe Harbor Precludes Liability for All Challenged Statements.

Plaintiff challenges a scattered mass of statements in the Amended Complaint. Each statement, however, is protected under the PSLRA's statutory safe harbor for forward-looking statements. *See* Chart of Forward-Looking Statements Challenged in the Amended Class Action Complaint (Ex. 14). The Court should dismiss Plaintiff's claims as to all of the challenged statements on the basis of the safe harbor alone.

First, all of the challenged statements are forward looking. *See* 15 U.S.C. § 78u-5(i)(1). The PSLRA defines forward-looking statements to include, among other things, "projections of future financial and economic performance, plans and objectives for future operations and assumptions underlying statements about future financial, economic or operational performance." *Martin v. GNC Holdings, Inc.*, No. 2:15-cv-01522, 2017 WL 3974002, at *8 (W.D. Pa. Sept. 8, 2017), *aff'd*, 2018 WL 6505927 (3d Cir. Dec. 11, 2018) (citing 15 U.S.C. § 78u-5(i)(1)). The Guidance Statements, which set forth the Company's financial guidance projections for 2018, are "plainly" forward looking within this statutory definition. *See Hertz*, 2015 WL

-12-

4469143, at *11 ("[P]rojections of financial results . . . plainly are forward-looking statements under the PSLRA."). Similarly, the Forecast Statements are forward-looking because they concern forecasted economic performance in certain business lines. *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp Inc.*, 720 F. Supp. 2d 517, 533 (D.N.J. 2010) (quoting *Avaya*, 564 F.3d at 255) ("[T]he Safe Harbor extends . . . to statements . . . 'of future economic performance' . . . [and] 'any statement of the assumptions underlying or relating to' such statements."). The Progress Statements are all forward looking because they express Defendants' views regarding progress with the Strategic Transformation and the Company's infrastructure. *See In re Anadigics, Inc., Sec. Litig.*, No. 08-5572 MLC, 2011 WL 4594845, at *23 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012) ("[T]he reference to plans to increase capacity continuing to progress forward is a forward-looking statement."). Finally, the Tolling Statements are forward looking because they concern progress toward remediation of operational issues. *See, e.g.*, *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, No. 15-cv-02938-HSG, 2018 WL 3126393, at *3 (N.D. Cal. June 26, 2018) (statements that company was making "strong and steady progress," that it was "in good shape to bring full production online" and "on track to reach full nameplate capacity" were forward-looking).[6]

---

[6] To the extent Plaintiff argues that any challenged forward-looking statement is a "mixed" statement, *i.e.* containing both forward-looking and present-tense components, the safe harbor still applies. This is because any arguably present-tense

-13-

### 1.    The Forward-Looking Statements Were Identified as Such and Accompanied by Meaningful Cautionary Language.

Each of the challenged forward-looking statements included language sufficiently identifying the statements as forward-looking statements subject to the PSLRA safe harbor.  *See* Ex. 14; *Avaya*, 564 F.3d at 256 n. 22 (observing that each source document noted "forward-looking statements were contained therein").[7]

The challenged forward-looking statements were also accompanied by meaningful cautionary language.  The challenged statements here warned, for example, that they "reflect Management's current beliefs, assumptions and expectations and are subject to a number of factors that may cause actual results to differ materially."  *See* Ex. 14; *Avaya*, 564 F.3d at 257 ("These documents explicitly

---

portions of the statement "[cannot] 'meaningfully be distinguished from the future projection of which they are a part.'" *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 280 (3d Cir. 2010) (quoting *Avaya*, 564 F.3d at 255); *Martin*, 2017 WL 3974002, at *9 ("[A]lthough [the speaker] referenced 'right now,' it is apparent he did so in order to make a future projection."). Moreover, the Amended Complaint makes clear that it challenges only the forward-looking aspects of any such statements. *E.g.*, AC ¶ 164 (alleging Tolling Statements were false or misleading because "Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients"); ("Defendants' forecasts were false or misleading because Conduent's IT infrastructure could not support the Company's core business."). *Id.* Regardless, to the extent Plaintiff challenges any present statement as false or misleading, it has not pled falsity with particularity, as described *infra* Part IV.B.

[7] The oral forward-looking statements are protected because they were accompanied by disclosure that the statements are forward-looking and actual results might differ materially from those projected, and identified a document containing additional information concerning risk factors. *See* 15 U.S.C. § 78u-5(c)(2); Ex. 14.

warned that [defendant's] forward looking-statements '*may turn out to be wrong*' because '[t]hey can be affected by inaccurate assumptions we might make or by known or unknown risk and uncertainties.'").

