**LAW OFFICES OF JAN MEYER
& ASSOCIATES, P.C.**
Jan Meyer, Esq.
1029 Teaneck Road, Second Floor
Teaneck, New Jersey 07666
Telephone: 201-862-9500
Email: jmeyer@janmeyerlaw.com

*Liaison Counsel for Lead Plaintiff and the Proposed Class*

[Co-Lead and Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 2:19-cv-08237-SDW |
| vs. | DEMAND FOR JURY TRIAL |
| CONDUENT INC., ASHOK VEMURI, and BRIAN WEBB-WALSH, | |
| Defendants. | |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.    STATEMENT OF FACTS............................................................................................ 2

A.    Conduent had a core business of managing tolling operations across the U.S....... 2

B.    Conduent announces a "Strategic Transformation" plan....................................... 3

C.    Conduent claims it completed the initial phase of the Strategic Transformation in 2017 and announces FY2018 guidance. ............................................................... 3

D.    Conduent concealed that it had not "addressed" its legacy vendor issues or fully inventoried its IT systems in 2017. ..................................................................... 4

E.    Conduent's IT issues negatively and materially impacted its tolling business....... 5

F.    Defendants made false and misleading statements about the Strategic Transformation, downplayed the impact of IT issues, and reaffirmed guidance.... 6

G.    Defendants finally revealed the truth about Conduent's IT issues. ...................... 7

II.   THE COMPLAINT STATES AN EXCHANGE ACT § 10(b) CLAIM ........................... 7

A.    Defendants' misrepresentations and omissions related to material facts............... 8

B.    The Complaint pleads specific material misrepresentations and omissions........ 10

1.    Defendants' factual argument that their misrepresentations were true when made is refuted by the Complaint's allegations. ...................................... 13

2.    Defendants' "Truth on the Market" defense fails as a matter of law........ 15

C.    The PSLRA's Safe Harbor does not insulate Defendants from liability. ............ 17

1.    The misrepresentations of present and historical facts, and Defendants' omissions, do not qualify for safe harbor protection. .............................. 17

2.    Defendants' forward-looking statements are not protected. .................... 18

a)    The false and misleading financial guidance and expectations of growth were not protected by meaningful cautionary language... 19

b)    The forward-looking statements were material. .......................... 20

c)    Defendants knew the financial guidance and expected growth were false and misleading................................................................. 20

i

D.      The Complaint Alleges a Strong Inference of Scienter ........................................ 20

    1.      There is a strong inference of scienter as to the Individual Defendants. .. 21

    2.      There is a strong inference of scienter as to Conduent. ........................... 25

    3.      Post-Class Period events support a strong inference of scienter.............. 27

E.      The Complaint adequately pleads loss causation because the market and analysts reacted to the corrective disclosures. .................................................................. 28

III.    THE COMPLAINT STATES AN EXCHANGE ACT § 20(a) CLAIM .......................... 30

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                 *Page(s)*

*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 2002 WL 33934282 (D.N.J. June 26, 2002) ........... 18

*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) .................................. 27

*Carmignac Gestion, S.A.* v. *Perrigo Co. PLC*, 2019 WL 3451523 (D.N.J. July 31, 2019) ......... 16

*City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) ................. 26

*City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 442 Fed. Appx. 672 (3d Cir. 2011).... 26

*Dudley* v. *Haub,* 2013 WL 1845519 (D.N.J. April 30, 2013) ...................................................... 15

*EP Medsystems, Inc.* v. *EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000) ......................................... 19

*Fan* v. *StoneMor Partners LP*, 927 F.3d 710 (3d Cir. 2019) .............................................. 8, 10, 11

*GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228 (3d Cir. 2004) ...................................... 19

*In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001) ................................... 21

*In re CIGNA Corp Sec. Litig.*, 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005) ............................... 10

*In re Cognizant Tech. Sols. Corp. Secs. Litig.*,
    2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..................................................................... 26, 27

*In re Enzymotec Sec. Litig.*, 2015 WL 8784065 (D.N.J. Dec. 15, 2015) ...................................... 17

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
    2015 WL 4469143 (D.N.J. July 22, 2015) .......................................................................... 27

*In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529 (D.N.J. 2002) .................................... 17

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litigation*,
    2011 WL 3444199 (D.N.J. August 8, 2011) .................................................................. 28, 29

*In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ........... 24, 25

*In re Scottish Re Grp. Sec. Litig.*, 524 F.Supp.2d 370 (S.D.N.Y. 2007) ...................................... 15

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) .................................. 7, 8

*In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................... 23, 25

*In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209 (D. Del. May 23, 2006).......... 12, 20

*In re Vicuron Pharms., Inc. Secs. Litig.*, 2005 WL 2989674 (E.D. Pa. July 1, 2005)................. 28

*Institutional Inv'rs Grp.* v. *Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)................................... passim

*Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006).................................. 23

*Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27 (2011) ......................................................... 10

*Mill Bridge V, Inc.* v. *Benton*, 2009 WL 4639641 (E.D. Pa. Dec. 3, 2009) ................................. 23

*MTB In*v. *Partners, LP* v. *Siemens Hearing Instruments, Inc.*,
    2013 WL 12149253 (D.N.J. Feb. 19, 2013) ......................................................... 25, 26, 27

*OFI Asset Mgmt* v. *Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016).................................. 27

*Omnicare, Inc.* v. *Laborers District Council Construction Industries Pension Fund*,
    135 S. Ct. 1318 (2015) ...................................................................................................... 17

*Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013).......................................................... 23

*Roofer's Pension Fund* v. *Papa*, 2018 WL 3601229 (D.N.J. July 27, 2018) ........................ 15, 16

*Semerenko* v. *Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ......................................................... 19

*Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) .............................................................. 8

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007)...................................... passim

*W. Va. Pipe Trades Health & Welfare Fund* v. *Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014) .................................................................................. 23

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) .............................................................................................. 10

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................................... 20

15 U.S.C. § 78u-5(c)(1) ........................................................................... 17, 18, 19, 20

## INTRODUCTION

This is a securities fraud class action. Defendant Conduent, Inc. manages massive amounts of data from automated tolling systems (i.e. EZ Pass) across the country. Conduent was initially a subsidiary of The Xerox Corp. and spun-off to Xerox shareholders effective January 1, 2017. Beginning in February 2017, Defendants Conduent and two senior officers (former CEO Ashok Vemuri and CFO Brian Webb-Walsh) told investors that to achieve profitability, the Company would execute a "Strategic Transformation" to consolidate data centers and move data to a Cloud-based platform. The Class Period begins on February 21, 2018, when after a year of work on the Strategic Transformation, Defendants advised investors that Conduent had passed the initial Strategic Transformation stage. Throughout the Class Period (ending November 6, 2018), Defendants represented to investors that they had addressed legacy vendor issues and inventoried Conduent's IT infrastructure (*i.e.*, they had created a map of the Company's existing IT systems), which were necessary steps before migrating data. Defendants issued financial guidance purporting to reflect benefits from the Strategic Transformation.