The statements also incorporated by reference risk factors listed in Conduent's quarterly and annual reports on file with the SEC, which warned investors of specific risks and uncertainties which could cause actual results to differ materially, including risks associated with financial results, third-party providers, and contractual obligations.[8] *See* Ex. 14. Conduent warned, for example:

- "We rely to a significant extent on third-party providers, such as subcontractors, a relatively small number of primary software vendors, utility providers and network providers," and "if they cannot deliver or perform as expected . . . our results of operations and financial condition could be materially adversely affected." Ex. 1 at 12;

- "[O]ur success depends to a significant extent upon our ability to attract, retain and motivate highly skilled and qualified technical personnel and to subcontract with qualified, competent subcontractors." *Id.* at 19;

- "Failure to deliver on our contractual obligations properly and on time could materially adversely affect our results of operations and financial condition." *Id.* at 12;

- "[W]e incur significant expenditures for the development and construction of system software platforms needed to support our clients' needs," and "failure to fully understand client requirements or implement the appropriate operating systems or databases or solutions which enable the use of other supporting

---

[8] "Cautionary statements disclosed in SEC filings may be incorporated by reference[.]" *Aetna*, 617 F.3d at 282 (quoting *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005)).

software may delay the project and result in cost overruns or potential impairment of the related software platforms." *Id.*;

- "[M]any of our contracts . . . have complicated performance obligations . . . [and] carry potential financial penalties or could result in financial damages or exposures if we fail to properly perform those obligations and could result in our results of operations and financial condition being materially adversely affected." *Id.* at 17;

- "If we are unable to meet our contractual requirements, we might experience delays in collection of and/or be unable to collect our client balances, and if this occurs, our results of operations and cash flows could be adversely affected." *Id.* at 18.

*See also* Ex. 14.[9]  These risk disclosures, which were extensive and specific, meaningfully informed investors of the kinds of risks that could impact Conduent's business.  Because Conduent's risk disclosures were "substantive, extensive and tailored to the future-looking statements they reference," the forward-looking statements fall squarely within the protection of the PSLRA's safe-harbor provision, and the claims based upon those statements must be dismissed.  *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010); *Avaya*, 564 F.3d at 256–57.

---

[9] Several oral forward-looking statements were further "tempered . . . with cautionary language" in statements made contemporaneously by Defendants. *See In re Lincoln Educ. Servs. Corp. Sec. Litig.*, No. 10–460, 2011 WL 3912832, at *6–*7 (D.N.J. Sept. 6, 2011) (statement during earnings call, "[w]e do think it will have some short term impact on start growth," was "cautionary language"); *e.g.*, Ex. 12 at 45 (discussing hurdles to winning new business, noting "we sort of have to address that win rate in light of the fact that we're still coming up to speed on some of these capabilities").

### 2.     Defendant's Forward-Looking Statements are Immaterial.

Not only are the challenged statements protected under the safe harbor's first prong, but many of the statements are also protected under the second prong because they are immaterial as a matter of law.  As described *infra* Part IV.B.1, many of the challenged forward-looking statements are immaterial puffery or opinions. Moreover, many of the challenged forward-looking statements are projections of future performance, and "[c]laims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) (Alito, J.); *see Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.") (citations omitted).  Because no reasonable investor would rely upon these sorts of statements as guarantees regarding future performance, they are immaterial as a matter of law and protected

-17-

under the safe harbor.  *See Burlington*, 114 F.3d at 1427–28 (rejecting as immaterial a "general, non-specific statement of optimism or hope that a trend will continue").[10]

### 3. Plaintiff Fails to Plead Defendants Had Actual Knowledge That Any Forward-Looking Statement Was False When Made.

Because the challenged forward-looking statements are protected under the first and second prongs of the safe harbor, the Court need not examine the allegations about Defendants' state of mind; the statements are absolutely shielded from liability.  Nonetheless, as shown below (*see infra* at Part IV.C), Plaintiff does not allege any particularized facts raising the required "strong inference" that Defendants had *actual knowledge* that the challenged forward-looking statements were false when made.  Thus, the statements are also protected under the safe harbor's third prong.  *See* 15 U.S.C. § 78u-5(c)(1)(B).

### B. Plaintiff Fails to Plead Falsity with Particularity.

Because all of the challenged statements are protected under the safe harbor, the Court need not proceed further; it may dismiss the Amended Complaint on the basis of the safe harbor alone.  But Plaintiff's claims also fail because it has not

---

[10] Even if this Court were to decline to treat any one of the forward-looking statements as forward-looking, each of these statements is nonetheless immaterial as a matter of law.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538-39 (3d Cir. 1999) (statements expressing "confidence in [defendant's] prospects for future growth" were "non-actionable expressions of optimism for the future"), *abrogated on other grounds by Tellabs*, 551 U.S. 308; *Burlington*, 114 F.3d at 1427 (statement that defendant "believe[d] [it could] continue to grow net earnings at a faster rate than sales" was not actionable); *see also infra* Part IV.B.1.

alleged with sufficient particularity facts showing that the challenged statements were materially false or misleading when made, as required by the PSLRA. *See* 15 U.S.C. § 78u-4(b)(1); *see also* FED. R. CIV. P. 9(b).