Unbeknownst to investors, Defendants knew or recklessly disregarded that the Strategic Transformation was failing. Confidential Witness 1 ("CW1"), a former Conduent VP of Enterprise Architecture, confirms Conduent did not address its issues with third-party IT vendor Atos SE, and Atos could not provide a complete inventory of Conduent's IT infrastructure. At the time of the initial data migration, Atos had inventoried only 14 percent of the IT infrastructure. If Conduent proceeded without a full inventory of the IT infrastructure, the new platform would not accurately function. The migration of data without a complete inventory caused network outages and service issues for cashless tolling clients. Numerous tolling agencies levied fines and withheld revenue from Conduent as millions of tolls went uncollected due to the outages. Senators sought an FTC investigation into its "pattern of mismanaging cashless toll systems."

Conduent's failure to successfully complete the initial phase of the Strategic Transformation materially hurt its business. Defendants failed to disclose that Conduent was experiencing serious IT and toll-processing issues, which were reducing its profits and growth. Yet Defendants falsely assured investors that the transformation was "progressing well," that any tolling issues were related to a single client and emphasized that there were no negative issues by reaffirming forecasts. Accordingly, the market was shocked on November 7, 2018, when Defendants belatedly, and in sharp contrast to their statements during the Class Period, told investors that the Strategic Transformation had stalled as a result of "continued suboptimal performance from an inherited legacy technology vendor [Atos]" and that vendor's "inability to deliver on service level agreements," as well as disruptions to operations that impacted client delivery caused by the Company's "outdated and historically under-invested legacy IT infrastructure." ¶¶143, 171.[1] None of these facts, which existed throughout the Class Period, had previously been disclosed to investors. On this news, Conduent's stock price fell 29% and analysts commented that the legacy vendor issue must have been known for some time.

Defendants' motion to dismiss relies on broad mischaracterizations of the Complaint. When the well-pled allegations are analyzed under the appropriate legal standards, it is apparent that defendants made reckless, knowing or intentional material misrepresentations and omissions, and caused economic loss to Lead Plaintiff and the class. Therefore, the Motion should be denied.

## I.    STATEMENT OF FACTS

### A.    Conduent had a core business of managing tolling operations across the U.S.

Conduent provides business process services, including managing operations involving high volume, repeatable, and individualized digital interactions. ¶4. Conduent was formed in 2016

---

[1] All "¶_" and "¶¶_" are to the Amended Class Action Complaint (ECF No. 18) ("Complaint").

as a business unit of Xerox Corporation, and inherited a number of legacy businesses that were not central to Xerox's operations. ¶39. On December 31, 2016, Conduent separated from Xerox and began to operate as an independent, publicly traded company. ¶41. Defendants initially made representations to investors that Conduent planned to grow by significantly relying on technology to service its clients. ¶57. Defendants specifically identified in public statements to investors the platform-based technology used to support its Transportation Services' tolling operations as a model for profitable growth. ¶¶7, 65, 67. During the Class Period, the Company's Transportation Services business managed back-office tolling operations for state and local government clients. ¶183. Defendants repeatedly stated that Conduent's Transportation Services business was a "core business" segment. ¶¶5, 48-49, 63, 85-86. Conduent's Transportation Services managed approximately 50% of the automated tolling systems in the United States. ¶47. Conduent also derived a material portion of Class Period revenue from its tolling business. ¶¶51-52, 55-56, 183.

**B.    Conduent announces a "Strategic Transformation" plan.**

To realize Defendants' plan of providing more technology-based services, Conduent began in early 2017 what it called the "Strategic Transformation." ¶¶8, 68. The initial phase of the Strategic Transformation included evaluating the Company's third-party vendor contracts and inventorying the Company's IT infrastructure to consolidate the Company's data centers. ¶¶8, 68, 70, 72. Throughout 2017, Defendants represented that Conduent's review of vendor contracts was underway and that the Strategic Transformation was on track. ¶¶75-77, 80, 84.

**C.    Conduent claims it completed the initial phase of the Strategic Transformation in 2017 and announces FY2018 guidance.**

On the first day of the Class Period, during Conduent's February 21, 2018 earnings call, Defendants represented to investors that Conduent had completed the initial phase of the Strategic Transformation and had cured inefficiencies stemming from legacy contracts agreed to by Xerox:

"In 2017, we addressed our sub-optimized IT-related workforce and vendor relationships. Next we expect to see benefits from the platform rationalization work ***completed last year.***" ¶¶10, 88, 91, 92.[2] Defendants also told investors that Conduent had inventoried the Company's legacy IT systems. ¶¶11, 93. Vemuri assured investors: "During our first year, we needed to inventory and rationalize our technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology." *Id.* Having a complete and accurate systems inventory was critical (and telling investors one existed was material) because the Company's data center transfer required an accurate systems inventory for keeping its operations that rely on platform-based technology, including the Company's tolling operation, running. ¶13. If the inventory was incomplete or inaccurate, operations such as tolling would not run correctly, or at all, when data is transferred to the new facility. *Id*.

Also on February 21, 2018, Defendants issued Conduent's FY2018 revenue and adjusted EBITDA guidance and stated that the Company "expect[s] transportation [revenue] inside of Public Sector to grow in 2018." ¶¶89, 147, 150. Conduent's FY2018 guidance advised that investors should expect Company-wide revenue in the range of $5.625 billion to $5.799 billion and adjusted EBITDA in the range of $707 million to $733 million. *Id.* Webb-Walsh stated that projected FY2018 EBITDA growth of between 8% and 12% was due in part to the positive results of the Company's Strategic Transformation. ¶90.

### D. Conduent concealed that it had not "addressed" its legacy vendor issues or fully inventoried its IT systems in 2017.

Contrary to its Class Period representations, Conduent had not "addressed" its sub-optimized vendor relationships in 2017 and did not possess a systems inventory of the Company's

---

[2] Unless otherwise noted, all internal citations, quotations, and quotation marks are omitted from citation sentences, and emphasis is added unless indicated as being in the original.

legacy IT infrastructure. ¶12. Prior to and during the Class Period, Conduent was under contract with third-party Atos to provide IT support for Conduent's businesses. ¶¶73, 172. A former Conduent employee who worked on the data center migration stated that Atos was responsible for deploying a software program that would inventory Conduent's legacy IT infrastructure. ¶138. As late as the summer of 2018, Atos could only inventory 14 percent of Conduent's systems. *Id.* According to the former Conduent employee, it was not until after June 2018 that Conduent began manually inventorying the Company's systems. ¶¶15, 139. This process was inaccurate and there was never a complete systems inventory prior to data migration. ¶¶16, 139. Regardless, Conduent performed data migrations with the incomplete systems inventory, resulting in network outages and service issues and outages for Conduent's tolling clients. *Id.*

### E.   Conduent's IT issues negatively and materially impacted its tolling business.

Throughout 2018, Conduent's failure to accurately inventory its IT infrastructure prior to data migration caused massive issues with its network, resulting in outages of Conduent's tolling platform. ¶¶16, 139. Starting at latest on May 15, 2018, these outages impacted nearly all of Conduent's E-ZPass tolling clients on the east coast. ¶¶16, 113-34. During these outages, Conduent's platform did not process tolls for the cashless tolling systems. ¶¶16, 115-16. As result of these lapses in service, the tolling agencies from several states withheld revenue from or fined Conduent for failure to meet its service requirements under its tolling contracts. ¶¶17, 126, 128, 130, 132-34. On July 30, 2018, Florida Senator Bill Nelson and Michigan Senator Gary Peters sent a letter to FTC Chairman Joseph Simons calling on the FTC to investigate Conduent for its "pattern of mismanaging cashless tolling systems." ¶119.