**1.      Many Challenged Statements are Immaterial as a Matter of Law.**

Several of the challenged statements constitute immaterial "puffery" or opinions, neither of which are actionable under the federal securities laws. *See Aetna*, 617 F.3d at 283; Ex. 13. "Puffery" includes "general statements of optimism" upon which no reasonable investor would rely. *See Aetna*, 617 F.3d at 283 (internal quotations omitted).  For example, Plaintiff challenges statements concerning "cutting-edge technology," the Strategic Transformation "progressing well," the Company "making good progress," and the Company's "strong performance track record." *See* AC ¶¶ 149, 155, 162; *see also* AC ¶¶ 148, 150, 154, 158, 159; Ex. 13. These are exactly the kind of vague and optimistic statements rightly dismissed as corporate puffery because reasonable investors would not rely on them in making investment decisions. *See Aetna*, 617 F.3d at 284 (statements regarding "solid and balanced growth that is representative of [Company's] dedication to disciplined pricing" was "immaterial as a matter of law"); *In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) ("[S]tatements about 'strong' and 'record' financial results, as well as the generally optimistic statements, constitute puffery."); *Se. Penn. Transp. Auth. v. Orrstown Fin. Servs.,*

*Inc.*, No. 1:12-cv-00993, 2015 WL 3833849, at *30 (M.D. Pa. June 22, 2015) (statement regarding "proven track record" constitutes immaterial puffery); *see also Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 252–53 (S.D.N.Y. 2019) (statements concerning company's "proven track record" constitute puffery "in that they are vague statements that no reasonable investor would rely upon"); *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1020 (D. Ariz. 2017) ("Numerous courts have held that terms like 'state-of-the-art,' 'advanced capabilities,' 'competitive strengths,' and 'differentiation' are mere puffery.").

Furthermore, many of the challenged statements are non-actionable statements of opinion. For example, statements such as "[r]eal estate and IT consolidation . . . are progressing well," AC ¶ 155, and "[w]e are an industry leader . . . with a strong performance track record," AC ¶ 162, are statements of management's opinions. *See also* AC ¶¶ 148, 149, 150, 154, 158, 159, 163; Ex. 13. "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh*, 754 F.3d at 170. Plaintiff has not alleged that the opinions were not sincerely held at the time they were expressed. *See id.* Nor has it also pled that Defendants lacked a reasonable basis for these opinions because, as discussed *infra* Part IV.B.2, Plaintiff fails to plead with particularity any material omitted facts that contradict Defendants' statements of opinion. Instead, Plaintiff merely alleges that Defendants expressed opinions

-20-

which, with hindsight, may have ultimately ended up being incorrect. Such expressions of opinion are not actionable, and Plaintiff's claims relating to these challenged statements must be dismissed.[11] *See id.*

### 2. Plaintiff Fails to Plead Particularized Facts Demonstrating Any Statement Was False or Misleading *When Made*.

Plaintiff also fails to allege with particularity that any challenged statement was false or misleading *when made*. The PSLRA "obliges a plaintiff to specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d at 259; 15 U.S.C. § 78u–4(b)(1). Rather than abide by that statutory mandate, Plaintiff recites a laundry list of allegations for each challenged financial quarter, leaving the reader to search earlier sections of the Amended Complaint for detail regarding each theory of falsity

---

[11] "In the context of a claim under § 11 of the Securities Act of 1933, the Supreme Court recently determined that an opinion may be actionable: (1) as an untrue statement of material fact if the opinion is both incorrect (i.e., objectively false) and not genuinely believed; or (2) as misleading if the speaker omits material facts underlying the basis for the opinion 'if those facts conflict with what a reasonable investor would take from the statement itself.'" *Hertz*, 2015 WL 4469143, at *10 n.7 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1326, 1329 (2015)). The Third Circuit has "expressed reluctance in finding that *Omnicare*'s standard applies to § 10(b) claims." *See Hoey v. Insmed Inc.*, No. CV 16-4323 (FLW), 2018 WL 902266, at *16 n.14 (D.N.J. Feb. 15, 2018). But even if *Omnicare* applied here, Plaintiff fails to plead that Defendants omitted any material facts underlying the basis for the opinion, as discussed *infra* Part IV.B.2.

-21-

and infer why each statement is allegedly false.[12]  AC ¶¶ 151, 156, 160, 164.  At its core, however, the verbose 233-paragraph Amended Complaint boils down to a few core theories of falsity, none of which demonstrates with particularity why any challenged statement was false or misleading at the time it was made.[13]

### a.       Plaintiff's Inventory Theory

Plaintiff alleges the challenged statements were false and misleading because Atos SE ("Atos"), a company contracted to provide Conduent with third-party IT support, was unable to create a systems inventory necessary to consolidate its data centers.  *See* AC ¶ 151(i), (iii), (iv); AC ¶ 156(i)–(iii), (v), (vi); AC ¶ 160(ii), (iii), (v), (vi); AC ¶ 164(ii), (iv), (v).  In support of this theory, Plaintiff relies on allegations from "CW1," an alleged former Company employee (AC ¶¶ 138–39),

---

[12] This kind of "puzzle pleading" has been found facially insufficient under the PSLRA, and is clearly disfavored in the Third Circuit.  *See Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, No. 16-112-GMS, 2017 WL 3891676, at *3 (D. Del. Sept. 6, 2017) ("Plaintiffs have failed to craft a complaint in such a way that a reader can determine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason why each statement is false or misleading."); *see also OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491–92 (3d Cir. 2016) (verbose complaint presented "extraordinary challenge for application of . . . the PSLRA").