**F.    Defendants made false and misleading statements about the Strategic Transformation, downplayed the impact of IT issues, and reaffirmed guidance.**

Throughout the Class Period, Defendants continued to make materially false and misleading statements, informing investors that the initial phase of the Strategic Transformation was complete, and failing to disclose the lack of an IT systems inventory and resulting problems with the data migration. On Conduent's May 8, 2018 first quarter 2018 earnings conference call, Vemuri provided an update on the Strategic Transformation, falsely stating real estate "and IT consolidation remain large contributors to our transformation work and are progressing well." ¶155. During Conduent's June 8, 2018 analyst day, Vemuri told investors: "We've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves." ¶159. Defendants also failed to disclose that the lack of systems inventory and resulting problems with the data migration were causing significant problems with Conduent's tolling business, resulting in reduced revenue and fines being levied against Conduent. On the May 8, 2018 earnings call, Defendants reaffirmed their FY2018 guidance and that the Company "still expect[s] to show growth in [the Transportation business] in 2018 as a large tolling contract is expected to ramp by the end of Q2." ¶¶152-54. On June 8, 2018, Defendants lowered FY2018 guidance, but Webb-Walsh misleadingly stated "the only change we are making to guidance are as a result of [a strategic]…divestiture" and Conduent "still expect[s] to grow organically in Q4 of this year." ¶¶157-58.

During the Company's August 8, 2018 earnings call, Vemuri acknowledged that the Company was experiencing performance issues on a tolling contract. ¶¶19, 105. However, Vemuri did not disclose the Company's underlying IT issues or suboptimal vendor performance, but instead falsely stated that the issues were isolated to a single client ("a tolling contract with a state government agency.") ¶¶20-21, 162. At the same time, Vemuri continued to mislead investors,

6

stating that Conduent had "the capability to efficiently resolve these issues." ¶¶105, 162. Webb-Walsh specifically falsely represented to the public that Defendants "d[idn]'t anticipate [the issue with the tolling contract] having an impact on our ability to meet our guidance." ¶¶106, 163.

### G. Defendants finally revealed the truth about Conduent's IT issues.

In a November 7, 2018 press release announcing Conduent's third quarter financial results, Defendants revealed that the underlying issues affecting tolling client services had materially impacted the Company's financial performance and caused the Company to lower its FY2018 guidance. ¶¶23, 165-67. On the ensuing earnings call, Vemuri cited "continued suboptimal performance from an inherited legacy technology vendor" and that vendor's "inability to deliver on service level agreements," as well as disruptions to operations that impacted client delivery caused by the Company's "outdated and historically under-invested legacy IT infrastructure" as material issues that caused the guidance cut. ¶¶24, 169-71.

Securities analysts were shocked by this revelation because, during the Class Period, Defendants assured the market that the vendor issues had already been addressed and that the systems were fully inventoried. ¶¶26, 148-49. BMO Capital Markets reported that it suspected that Conduent was aware of these issues, in particular that "the issue with the IT providers has likely been a problem for some time." ¶¶26, 144, 174. As a result of these revelations, on November 7, 2018, Conduent's common stock price fell over 29%. ¶¶27, 176.

### ARGUMENT

### II.   THE COMPLAINT STATES AN EXCHANGE ACT § 10(b) CLAIM

To state a claim pursuant to Section 10(b) of the Exchange Act, Lead Plaintiff must plead: (1) a material misrepresentation or omission necessary to make the statements made not misleading, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *In re Suprema*

*Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). Defendants' motion only argues that the Complaint fails to adequately plead a material misrepresentation or omission, scienter, or loss causation. Defendants' arguments fail on each count.

### A. Defendants' misrepresentations and omissions related to material facts.

A material misrepresentation or omission is actionable. A misrepresentation or omission is material if a reasonable investor would have viewed the information "as having significantly altered the total mix of information available to that investor." *Fan* v. *StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019). Only "misrepresentations or omissions [that] are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality" can be found to be immaterial. *Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992). In determining whether statements are materially misleading, the alleged misstatements "cannot be considered in isolation,…but rather must be considered in their entirety." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). Materiality "is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro*, 964 F.2d at 280 n.11.

Here the Complaint alleges specific material misrepresentations:

- Vemuri, February 21, 2018: "In 2017, we addressed our sub-optimized IT-related workforce and vendor relationships" (¶148); and that the technology portfolio was inventoried in 2017 (¶149);

- Vemuri, May 9, 2018: "our transformation work…[is]…progressing well" (¶155);

The Complaint also alleges that Defendants omitted material information from statements with investors about: known issues with the Company's legacy IT infrastructure and that vendor performance were impacting Conduent's financial guidance and growth; several of the Company's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal vendor performance (not just one) (¶¶114-19; 162, 163); and the IT

issues caused the Company to accrue material penalties and lost revenue for failing to perform under tolling clients' contracts (¶¶121-34).

The statements and omissions were material because they created the misleading impression that Conduent would be able to achieve profitable growth based on the Company's progress with the Strategic Transformation. The value of this information is evident as Defendants routinely informed investors about Transformation milestones, such as curing legacy IT inefficiencies by addressing its sub-optimal vendor relationships (¶¶10, 92), and progressing with the Company's data center consolidation (¶¶11, 93 155), which were necessary to support the Company's technology-centric vision. ¶¶8, 68-72. Further, based on Defendants' steadfast maintenance of Conduent's financial forecasts and growth expectations, save for certain strategic divestitures, investors could only assume that the Strategic Transformation remained on track. ¶¶152, 157, 163. Investors also demonstrated that the Company's progress with the Strategic Transformation was material and impacted investment decisions when investors devalued and sold Conduent stock after Defendants revealed that issues with the Company's third-party vendor and legacy IT infrastructure negatively impacted financial performance. ¶¶27, 165-71, 176.

Defendants do not specifically contest the materiality of each alleged misrepresentation and omission. Instead, Defendants isolate irrelevant terms used in conference calls, such as "cutting-edge technology" (Mot. at 19) and had a "strong performance track record" (*Id.*) to claim that Defendants provided mere immaterial puffery to investors. Mot. at 19. But these statements are not the sole basis for Defendants' liability. Defendants also argue that advising investors that the Strategic Transformation was "progressing well" and "making good progress" was too vague or optimistic to be material. *Id*. But the Complaint alleges these false statements were designed to mislead investors about the progress of the Transformation and the value of Conduent's core

business. Statements updating investors on the progress of a project, which is known or recklessly disregarded as untrue, are materially false and misleading. *See In re CIGNA Corp Sec. Litig.,* 2005 WL 3536212, at \*11 (E.D. Pa. Dec. 23, 2005) (Defendant's statement about the status of its Transformation Project was actionable).