[13] Plaintiff's litany of romanette falsity allegations in AC ¶¶ 151, 156, 160, and 164 is largely repetitive.  In AC ¶ 151, Plaintiff asserts nine reasons why the challenged statements were false and misleading.  AC ¶ 151(i)–(ix).  Each of those nine reasons is recited again in AC ¶¶ 156, 160, and 164.  The only allegations that are added after AC ¶ 151 are:  AC ¶ 156(i)–(ii); AC ¶ 160(i)–(ii); and AC ¶ 164(i).  Together, these fourteen falsity allegations share a few core theories, as explained below.

-22-

and post-hoc statements from Mr. Vemuri in the November 7, 2018 third-quarter earnings call (AC ¶¶ 169–70).  For several reasons, this theory fails to demonstrate that any challenged statement was false or misleading when made.

*First*, Plaintiff's allegations of fraud are belied by Defendants own statements and the context in which they were made.  For instance, with respect to Mr. Vemuri's February 2018 statement, "'[d]uring our first year, we needed to inventory and rationalize our technology portfolio,'" Plaintiff claims investors were misled because that statement "represented to investors that Conduent now had a map of its IT infrastructure[.]" *See* AC ¶ 93; *see also* AC ¶¶ 11, 149.  But Plaintiff's strained interpretation of Mr. Vemuri's statement is simply not viable, particularly when the statement is considered in its proper context (which Plaintiff omits).  In the February 2018 earning call, Mr. Vemuri also stated the Company "needed to inventory and rationalize [its] technology portfolio" during its first year, had "begun [its] work to modernize [its] offerings" in 2018, and would be engaging in "an almost $200 million multiyear investment program" in support of that effort.  Ex. 11 at 6.  Mr. Vemuri's forward-looking statement belies Plaintiff's improper and incorrect attempt to cast it as a statement of completion.  *See Sec. Police & Fire Prof'ls of Am. Ret. Fund v. Pfizer, Inc.*, No. 10-cv-3105 (SDW) (MCA), 2013 WL 1750010, at *6–7 (D.N.J. Apr. 22, 2013), *aff'd*, 754 F.3d 159 (3d Cir. 2014) (defendants' "cautious" statements about test results were not false or misleading "when taken in context").

Similarly, Plaintiff claims the Company misled investors because—according to anonymous CW1—"by summer 2018" Atos had identified only 14 percent of Conduent systems, and "as a result of Atos's failure to create the inventory, Conduent began directing the data center migration." AC ¶¶ 138–39. Even taking those allegations at face value, however, Mr. Vemuri "updated investors" in June 2018 that "we've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves."[14]   AC ¶ 159.   Plaintiff also fails to demonstrate how the alleged decision to work with Atos "to manually review the legacy IT infrastructure" is inconsistent with the Company "aggressively attacking [its] IT infrastructure," forecasting growth at the end of the year, or reaffirming Company-wide annual financial guidance. AC ¶¶ 139, 157–61; *see Aetna*, 617 F.3d at 281 ("[T]he statement itself contains no falsity. Even accepting plaintiffs'

---

[14] Plaintiff's allegation that this statement was false because Defendants failed to disclose Conduent took back the network "due to Atos's suboptimal performance" fails. AC ¶ 160(i). Defendants explained the Company took back the network from service providers "for better control and performance by ourselves," and Plaintiff fails to explain how the decision not to name Atos specifically—even assuming Defendants were not prohibited from doing so—was material omitted information. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (securities laws do not require that "by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but . . . only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.") (quotation marks omitted).

-24-

allegations about underpricing as true, the statement asserts the very fact allegedly concealed[.]"). All of Plaintiff's allegations with respect to the migration demonstrate the Company was actively taking action and making adjustments in furtherance of the project's completion, not that the project was "doomed from the outset." AC ¶¶ 135, 137.

*Second*, Plaintiff's attempt to infer falsity based upon the ultimately unsuccessful migration is impermissible fraud-by-hindsight. Plaintiff relies on CW1's allegation that "when Conduent performed the network cutover during the data center migration," the Company experienced "network outages that impacted Conduent's tolling customers." AC ¶ 139. Plaintiff further relies on Mr. Vemuri's statements during the Q3 2018 earnings call referencing "performance issues" from a legacy technology vendor, including that the Company "had [its] first planned data center migration in Q3 and during this migration, we uncovered issues that caused significant disruption to our client delivery and operations and resulted in penalties to Conduent." AC ¶¶ 169–70; Ex. 9 at 6. At bottom, Plaintiff's allegations are nothing more than an attempt to infer that statements issued months earlier must have been false because the Company ultimately experienced a delay in its Q3 data center migration (which the Company promptly disclosed to investors during its Q3 2018 earnings call). Ex. 9 at 6. That form of pleading is not probative of the falsity of the challenged statements *at the time those statements were made*. Instead, it is