Defendants also assert that all misrepresentations related to the tolling business statements are immaterial. Mot. at 27-28. This charge is futile. ***First***, Conduent's tolling business accounted for a material part of the Company's revenue throughout the Class Period. ¶¶51-52, 55-56, 183. ***Second***, Defendants admitted that the tolling business was material by telling investors it was a "core business" segment of Conduent. ¶¶5, 48-49, 63, 85-86. ***Third***, Defendants' actions suggest that qualitatively, tolling was important to investors and the Company. Defendants spoke about tolling regularly to investors, including using it as the operating model the Company wished to emulate across all business segments. ¶¶62-67.[3] In fact, the tolling business was so important that Vemuri acknowledged that Conduent's performance on a single tolling contract, as reported in the press, required an explanation to investors because he gave one. ¶162.

### B.   The Complaint pleads specific material misrepresentations and omissions.

A complaint adequately alleges falsity under the PSLRA by "specify[ing] each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Institutional Inv'rs Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009); 15 U.S.C. § 78u-4(b)(1)(B). Statements are actionable "if when read in light of all the information then available to the market or a failure to disclose particular information, [they] conveyed a false or misleading impression." *StoneMor*

---

[3] Quantitative and qualitative factors should be considered when determining materiality. *See Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 30, 43-45 (2011) (rejecting a purely quantitative materiality test).

*Partners*, 927 F.3d at 715. Here, the Complaint identifies specific misleading statements made by Defendants and adequately states why the statements were false, misleading, or omitted material facts. *See e.g.,* ¶¶147-50, 151, 152-55, 156, 157-59, 160, 161-63 164.

Alleging specific facts, the Complaint details why each statement is a misrepresentation and why each omission is misleading. For example, during the 2018 fourth quarter earnings call on February 21, 2018, contrary to the true state of affairs at Conduent, Vemuri stated "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships" and that "[d]uring the first year [2017], we needed to inventory and rationalize our technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology." ¶148-49. This gave investors the misleading impression that the inventory of the technology portfolio was complete. Numerous facts alleged show Defendants had not "addressed" the Company's sub-optimized IT vendor relationships and Defendants did not complete its inventory of the Company's legacy IT infrastructure in 2017. *E.g.,* ¶149. According to CW1, a VP of Enterprise Architecture for Conduent from approximately March 2017 until March 2019, who had direct involvement with the issues at hand, Conduent never possessed a complete systems inventory or had documentation about the Company's legacy IT infrastructure. ¶138. Further, CW1 stated that "by summer of 2018 Atos was only able to identify about 14 percent of Conduent's systems." *Id.* At the end of the Class Period, Defendants admitted that Atos had performed sub-optimally in its failure to create the systems inventory, this failure had caused serious issues for the Company, and that the Company was unable to address this relationship because it was locked into the contract. ¶165-71. The known failure to inventory the technology and to address the sub-optimal relationship with its key vendor rendered the Company's guidance misleading at the time it was made. Defendants misled investors to believe that Conduent had addressed the Company's legacy IT and vendor issues, when in fact,

these issues continued to plague the Company.

During the 2018 first quarter earnings call with investors on May 9, 2018, Vemuri stated that "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well." ¶155. This was false and misleading as Conduent's IT consolidation was not progressing well. ¶138. According to CW1, Conduent lacked a systems inventory of the Company's legacy IT infrastructure. *Id*. An accurate systems inventory was critical to the Company's data center transfer and, consequently, for keeping its existing operations that rely on the data center running, including the Company's platform-based tolling operation. ¶13. Given that at the time this statement was made, Conduent possessed about 14 percent of critical components to the data center transfer, (*id.*) the Company's IT consolidation could hardly be characterized as progressing at all, let alone well.

Throughout the Class Period, Defendants also made statements to investors regarding the Company's financial guidance and expected growth. ¶¶147, 150, 152-54, 157-58, 161-63. Each one of these statements were false and misleading because Defendants had no reasonable basis to believe that Conduent could achieve these results. *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, *7 (D. Del. May 23, 2006) ("Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made"). The issues that caused Conduent to miss its projections were present throughout the Class Period. The Complaint pleads in great detail how issues stemming from Conduent's legacy IT infrastructure and unaddressed sub-optimal vendor caused service delivery issues for many of the Company's core tolling clients, resulting in tolling clients levying material penalties and withholding anticipated revenue from the Company. ¶¶114-34; 137-39. Defendants were aware of these issues, yet continued to mislead investors as to the status of the "Strategic Transformation" and to affirm the Company's guidance

12

and project growth, without any warning to investors that these issues could negatively impact Conduent's projections. Thus, Defendants' public statements and guidance and expectation statements were without any reasonable basis and failed to disclose material facts necessary to make those statements not misleading.

Defendants also misled investors on August 8, 2018 when Conduent announced its financial results for the second quarter. During the call, Vemuri addressed "a matter that has been in the press recently around our performance on a tolling contract with a state government agency." ¶162. When Webb-Walsh was questioned by analysts about the potential impact of the issue with this tolling client, he stated, "we typically don't comment on the financials around one specific contract," and that "we just confirmed our guidance in revenue, free cash flow and adjusted EBITDA" so "we don't anticipate it having an impact on our ability to meet our guidance." ¶163. These statements were false and misleading because Defendants failed to disclose that the Company's service issues were not isolated to one state government agency, Florida Department of Transportation, but rather several of the Company's tolling clients, including state agencies in New York, New Jersey, Michigan, California, Texas, New Hampshire, and Maryland, were also experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos. ¶¶114-19, 121-22, 125-26, 137-39. Additionally, Defendants failed to disclose that these issues could have a significant impact on the Company financially, as Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients as a result of these service issues. ¶¶121-34.

      **1.**    **Defendants' factual argument that their misrepresentations were true when made is refuted by the Complaint's allegations.**

Defendants incorrectly argue that the alleged misstatements were not false or misleading when made. Defendants' statements that issues with the Company's sub-optimal IT vendors had

been "addressed" and that Conduent had inventoried the Company's IT infrastructure were either made contemporaneously with, or after, the adverse facts were known by, or available to, the Defendants. ¶¶ 108-12; 114-34, 136-39. For example, the facts provided by CW1 demonstrate the statements were false: the data center transfer for Conduent's Transportation segment was doomed from the outset, because Conduent lacked a functional systems inventory and Atos misstated its ability to create one. ¶¶135-39. CW1 also stated Atos was only able to identify about 14 percent of Conduent's systems by summer of 2018, and as a result of Atos's failure to create inventory, Conduent began directing the data center migration. ¶138-39. This occurred sometime prior to June 8, 2018, the date which Vemuri informed investors that the critical network infrastructure had been "taken back," after discovery of Atos's failure. ¶¶101-02. CW1 explained that there were problems with the firewalls and load balancers, which during the network cutover caused network outages that impacted Conduent's tolling customers. ¶139. During the fourth quarter earnings call with investors on February 21, 2018, Vemuri misled investors by implying Conduent's sub-optimized IT-related workforce and vendor relationships were in the past. ¶148.

Vemuri made false and misleading statements on August 8, 2018, when he addressed the Company's performance on "a tolling contract with a state government agency," stating "[w]e have the capability to efficiently resolve these issues, and are dedicating all necessary resources to meet our contractual commitments." ¶162. At the time these statements were made, Defendants knew or should have been aware that its tolling issues were not isolated to one client. In June 2018, Conduent knew that its system update to the Florida Department of Transportation's tolling system had caused significant outages. ¶116. Additionally, Conduent also knew by May 15, 2018 that it had failed to process tolls on several of New York's bridges and roads throughout 2018 and by July 30, 2018 that it was experiencing systemic issues with cashless tolling systems it operated in

Florida, Michigan, California, Texas, New Hampshire, and Maryland. ¶¶114, 119. These facts, in concert with CW1's statements that by the summer of 2018 Atos was only able to identify about 14 percent of Conduent's systems, evidence that the issues were present and known when the material false and misleading statements were made.