-25-

fraud-by-hindsight, which is not permitted under the securities laws.[15]  *See City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 883 (3d Cir. 2018) (quoting *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 225 (3d Cir. 2002)) ("[T]he complaint attempts to establish falsity through the very sort of 'speculative fraud by hindsight that the [PSLRA] was intended to eliminate.'").

      b.      *Plaintiff's Core Business Theory*

Plaintiff also alleges Defendants' statements were false and misleading because Defendants failed to disclose the Company's IT infrastructure could not support the Company's core business, causing service issues and lost revenue with customers including tolling clients.  *See* AC ¶ 151(v)–(ix); AC ¶ 156(vii)–(xi); AC ¶ 160(vii)–(xi); AC ¶ 164(i), (vi)–(x).  Plaintiff relies on allegations concerning service interruptions and penalties for Conduent's tolling clients (AC ¶¶ 114–19, 121–34), CW1's allegations (AC ¶¶ 137–39), and Defendants' post-hoc evaluations

---

[15] It bears noting, too, that Plaintiff affirmatively demonstrates that CW1's allegations are not probative of falsity of Defendants' February 2018 and May 2018 statements.  As Plaintiff itself alleges (based on information it allegedly learned from CW1), "Atos was responsible for deploying a software program to recreate the inventory, but ***by summer 2018*** Atos was only able to identify about 14 percent of Conduent's systems."  AC ¶ 138 (emphasis added).  Not only does that allegation fail to specify with particularity when Atos was allegedly unable to identify Conduent's systems (and, relatedly, when that alleged fact was relayed to Defendants), but it demonstrates that CW1's allegations are not probative of falsity of statements prior to "summer 2018."

during the Q3 2018 earnings call (AC ¶¶ 169–74, 182–88, 190–91).  Once again, this theory fails for several reasons.

As an initial matter, as even Plaintiff admits, nearly all of the allegations concerning service interruptions and penalties are based on information that was publicly available to investors during the putative Class Period.[16]  Defendants cannot be liable where the information they claim was omitted was in fact publicly disclosed. *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 580 (E.D. Va. 2006) ("Where information about a company was made available in an analyst report, or by newspaper articles, any withholding of information by the company is immaterial and cured any omissions by the company.") (emphasis omitted).

Moreover, Plaintiff's own allegations demonstrate that the incidents were immaterial.  As Plaintiff alleges, Conduent's entire tolling business segment constituted $299 million in revenue, which itself accounted for only "5.5% of the Company's total revenues."  AC ¶ 56; Ex. 3 at 4–5 (Conduent achieved over

---

[16] *See, e.g.*, AC ¶ 115 (citing May 15, 2018 New York Thruway Authority Press Release (Ex. 15)); AC ¶ 117–18 (citing July 11, 2018 New York State Comptroller Press Release (Ex. 16)); AC ¶ 119 (citing July 30, 2018 Letter from United States Senators Nelson & Peters (Ex. 17)); AC ¶ 128–29 (citing July 16, 2018 Letter from Florida Secretary Mike Dew (Ex. 18)); AC ¶ 130 (citing August 14, 2018 Orlando Weekly news article (Ex. 19)); AC ¶ 132 (citing July 17, 2018 WAMC.org news article (Ex. 20)).

*$6 billion* in revenue for 2017).  When considered in that context, Plaintiff cannot rely on these incidents to demonstrate that Defendants omitted material information, especially considering Defendant's repeated disclosures to investors that they were engaged in a multiyear investment program to upgrade and modernize existing infrastructure and technology.[17]  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ("Although $2 billion in prepay transactions may sound staggering, the number must be placed in context—reclassifying $2 billion . . . does not alter JPMC's total assets of $715 billion.").

Furthermore, Plaintiff relies on post-hoc statements by Defendants and securities analysts in an attempt to infer fraud by hindsight.  AC ¶¶ 169–74, 182–88, 190–91.  But Plaintiff pleads no contemporaneous facts undermining Mr. Vemuri's explanation that the Company issued what it considered to be reasonable annual

---

[17] Plaintiff makes much of the "withheld payment[s]" and "financial penalties" for Conduent's alleged "service failures."  AC p. 24.  Even when aggregated, however, the fines, penalties, and withheld payments that Plaintiff ascribes a dollar amount in the Amended Complaint—some of which allegedly pertain to months before the putative Class Period—total just under $10 million.  *See* AC ¶¶ 122, 126, 130, 132, 133.  For context, that is just 0.19% of Conduent's 2018 revenues of $5.39 billion, which is hardly a material amount.  *See JP Morgan Chase Co.*, 553 F.3d at 204.  Similarly, Plaintiff makes much of alleged service interruptions in Florida, which it claims resulted in a post-Class Period penalty of $4.6 million.  AC ¶ 192.  Again, this post-class period figure pales in comparison to Conduent's $5.39 billion in revenue.

financial guidance throughout 2018, and ultimately certain issues "accelerated" and "amplified" and contributed to a lower outlook in Q3 2018. Ex. 9 at 15. Once again, Defendants' retrospective explanations for lower-than-expected financial results cannot be used to backcast an inference that statements made months earlier were false when they were made. *See Altisource*, 908 F.3d at 883.[18]