Defendants also challenge whether the statements were misleading when made by claiming the allegations are merely fraud-by-hindsight. This argument fails. The Complaint shows Defendants concealed material information, which caused wide-spread service issues across its customer tolling platforms in numerous states, which was known by Defendants *at the time they made their statements*. ¶¶113-19. *See Dudley* v. *Haub,* 2013 WL 1845519, at *12 (D.N.J. April 30, 2013) (goodwill impairment charge not fraud by hindsight because plaintiffs alleged contemporaneous circumstances showing indicators of goodwill impairment); *In re Scottish Re Grp. Sec. Litig.,* 524 F.Supp.2d 370, 394 (S.D.N.Y. 2007) ("This is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements. Rather, plaintiffs have cited contemporaneous circumstances...of which [the defendants] were aware").

### 2. Defendants' "Truth on the Market" defense fails as a matter of law.

Defendants' "truth on the market" defense, that corrective information was previously available to investors during the Class Period, fails. *See* Mot. at 27. For a "truth on the market" defense to prevail, Defendants must establish that "the market was aware of curative information" and that the corrective information "has been conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Roofer's Pension Fund* v. *Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018). At the motion to dismiss stage, "defendants must establish that defense as a matter of law on the basis of the allegations of the Amended Complaint." *Id*. Generally, this defense is "intensely

fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *See Id.*; *Carmignac Gestion, S.A.* v. *Perrigo Co. PLC*, 2019 WL 3451523, at *9 (D.N.J. July 31, 2019). Defendants have failed to establish this defense as a matter of law.

Defendants argue that Conduent informed the market that the Company had issues with its IT infrastructure by stating Conduent was continuing to invest in its IT infrastructure. Mot. at 23-24. But this promise to engage in a $200 million multiyear investment in IT infrastructure fails to inform investors that (a) the Company lacked an inventory of its present IT infrastructure necessary to complete its planned data center consolidation; and (b) the present IT infrastructure was insufficient to support its core business segments in the interim and could create service delivery issues to the Company's core businesses. Similarly, Defendants claim that they notified the market of the Company's infrastructure and vendor issues when they disclosed that Conduent had "taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance." Mot. at 24-25. This purported notification, however, does not inform investors that Conduent took control of these tasks, because Atos, the Company's unaddressed sub-optimal vendor, failed to create the critical systems inventory. Investors also remained in the dark as to the severity of the service issues experienced by the Company's tolling clients and of the penalties and payment withholdings from clients, including the Texas Department of Transportation, the NJ Agencies, and the Florida Department of Transportation. ¶¶122, 125, 128. Furthermore, to the extent information was publicly available from disparate state or federal government offices, such information was not easily obtainable nor conveyed to the public with any degree of intensity sufficient to counter-balance Defendants' misleading statements and omissions. *See Roofer's Pension Fund*, 2018 WL 3601229, at *9.

**C.      The PSLRA's Safe Harbor does not insulate Defendants from liability.**

**1.      The misrepresentations of present and historical facts, and Defendants' omissions, do not qualify for safe harbor protection.**

The PSLRA safe harbor insulates certain "forward-looking statements" made to investors from liability under the Exchange Act. 15 U.S.C. § 78u-5(c)(1). Forward-looking statements are not statements of present facts, statements of historical fact, or material omissions. *See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015).

The Complaint alleges misrepresentations and omissions that are present and historical facts, which render the safe harbor inapplicable. Defendants' statements that: "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships" (¶¶10, 92, 148); "[d]uring [2017], we needed to inventory and rationalize our technology portfolio" (¶11, 93, 149); and the Company's Transformation was "progressing well" (¶97, 155) all purport to describe a then present state of affairs.[4] As this Court has recognized, such "statements of present or historical fact … are not entitled to PSLRA's safe harbor at [the motion to dismiss] stage." *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (finding statements about progress such as "well positioned for future growth and 'achieving rapid penetration' relate to then existing conditions as opposed to future projections," and were actionable); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 545-46 (D.N.J. 2002) (ruling that "experiencing" growth and "is

---

[4] Defendants also argue that these statements are non-actionable statements of opinion. Mot. at 20. A plain reading of each statement shows that the statements report a present state of affairs. To the extent Defendants argue the forward-looking guidance and expected growth statements are opinions, they meet the actual knowledge standard of the PSLRA and satisfy any standard for actionable opinions. Investors would "take" from any statements of opinion, that the technology had been appropriately inventoried and would be unaware of the ongoing difficulties CNDT was experiencing with Atos. *See Omnicare, Inc. v. Laborers District Council Construction Industries Pension Fund*, 135 S. Ct. 1318, 1329 (2015) ("[An investor] expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.").

growing" are not forward-looking statements).[5] Accordingly, liability for these misrepresentations is not barred by the PSLRA.

Additionally, material omissions are not forward-looking statements and do not qualify for safe harbor protection. *See Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.,* 2002 WL 33934282, at *11 (D.N.J. June 26, 2002). The Complaint alleges numerous public statements in which Defendant omitted material information. For example, when Vemuri stated "[w]e've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves," he omitted that, at the time, Conduent was experiencing massive problems due to the Company's lack of an IT systems inventory. ¶138. Additionally, when Vemuri claimed they were dealing with an IT issue with one state government agency (¶162, 187), he omitted that there were actually several of the Company's tolling clients experiencing the same service issues caused by the failure to map the IT systems inventory, and sub-optimal performance by third-party vendor Atos. ¶¶113-19. Defendants also omitted that as a result of the IT issues, the Company accrued material penalties and lost anticipated revenue. ¶¶120-34. None of these omissions are protected by the safe harbor.

### 2.    Defendants' forward-looking statements are not protected.

Safe harbor protection only applies to forward-looking statements that are: a) accompanied by meaningful cautionary language; b) are immaterial; or c) were not made with actual knowledge that the statements were false or misleading. 15 U.S.C. § 78u-5(c)(1). None of the statements Defendants contend are forward-looking meet these requirements.

---

[5] Even if Defendant's statements were a mix of forward-looking and present tense statements, "'a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Avaya*, 564 F.3d at 255.

### a) The false and misleading financial guidance and expectations of growth were not protected by meaningful cautionary language.

The Safe Harbor requires forward-looking statements to be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1); *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 243 (3d Cir. 2004) "Cautionary language must be extensive and specific." *Id.*, at 243 n. 3 (noting that "a vague or blanket (boilerplate) disclaimer which merely warns… will ordinarily be inadequate" and "cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions…which the plaintiffs challenge"); *see also Semerenko* v. *Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000). Cautionary language should be directly related to the alleged misrepresentations. *EP Medsystems, Inc.* v. *EchoCath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000).