## C.   Plaintiff Fails to Allege Facts Raising a Strong Inference of Scienter.

The PSLRA requires Plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind is scienter, defined to mean conscious misbehavior or severe recklessness—*i.e.*, "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 & n.42 (quoting *Advanta*, 180 F.3d at 535). "Cobbling together a litany of inadequate allegations does not render those allegations particularized in

---

[18] Plaintiff also alleges that "according to Defendants Vemuri, Conduent was constrained by its sub-optimized contract with Atos from realizing the benefits of the Strategic Transformation." AC ¶ 151(ii); AC ¶ 156(iv); AC ¶ 160(iv); AC ¶ 164(iii). Plaintiff's allegation is belied by its failure to plead any particularized facts demonstrating that the Company did not, in fact, realize the Strategic Transformation benefits as it reported to investors before, during, and after the putative class period. *See supra* Part II.

accordance with Rule 9(b) or the PSLRA," nor does it help Plaintiff surmount the stringent scienter hurdle. *See Calif. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004). Moreover, a strong inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiff's disjointed set of circumstantial allegations fails to meet these stringent pleading standards.

### 1. Plaintiff Fails to Raise a Strong Inference of Actual Knowledge or Severe Recklessness.

Plaintiff alleges two primary theories of scienter, each of which fails. First, Plaintiff alleges that the Individual Defendants must have known about the alleged fraud because it concerned a "core operation" of the Company. AC ¶¶ 182–88. The Third Circuit, however, has explained that corporate management's general awareness of the workings of a company's core business operations does not establish scienter "absent some additional allegation of specific information conveyed to management and related to the fraud." *Avaya*, 564 F.3d at 270 (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008)). The Amended Complaint contains no particularized allegations showing that specific information was conveyed to Conduent management concerning the purported fraud. Instead, it relies entirely upon Defendants' general awareness of the Company's core operations, without any detailed facts showing that Defendants were aware of the specific alleged issues concerning the Company's technology

infrastructure or data center migration.  AC ¶¶ 182–88.  This type of general allegation is insufficient under the PSLRA.  *See Martin*, 2017 WL 3974002, at *14 (rejecting argument that "third-party sports nutrition products represent a core operation of GNC, thus the Individual Defendants should be charged with knowledge concerning its vendors' products").

Second, Plaintiff relies upon retrospective allegations based on post-Class Period events to infer prior knowledge of fraud.  AC ¶¶ 189–97.  For example, Plaintiff cites news articles concerning tolling contract issues and penalties concerning Conduent's contract with the State of Florida.  AC ¶¶ 189–92.  Plaintiff also cites the April 2019 resignation of a Conduent board member, alleging that Board member "stated that Defendant Vemuri was not giving his duties at Conduent his full attention"—an ironic allegation for a Plaintiff attempting to plead knowledge of fraud.  AC ¶¶ 193–97.  These kind of generalized corporate mismanagement allegations do not give rise to a strong inference of fraud. *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011) ("Allegations akin to corporate mismanagement are not sufficient.").  Instead, these post-hoc allegations are further attempts to infer fraud-by-hindsight, which is not permitted under the PSLRA.  *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 497 (3d Cir. 2016) (plaintiff's "attempt to prove fraud by hindsight" is "something our Court has long rejected") (quotation marks and citation omitted);

-31-

*Chubb*, 394 F.3d at 158 (3d Cir. 2004) ("We have long rejected attempts to plead fraud by hindsight."); *Hertz*, 2015 WL 4469143, at *19 (defendants' "post-hoc, speculative explanation for the Sequester's impact" was "[h]indsight statement[] . . . insufficient to give rise to a strong inference of scienter").

Plaintiff includes a number of other scienter allegations scattered throughout the Amended Complaint, each of which is also deficient.  For instance, Plaintiff cites Defendants' "positions and access to material non-public information," speculating that because of Defendants' role in the Company, they must have known of the alleged fraud.  AC ¶ 180.  This allegation is not supported by any particularly pled facts tending to establish such a connection, and it is exactly the kind of general and conclusory scienter allegation the PSLRA was designed to prohibit.  *See In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 430 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007), *as amended* (Nov. 20, 2007) (allegation that officer must have known of fraud because he was "responsible for the reliability of Exxon's system of internal controls and the accuracy of its financial statements" was "exactly the kind of conclusory allegation prohibited by the PSLRA mandate"); *Nat'l Junior Baseball*, 720 F. Supp. 2d at 556 (rejecting scienter allegation that defendants had "intimate knowledge" of illegal practices due to positions as "high-ranking executives").

Similarly, to the extent Plaintiff relies on the allegations of its confidential witness to infer scienter (AC ¶ 14), those allegations fail to include any particularized

-32-

allegations that pertain to the Individual Defendants' knowledge. To the contrary, Plaintiff pleads that CW1 was at least three levels of reporting removed from the Defendants. AC ¶ 136; *see Winer Family Tr. v. Queen*, 503 F.3d 319, 332 (3d Cir. 2007) ("[T]he proposed amendments never alleged that Timmons informed Queen of the poor condition of the Tabor Facility. Winer failed to adequately plead scienter by failing to link the declarant of the challenged statement with facts that might contradict his statement.").