Defendants provide six broad and vague examples of cautionary language, none of which addressed the risks that materialized in this case. Mot. at 15-16. For example, Defendants merely state that third-party provider's failure "to deliver or perform as expected" on contractual obligations could materially adversely affect results. Mot. at 15. Moreover, they state that success depends on their ability to "subcontract with qualified, competent subcontractors." *Id.* This cautionary language was inadequate to warn investors of what Defendants knew: the Company was locked into a contract with a "sub-optimal" vendor, which it could not address, and that vendor had overstated its ability to perform a necessary component of Conduent's data center consolidation. ¶¶138, 169, 172. These known factors contributed to Conduent's failure to meet financial guidance and expected growth. Furthermore, the fact that the risks at issue had materialized during the Class Period rendered the cautionary language that they only may or might occur ineffective.

### b) The forward-looking statements were material.

Forward-looking statements that are material may be excluded from the safe harbor. 15 U.S.C. § 78u-5(c)(1). As set forth *supra* at §II(B), Conduent's alleged financial guidance and growth were important factors that a reasonable investor would have taken into consideration.

### c) Defendants knew the financial guidance and expected growth were false and misleading.

A forward-looking statement made with actual knowledge that it was false may also be excluded from safe harbor protection. 15 U.S.C. § 78u-5(c)(1). As discussed *infra* at §II(D), the Complaint pleads a strong inference that Defendants knew their forward-looking statements were materially false and misleading. "The safe harbor provision does not afford … a free pass to lie to investors." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *7 (D. Del. May 23, 2006). Therefore, Defendants' material misstatements and omissions are not protected.

### D.      The Complaint Alleges a Strong Inference of Scienter

"A plaintiff alleging scienter must assert facts giving rise to a strong inference of reckless or conscious behavior." *Avaya*, 564 F.3d at 267. The Complaint must, as it does here, "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind" of intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313; 15 U.S.C. § 78u-4(b)(2)(A). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts *or access to information contradicting their public statements.* Under such circumstances, defendants knew or, more importantly, should have known that they were

misrepresenting material facts related to the corporation." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (emphasis added).

A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The inference need not be irrefutable or a "smoking gun." *Id.* at 330. The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 322-23. The Court must rest its analysis not on "the presence or absence of certain types of allegations but on practical judgment about whether… it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

### 1.   There is a strong inference of scienter as to the Individual Defendants.

The Complaint alleges a strong inference that Vemuri and Webb-Walsh knew or recklessly disregarded that contrary to their public statements, Conduent had not addressed its known issues with third-party vendor Atos and did not have an inventory of its technology portfolio. They also knew, or disregarded facts about, the Strategic Transformation not working, Conduent's major problems with data center migration, and the resulting outages in Conduent's tolling platform. *See supra* §I.

Vemuri "spearheaded the Strategic Transformation, overseeing how to update the Company's legacy systems." ¶112. Vemuri's public statements during the Class Period evidence his knowledge of the Strategic Transformation, the data center migration, and the serious problems with the tolling business. For example, on May 1, 2018, in an interview with *Strategy + Business* magazine, Vemuri stated he was "deeply involved in overseeing Conduent's technology," he had been "surprised that Conduent was operating its business using what he called a '1990s ecosystem' of mainframes and datacenters, while 'everybody else had moved to off-premises systems, moved into the cloud," and "he met with approximately 25 of Conduent's top clients and learned that the

Company had problems managing its data." ¶¶109-10. While certain of these admissions relate to meetings prior to the Class Period, it is reasonable to infer that he continued to be involved when the Class Period began several months before the interview. On June 8, 2018, Vemuri advised in connection with the data center consolidation that Conduent was moving critical network infrastructure and client facing applications in house. ¶102. Similarly, on August 8, 2018, Vemuri affirmatively brought up the issues with Conduent's tolling platform stating he "want[ed] to address a matter that has been in the press recently around our performance on a tolling contract with a state government agency… ***We have the capability to efficiently resolve these issues, and are dedicating all necessary resources to meet our contractual commitments***." ¶¶162, 187. These allegations make clear that Vemuri had access to facts demonstrating the serious problems with the Strategic Transformation, data center migration, and tolling platform, or was severely reckless in affirmatively choosing to speak without such knowledge.

The Complaint also alleges a strong inference of scienter as to Webb-Walsh. For example, during the August 8, 2018 investor conference call, Bryan Bergin, an analyst with Cowen & Company, asked "as far as the public tolling contract, does the increased resources to complete the work imply somewhat pressured margin there versus expectations? Just trying to understand the implications here on the financials…" ¶¶163, 187. Webb-Walsh responded:

> We're obviously working to remediate the situation. But what I will say is we just confirmed our guidance in revenue, free cash flow and adjusted EBITDA. So at this time, we don't anticipate it having an impact on our ability to meet our guidance.

*Id.* Webb-Walsh's response to this pointed inquiry from a stock analyst concerning the tolling platform problems supports a strong inference of knowledge or recklessness. *See Avaya*, 564 F.3d at 268 (the CEO and CFO affirmatively denied the existence of intense price competition at a time when the company actively was granting steep price discounts; "since competition, pricing policies, and pricing concessions [were] 'core matters' of central importance to Avaya and its

principal executives, a 'core operations inference' supports scienter.").[6]

The Complaint also pleads a strong inference of scienter as to Vemuri and Webb-Walsh under the "core operations" doctrine, which provides that "misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (quoting *Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013)). As set forth *supra*, the tolling operations were of significant importance to Conduent, *see* §II(A), and the upgrade of Conduent's legacy technology was so important that Vemuri himself was involved in it and spoke of it in a way evidencing he was monitoring it. *See* §II(D)(1); *see also Mill Bridge V, Inc.* v. *Benton*, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("while a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.").

Defendants incorrectly argue that the Complaint "relies entirely upon Defendants' general awareness of the Company's core operations, without any detailed facts showing that Defendants were aware of the specific alleged issues concerning the Company's technology infrastructure or data center migration." Mot. at 30-31. As detailed above, the Complaint includes specific allegations that Vemuri supervised the Strategic Transformation, met with customers and was told

---

[6] This also demonstrates materiality, as "in observing that context matters, courts have typically found otherwise vague statements to be actionable when they were made in response to a specific inquiry… from an analyst or investor." *W. Va. Pipe Trades Health & Welfare Fund* v. *Medtronic, Inc.*, 57 F. Supp. 3d 950, 970 (D. Minn. 2014); *Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007) (statement "went well beyond puffery" because "it was a direct response to an analyst's inquiry").

of data problems, and affirmatively spoke about the problems with the tolling platform. ¶¶109-10, 162, 187. Webb-Walsh denied that the problems with the tolling platform would have any effect on Conduent's ability to meet its guidance. ¶¶163, 187. These allegations evidence Defendants were aware of the "specific alleged issues," or at a minimum, their recklessness, in so speaking.[7]

Further, it is inconceivable that the Individual Defendants, who were the CEO and CFO of the Company, were not aware of the problems with the tolling platform during the Class Period due to the number of problems and amount of penalties Conduent incurred.[8] For example, Conduent's system failed to properly process tolls on the New York State Thruway ***throughout 2018***. ¶114. In 2018, Conduent also incurred penalties of nearly $1 million from Texas DOT and over $5 million from the NJ Turnpike Authority. ¶¶122-26. Conduent's system for processing tolls for the Florida DOT was "completely overwhelmed," and in June 2018, a Conduent system update caused a month-long system outage in Florida DOT's tolling systems, resulting in the maximum performance penalty allowed, $4.6 million. ¶¶116, 189-92. Given that the tolling business was repeatedly identified as one of Conduent's core businesses, it would be absurd to suggest that the Individual Defendants were without knowledge of them. For example, in *In re PTC Therapeutics, Inc. Securities Litigation*, the court observed:

---

[7] As such, Defendants' reliance on *Martin*, 2017 WL 3974002, is misplaced. There, the Complaint failed to plead "particularized allegations linking any of the Individual Defendants' positions to knowledge" of the alleged fraud.