Finally, Plaintiff's conclusory attempt to rely on the alleged knowledge of other employees to impute knowledge to the Company fails. AC ¶ 181. As an initial matter, it is not at all clear that this "collective scienter" theory is even a viable means of pleading scienter in the Third Circuit. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) ("We, however, neither have accepted nor rejected the doctrine of corporate scienter in securities fraud actions, and we do not do so now . . . ."). Moreover, "[e]ven if . . . it were possible to plead" collective scienter in the Third Circuit, the facts alleged would need to be "extraordinary" and involve a "long-lasting" wrongdoing affecting a "substantial portion" of a company's business. *See Horizon Lines, Inc.*, 442 F. App'x at 676-77. Such "extraordinary" facts do not exist here. In fact, the only factual allegation Plaintiff offers with respect to most of these individuals is that they "attended monthly governance meeting with Atos personnel to review Severity 1 or 'Sev. 1' IT incidents"—hardly an

extraordinary fact, and one that is not probative of falsity in any event as discussed *supra* Part IV.B.2.[19]   *See* AC ¶ 137.   Therefore, Plaintiff's collective scienter theory—even assuming it could be viable in the first place—falls flat.  *See Horizon Lines*, 442 F. App'x at 676-77 n.6; *Christian v. BT Grp. PLC*, No. 2:17-cv-497-KM-JBC, 2018 WL 3647213, at *7 (D.N.J. Aug. 1, 2018) (collective scienter doctrine only potentially applies "in unique and extraordinary circumstances").[20]

Perhaps the most notable aspect of Plaintiff's scienter theory is what it fails to include:  Any alleged financial motivation to capitalize on the purported fraud.  For example, the Amended Complaint contains no allegations of insider trading by the Individual Defendants.  Plaintiff's failure to include any allegation of personal benefit motivating the Individual Defendants to commit the alleged fraud weighs against a finding of scienter.  *See Avaya* 564 F.3d at 278-79 (absence of personal benefit "undermines any inference of scienter"); *Burlington*, 114 F.3d at 1423 (no strong inference of scienter where "two officer-defendants are not alleged to have

---

[19] Notably, Plaintiff does not allege that Messrs. Vemuri or Webb-Walsh had any involvement with these monthly meetings, much less attended them.

[20] This Court has previously addressed a collective scienter allegation.  *See MTB Inv. Partners, LP v. Siemens Hearing Instruments, Inc.,* No. 12-cv-00340 (SDW) (MCA), 2013 WL 12149253 (D.N.J. Feb. 19, 2013).  In *MTB*, however, this Court was faced with facts "so dramatic" that they must have been approved by corporate officials. *See id.* at *5-6.  Here, Plaintiff's alleged facts—or lack thereof—are a far cry from *MTB*.

traded at all, and these two defendants appear to be two of the more powerful among the group"); *Hoey*, 2018 WL 902266, at *21 ("Although not determinative, courts have consistently weighed [failure to engage in insider trading] against an inference of scienter."); *In re Interpool, Inc. Sec. Litig.*, No. 04-321 (SRC), 2005 WL 2000237, at *12 (D.N.J. Aug. 17, 2005) (similar).

### 2. Far More Compelling Inferences of Non-Fraudulent Intent Exist.

Plaintiff's theory of scienter rests on a combination of hindsight and unfounded speculation. Essentially, Plaintiff claims that Defendants knew that infrastructure-related issues would ultimately impact financial guidance in the third quarter of 2018. Yet, for reasons unclear—indeed, the Amended Complaint includes no allegations of personal financial motivation—Defendants determined not to disclose those issues to investors earlier in the year. Fortunately, at the motion to dismiss stage, "the court must take into account plausible opposing inferences" when evaluating allegations of scienter, including inferences of non-fraudulent intent. *See Tellabs*, 551 U.S. at 323. Because Plaintiff's disjointed combination of circumstantial allegations is far outweighed by a much more compelling inference of non-fraudulent intent, the complaint should be dismissed. *See id*. at 324.

The more compelling inference is that Defendants simply did not foresee that a number of issues would coalesce in the third quarter of 2018 and require lowering annual financial guidance, including: "lower sales activity"; a "first planned data

center migration" which "uncovered issues that caused significant disruption"; "major disruptions to . . . operations" from legacy IT infrastructure" and a need to "increase[] CapEx outlook for the year"; "a delay in yield from [the Company's] European business"; and "impact from the timing and slippage of deal signings into latter quarters[.]" Ex. 9 at 6. The most compelling inference is that Defendants were working through these various issues with a reasonable belief that the issues would not impact annual 2018 financial guidance.