[8] Defendants argue that the Individual Defendants' positions cannot support an inference of scienter. Mot. at 32. However, under *Tellabs,* the court must consider all allegations collectively (551 U.S. at 322-23) , and as discussed in *Avaya,* there are circumstances, such as core operations or matters of principal concern, when a Defendant's position supports a strong inference of scienter (564 F.3d at 270-71). Because the Complaint properly alleges core operations and the importance of the Strategic Transformation and tolling business, and Vemuri and Webb-Walsh's knowledge of problems with them, their positions support an inference of scienter. Defendants' reliance on *In re Exxon Mobile Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 430 (D.N.J. 2005) and *Nat'l Junior Baseball League* v. *Pharmanet Development Group Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010), is therefore distinguishable and Defendants' argument otherwise should be rejected.

> It seems implausible that [the CEO and CFO] were not paying close attention to the results of the company's most critical clinical trial for their most important drug. Nor is it plausible that [the CEO and CFO] played a subordinate role in the decision to submit the 2016 NDA. To the contrary, [the CEO's and CFO's] statements to investors during earnings calls and healthcare conferences implied that they had first-hand knowledge of ACT DMD results and PTC's conversations with the FDA. For that reason, PTC's assertion that the core operations doctrine does not support scienter unless allegations of specific information conveyed to management and related to fraud are alleged fails. Through their public statements, [the CEO and CFO] demonstrated personal knowledge of the ACT DMD results and PTC's conversations with the FDA.

2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017) (internal citations and quotations omitted)).

In sum, Lead Plaintiff alleges a strong inference of scienter as to Vemuri and Webb-Walsh.

**First**, the Complaint alleges that Defendants were directly involved with the Company's business activities and knew or reasonably should have known of the true information. *Urban Outfitters*, 103 F. Supp. 3d at 653-54. **Second**, "maybe the most powerful evidence of scienter is the content and context of the statements made by [the defendants], which were made in response to analysts['] questions." *Id.* **Third**, "under the core operations doctrine, misstatements and omissions made on core matters of central importance to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Id.* Defendants' arguments otherwise should be rejected.[9]

### 2.    There is a strong inference of scienter as to Conduent.

There are three ways to allege corporate scienter: "(1) apparent authority, (2) *respondeat superior*, and (3) through an inference based on alleged misconduct that is attributable only to management level corporate officials." *MTB In*v. *Partners, LP* v. *Siemens Hearing Instruments, Inc.*, 2013 WL 12149253, at *5 (D.N.J. Feb. 19, 2013) (Wigenton, J.). Here, the Complaint alleges

---

[9] Defendants' argument that the Complaint lacks motive allegations misunderstands the legal standard. The scienter analysis is holistic, the absence or inclusion of a type of allegation is not determinative, and "the absence of a motive allegation is not fatal" when evaluating whether scienter is adequately pled. *See Tellabs*, 551 U.S. at 325; *Avaya*, 564 F.3d at 277.

a strong inference of scienter as to Vemuri and Webb-Walsh, whose conduct is imputable to Conduent under *respondeat superior* and, as CEO and CFO, apparent authority.

The Complaint also alleges a strong inference of scienter as to Conduent through the knowledge of other management level corporate officials. During the Class Period, CW1 attended monthly meetings with personnel from Atos concerning the data migration. Conduent executives who also attended were Bev Chamberlin, VP and Head of Business Information Office, IT Strategy, and Process; Kevin Cahan, Conduent's SVP of IT Solutions; and Rick Dastin, Conduent's Chief Technology and Product Officer. ¶136-37. Each month, this group would discuss six to twelve incidents that impacted multiple customers or had significant impact on Conduent's business. *Id.* These meetings and discussions support a finding of corporate scienter. Given the importance of the data migration, how problems with that migration impacted the tolling business, and the fact that the tolling business was a core operation, the facts alleged are "extraordinary," similar to Bridgestone's conduct in covering up serious problems with its tires, as described in *City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005), and cited approvingly by the Third Circuit. *See City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 442 Fed. Appx. 672, 676-77 (3d Cir. 2011). The allegations also rise to the level of the hypothetical in *Tellabs II* that "has been used as a standard in subsequent cases for determining the sufficiency of pleadings related to the third approach of alleging corporate scienter:"

> [I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false. *Tellabs II*, 513 F.3d at 710.

*MTB Inv.* at *5. Defendant's conduct constitutes "pervasive corporate misconduct, or blatantly false statements" such that a finding of corporate scienter is appropriate. *See In re Cognizant Tech.*

*Sols. Corp. Secs. Litig.*, 2018 WL 3772675, at \*32 (D.N.J. Aug. 8, 2018). The conduct involves an important portion of Conduent's business, and the misstatements concerning the Strategic Transformation, data migration, and tolling business would "have been approved by corporate officials sufficiently knowledgeable about the company to know that the" statements were false. *MTB In*v. at \*7. As such, the complaint alleges a strong inference of corporate scienter.

### 3.      Post-Class Period events support a strong inference of scienter.

Defendants incorrectly claim that the Complaint's reliance on post class period events to prove scienter are improper attempts to infer fraud by hindsight. While the ***disclosures*** were after the Class Period, they concerned facts and events ***occurring during the Class Period***. For example, the February 19, 2019 *Miami Herald* article discussed that in the summer of 2018, during the Class Period, Conduent's system update caused a month-long outage in collecting tolls for the Florida Department of Transportation. The Complaint does not claim "merely that [the Defendants'] statements turned out to be wrong, and therefore must have been fraudulent." *Avaya*, 564 F.3d 242 at 269. Rather, the post-Class Period allegations evidence Class Period facts and "proffer an array of circumstantial evidence giving rise to a strong inference that [Defendants'] statements were at least reckless, which is enough to survive a motion to dismiss under the PSLRA." *Id.* As such the post-Class Period disclosures of Class Period events support a strong inference of scienter.[10]

---

[10] Defendants' cases are based on inapposite facts. In *OFI Asset Mgmt* v. *Cooper Tire & Rubber*, the plaintiff alleged that "once the Merger Agreement was announced, Che's opposition would lead to a threatened labor strike." 834 F.3d 481, 497 (3d Cir. 2016). The Third Circuit "decline[d] to connect those dots" as "[h]ow Che would react was an unknown." *Id.*; *Cf. also Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("Neither the adequately pled true facts nor Defendants' public statements demonstrate the alleged falsity of Defendants' Class Period disclosures."); *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at \*19 (D.N.J. July 22, 2015) ("These statements, however, say nothing about Defendants' knowledge or state of mind during the Class Period.").