With respect to the Company's data center migration, for instance, the most compelling inference is not the unfounded and illogical inference that the Company committed significant time and investment to a project that it knew was "doomed from the outset." AC ¶ 135. Rather, the far more compelling inference is that the Company was working through a lengthy and complicated migration process alongside its vendor that involved a number of hurdles, but the Company made adjustments with a reasonable belief that it would complete the migration in 2018. Indeed, because this was the "first planned data center migration" (Ex. 9 at 6), it follows logically that the delay and ultimate October 2018 outage revealed a number of issues and had a ripple effect for other Company plans, necessitating an adjustment of guidance to account for previously unplanned delays and increased capital expenditures in the back half of the year.

A non-fraud inference is even more compelling when considering Conduent's background as a newly formed, independent public Company actively working to accomplish transformative goals in its first several years in existence. Defendants, as officers of the newly formed Company, issued annual guidance based on their reasoned business judgment, but simply failed to foresee that the third quarter of 2018 would present challenges to achieving that guidance. This inference follows naturally when considering that Plaintiff offers no allegations of personal financial motivation for the alleged fraud. Fortunately, the securities laws do not demand clairvoyance from corporate officers, nor do they sanction mere hindsight allegations of corporate mismanagement. *See Fain v. USA Techs., Inc.*, 707 F. App'x 91, 97–98 (3d Cir. 2017) (affirming dismissal where "Plaintiff's facts add up to corporate mismanagement . . . but nothing more"); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 408 (D.N.J. 2010) ("[I]t is well established that securities law does not expect clairvoyance . . . i.e., the law of securities knows no liability for false failure to predict[.]") (citation and alterations omitted). Because the more compelling inference is one of non-fraudulent intent, the Amended Complaint must be dismissed. *Tellabs*, 551 U.S. at 324.

## D.     Plaintiff Fails to Plead Loss Causation.

Finally, Plaintiff fails to adequately allege loss causation. To plead loss causation, Plaintiff may not simply allege a price decline following an

-37-

announcement of negative information. Plaintiff must plead facts demonstrating that the price decline immediately followed a "corrective disclosure" that revealed the "truth" about a previous misstatement and was responsible for a "substantial" amount of the price drop. *Dura*, 544 U.S. at 345-48. "In other words, the plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud." *Nat'l Junior Baseball*, 720 F. Supp. 2d at 559.

Plaintiff's claimed "loss" is entirely attributable to the Company's revised financial projections and results for the third quarter of 2018. Plaintiff alleges one corrective disclosure: the November 7, 2018 earnings release that allegedly "revealed that Conduent fell short of expectations for revenue in 3Q18 and was revising its previously stated revenue guidance for FY2018[.]" AC ¶ 206. As a matter of law, this announcement—without more—cannot support allegations of loss causation. Although disappointing results and lowered guidance may have had a downward effect on the Company's stock price, such an announcement did not— and cannot—have the requisite corrective effect in revealing any fraud:

> The fact that an event—in this case, a failure to meet earnings forecasts or a statement foreshadowing such a failure—disabused the market of that belief does not mean that the event disclosed the alleged scheme to the market. In other words, a failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect. Such a failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices. It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.

-38-

*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (emphasis omitted).  This is especially true given that the Company provided several reasons for its revised guidance—not just IT infrastructure issues.  Plaintiff's failure to properly allege that its claimed loss was caused by any alleged fraud, as opposed to disappointing results and revised guidance, is yet another reason for dismissal.[21]

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint for failure to state a claim upon which relief may be granted.

---

[21] Plaintiff also alleges that its loss resulted from "the materialization of concealed investment risks" concerning the Company.  AC ¶ 205.  However, "the Third Circuit has not endorsed this type of pleading as a way to establish loss causation." *Nat'l Junior Baseball*, 720 F. Supp. 2d at 563 n.35.  Regardless, even assuming this was a viable theory, Plaintiff's allegation would still fail for the same reason it fails under the corrective disclosure theory: it has failed to show that Defendants' "fraudulent concealment" of any materialized risk "proximately caused" its losses. *See Glover v. DeLuca*, No. 2:03-CV-0288, 2006 WL 2850448, at *37 (W.D. Pa. Sept. 26, 2006); *see also In re Initial Pub. Offering*, 399 F. Supp. 2d at 308 ("Plaintiffs have not alleged that defendants' fraudulent concealment of their true opinions was ever disclosed, and plaintiffs have made no attempt to tie such a disclosure to their alleged losses.").

Respectfully submitted this 12th day of November, 2019.

<div style="margin-left: 45%;">

_/s/ Israel Dahan_
**KING & SPALDING LLP**
Israel Dahan
1185 Avenue of the Americas, 36th Floor
New York, NY 10036-2601
Telephone: (212) 556-2100
Fax: (212) 556-2222
idahan@kslaw.com

B. Warren Pope (_pro hac vice_)
Brian D. Barnes (_pro hac vice_)
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Fax: (404) 572-5100
wpope@kslaw.com
bbarnes@kslaw.com

_Counsel for Defendants_

</div>

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel registered to receive ECF notifications in this case.

This 12th day of November, 2019.

/s/ Israel Dahan
**KING & SPALDING LLP**
Israel Dahan
1185 Avenue of the Americas, 36th Floor
New York, NY 10036-2601
Telephone: (212) 556-2100
Fax: (212) 556-2222
idahan@kslaw.com

-1-