Defendants' argument concerning the resignation of Michael Nevin from Conduent's Board similarly fails. While Nevin's resignation took place after the Class Period, his allegations against Vemuri concerned Class Period conduct. Nevin specifically stated that Vemuri was disregarding his duties to Conduent at a time when "negative disclosures by Conduent resulted in the evaporation of almost half the company's stock market valuation in a matter of a few short weeks." ¶195. This reaction was precipitated by the November 7, 2018 disclosure that Conduent fell short of revenue expectations and was revising its guidance, because the Company "suffered from sub-optimal performance by its third-party vendor and its own sub-standard IT infrastructure." ¶¶193-95, 206-07.[11] Defendants also completely ignore that Conduent announced Vemuri was stepping down as CEO and as a member of the Board on May 8, 2019, 30 days after Nevin resigned and sent his letter. ¶¶193-96. The proximity of Nevin's allegation to Vemuri's resignation supports a strong inference of scienter.

    **E.**    **The Complaint adequately pleads loss causation because the market and analysts reacted to the corrective disclosures.**

Loss causation is an inquiry concerning proximate cause. *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litigation*, 2011 WL 3444199, at *29 (D.N.J. August 8, 2011). "Purchase of a security at a price that is artificially inflated due to an alleged misrepresentation and a loss therefrom constitutes a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement." *In re Vicuron Pharms., Inc. Secs. Litig.*, 2005 WL 2989674, at *11 (E.D. Pa. July 1, 2005). "Such an inquiry can be highly factual, and thus the Third

---

[11] Defendants argue that the allegation that "Vemuri was not giving his duties at Conduent his full attention" is "ironic [] for a Plaintiff attempting to plead knowledge of fraud." Mot. at 31. This ignores that this allegation evidences Vemuri's recklessness, as he spoke about issues while being "asleep at the switch, as he has been in so many instances during his tenure." *See* ¶¶194-95; *see also* https://www.sec.gov/Archives/edgar/data/1677703/000095015719000444/ex17-1.htm. It also speaks to Conduent's recklessness, through the inaction of its Board at the time.

Circuit has noted that it is often unsuited to disposition based on the pleadings alone." *In re Merck*, at *29. On a motion to dismiss, loss causation allegations are adequate if they meet the Rule 8(a) standard by giving a "short and plain statement" of economic loss and its causal connection to the alleged misrepresentations and/or omissions. *Id*. Alleging a price drop in the company's securities upon the public release of information revealing the misleading nature of previous misrepresentations or omissions by the company is sufficient. *See id.* at 30.

The Complaint sufficiently alleges that Lead Plaintiff and the Class' economic loss was caused by Defendants' misrepresentations and omissions. *See* ¶¶202-09. Lead Plaintiff alleged that Defendants made material misstatements and omissions about the Company's Strategic Transformation, specifically, that during 2017, it had addressed its sub-optimal vendor relationships and had inventoried its IT technology portfolio. ¶¶10-11, 91-93. Lead Plaintiff further alleged that Defendants' material misstatements and omissions artificially inflated Conduent's stock price throughout the Class Period. ¶202. On November 7, 2018, Conduent revealed it fell short of expectations for revenue in the third quarter of 2018 and revised its previously stated revenue guidance for FY2018 because the Company suffered from sub-optimal performance by its third-party vendor and its own sub-standard IT infrastructure. ¶¶165-73. Vemuri further disclosed that these underlying IT issues caused disruptions to the Company's operations and impacted delivery to core business clients. ¶¶24, 169-71. Additionally, Vemuri revealed that Conduent had been aware that it was constrained by the limitations of its existing infrastructure and sub-optimized vendor relationship. ¶¶172-73. On November 7, 2018, following these revelations, the Company's stock price fell over 29%. ¶¶27, 167, 207. This decline was a direct result of Defendants' misrepresentations and omissions being revealed to investors and the market. ¶¶204, 209. Multiple analyst reports addressed the disclosures, including BMO Capital Markets

who noted vendor problems and the IT infrastructure as two of Conduent's issues, and specifically stated that the IT provider issues had likely been a problem for some time and could have been shared with investors earlier. ¶¶26, 144-45, 174-75.

Defendants argue Lead Plaintiff has not pled loss causation because it has not alleged a fraud, but merely a stock drop following disappointing results and revised guidance. Mot. at 37-39. This argument is without merit. Defendants' argument ignores Lead Plaintiff's allegations that Conduent's material misstatements related to the adequacy of the Company's legacy IT infrastructure and technology vendors were underlying factors that ultimately caused the negative impact on the Company's financial performance.[12] ¶¶147-51. Defendants' position is especially weak, considering Vemuri plainly admitted as much while announcing the Company's third quarter financial results. ¶¶24, 169-71.

## III.   THE COMPLAINT STATES AN EXCHANGE ACT § 20(a) CLAIM

Because the Complaint states a §10(b) claim, the §20(a) claim stands. *Cf.* Mot. at 10 n.5.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.[13]

---

[12] Plaintiff "need not show that a misrepresentation was the sole reason for the investment's decline in value," only that it "was a substantial factor" in that decline." *See id.*

[13] If the Court grants any part of the Motion, such dismissal should be without prejudice.

Dated: December 23, 2019                    Respectfully submitted,

                                            /s/ Richard Elem

                                            **LAW OFFICES OF JAN MEYER**
                                            **& ASSOCIATES, P.C.**
                                            1029 Teaneck Road, Second Floor
                                            Teaneck, New Jersey 07666
                                            Telephone: 201-862-9500
                                            Email: relem@janmeyerlaw.com

                                            *Liaison Counsel for Lead Plaintiff*

                                            **BERNSTEIN LIEBHARD LLP**
                                            Stanley D. Bernstein (*pro hac vice*)
                                            Michael S. Bigin (*pro hac vice*)
                                            Peter J. Harrington (*pro hac vice*)
                                            10 East 40th Street
                                            New York, NY 10016
                                            Telephone: (212) 779-1414
                                            Facsimile: (212) 779-3218
                                            Email: bernstein@bernlieb.com
                                                   bigin@bernlieb.com
                                                  pharrington@bernlieb.com

                                            **THORNTON LAW FIRM LLP**
                                            Guillaume Buell (*pro hac vice*)
                                            1 Lincoln Street
                                            Boston, MA 02111
                                            Telephone: (617) 531-3933
                                            Email: gbuell@tenlaw.com

                                            *Co-Lead Counsel for Lead Plaintiff and the*
                                            *Proposed Class*

                                            **WOLF POPPER LLP**
                                            Robert C. Finkel (*pro hac vice*)
                                            Joshua W. Ruthizer (*pro hac vice* to be filed)
                                            845 Third Avenue
                                            New York, NY 10022
                                            Telephone: (212) 759-4600
                                            Email: rfinkel@wolfpopper.com
                                                   jruthizer@wolfpopper.com

                                            *Additional Counsel for Lead Plaintiff and the*
                                            *Proposed Class*

## CERTIFICATE OF SERVICE

I, Richard Elem, hereby certify that on December 23, 2019, a true and correct copy of the annexed **LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served in accordance with the Federal Rules of Civil Procedure with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all parties with an email address of record who have appeared and consented to electronic service in this action.

Dated: December 23, 2019                                    /s/ Richard Elem
                                                            Richard Elem