**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, *Individually and on Behalf of All Others Similarly Situated*,<br><br>Plaintiff,<br><br>v.<br><br>CONDUENT INC., *et al.*,<br><br>Defendants. | Civil Action No. 19-8237 (SDW) (SCM)<br><br>**OPINION**<br><br>June 5, 2020 |

**WIGENTON**, District Judge.

Before this Court is Defendants Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh's (collectively, "Defendants") Motion to Dismiss Lead Plaintiff's Amended Class Action Complaint, (D.E. 18), for failure to state a claim pursuant to Federal Rules of Civil Procedure ("Rule") 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act.[1]  Jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated herein, the Motion to Dismiss is **DENIED**.

---

[1] Lead Plaintiff is the Conduent Institutional Investor Group, consisting of Plaintiffs Employees Retirement System of the Puerto Rico Electric Power Authority, Oklahoma Firefighters Pension and Retirement System, Plymouth County Retirement Association, and Electrical Workers Pension Fund, Local 103, I.B.E.W.  (D.E. 10.)

I.     **BACKGROUND AND PROCEDURAL HISTORY**

**A.**

Defendant Conduent Inc. ("Conduent") is a New York corporation based in New Jersey, with a common stock that trades on the New York Stock Exchange. (Am. Compl. ¶ 33.) The company provides business processing services to commercial and government clients, including electronic toll collection (*e.g.*, E-ZPass) for government clients. (*Id.* ¶¶ 42–43, 45.)[2] During the Class Period,[3] Defendants Ashok Vemuri and Brian Webb-Walsh (together, the "Individual Defendants") served as Conduent's Chief Executive Officer and Chief Financial Officer, respectively. (*Id.* ¶¶ 35–36.) This action arises from allegations that, during the Class Period, Defendants overstated to investors the progress that Conduent was making in modernizing the IT infrastructure supporting its electronic toll collection business, resulting in a significant drop in the company's stock price when Mr. Vemuri revealed the truth on November 7, 2018. (*Id.* ¶¶ 8–27.)

Plaintiff Employees Retirement System of the Puerto Rico Electric Power Authority filed the instant suit on March 8, 2019 and Lead Plaintiff filed the Amended Class Action Complaint ("Amended Complaint") on September 13, 2019. (D.E. 1, 18.) The Amended Complaint asserts two counts of securities fraud: (I) violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder (against all Defendants) and (II) violations of Section 20(a) of the Securities Exchange Act (against the Individual Defendants). Defendants subsequently moved to dismiss the Amended Complaint and briefing was timely completed. (D.E. 33, 37–38.)

---

[2] Conduent began operations as an independent company on December 31, 2016, when it fully separated from Xerox Corporation ("Xerox"). (Am. Compl. ¶¶ 39, 41.)

[3] The putative class consists of persons who purchased Conduent common stock on the open market on a U.S. stock exchange between February 21, 2018 and November 6, 2018 (the "Class Period"). (*Id.* ¶ 3.)

**B.**

Lead Plaintiff alleges that on February 22, 2017, Conduent announced a business plan that it called "Strategic Transformation." (Am. Compl. ¶ 68.) The first phase of the Strategic Transformation included evaluating the company's third-party vendor contracts and inventorying the company's IT infrastructure to consolidate its data centers. (*Id.* ¶¶ 8, 70, 72.)[4] At various times in 2017, Defendants represented to investors that these improvements were part of their plan to grow the company by relying on technology, and they specifically identified the platform-based technology supporting Conduent's tolling operations as a model for profitable growth. (*Id.* ¶¶ 7, 57, 65, 67.) Defendants further identified Conduent's tolling operations as a "core" business segment. (*Id.* ¶¶ 5, 48–49, 63, 85–86.) In fact, in 2018, Conduent managed approximately 50% of all automated tolling systems in the United States and its tolling business reported $299 million in revenue (approximately 5.5% of Conduent's total revenues). (*Id.* ¶¶ 47, 51–56.)

Lead Plaintiff alleges that on the first day of the Class Period, during Conduent's February 21, 2018 earnings call, Defendants represented to investors that Conduent had completed the initial phase of the Strategic Transformation and had cured inefficiencies stemming from legacy contracts, stating, "In 2017, we addressed our sub-optimized IT-related workforce and vendor relationships. Next we expect to see benefits from the platform rationalization work completed last year." (*Id.* ¶¶ 10, 88, 91–92.) Mr. Vemuri also told investors that Conduent had inventoried the company's legacy IT systems, stating, "During our first year, we needed to inventory and rationalize our technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology." (*Id.* ¶ 93.) Also on the call, Defendants issued

---

[4] A complete and accurate systems inventory was critical to keeping the company's tolling operations and other platform-based technologies running correctly after it transferred its data to the new facility. (*Id* ¶¶ 8, 13.)

Conduent's FY2018 revenue guidance and stated that the company "expect[s] transportation [revenue] inside of Public Sector to grow in 2018." (*Id.* ¶¶ 89, 147, 150.)[5]

However, Lead Plaintiff alleges that, contrary to these representations, Conduent had not "addressed" its "sub-optimized" vendor relationships in 2017 and did not possess a systems inventory of the company's legacy IT infrastructure. (*Id.* ¶ 12.) Prior to and during the Class Period, Conduent was under contract with third-party Atos SE ("Atos") to provide IT support for Conduent's businesses. (*Id.* ¶¶ 73, 172.) Atos was responsible for deploying a software program that would inventory Conduent's legacy IT infrastructure, but it was only able to inventory 14% of Conduent's systems by summer 2018. (*Id.* ¶ 138.) According to a former Conduent employee, as a result of Atos's failure, Conduent began manually inventorying the company's systems in June 2018, but the process was inaccurate and did not result in a complete systems inventory prior to data migration. (*Id.* ¶¶ 15–16, 139.)

Nonetheless, Lead Plaintiff alleges, Conduent went ahead and performed data migration without a complete systems inventory in place, resulting in service issues and network outages for Conduent's tolling clients. (*Id.* ¶¶ 16, 139.) During these outages, Conduent's platform did not process tolls for the cashless tolling systems, causing the tolling agencies of several states to fine or withhold revenue from Conduent. (*Id.* ¶¶ 16–17, 115–34.) By May 15, 2018, these outages began impacting nearly all of Conduent's E-ZPass tolling clients on the East Coast. (*Id.* ¶¶ 16, 113–34.) As a result, on July 30, 2018, two U.S. senators asked the Federal Trade Commission to investigate Conduent's "pattern of mismanaging cashless tolling systems." (*Id.* ¶ 119.)

---

[5] Conduent's FY2018 guidance advised that investors should expect company-wide revenue in the range of $5.625 billion to $5.799 billion and adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) in the range of $707 million to $733 million. (*Id.* ¶ 147.) Mr. Webb-Walsh stated that projected FY2018 EBITDA growth of between 8% and 12% was due in part to the positive results of the company's Strategic Transformation. (*Id.* ¶ 90.)

Despite these issues, Lead Plaintiff alleges that, throughout the Class Period, Defendants continued to make materially false and misleading statements, informing investors that the initial phase of the Strategic Transformation was complete, and failing to disclose that the lack of systems inventory and ensuing problems with the data migration were causing significant problems with Conduent's tolling business, resulting in reduced revenue and fines being levied against Conduent. Specifically, on May 9, 2018, during Conduent's first quarter 2018 earnings conference call, Mr. Vemuri provided an update on the Strategic Transformation, stating that real estate "and IT consolidation remain large contributors to our transformation work and are progressing well." (*Id.* ¶ 155.) Similarly, during Conduent's June 8, 2018 analyst day, Mr. Vemuri told investors, "We've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves." (*Id.* ¶ 159.)[6]

During the company's August 8, 2018 earnings call, Mr. Vemuri acknowledged that Conduent was experiencing performance issues on a tolling contract. (*Id.* ¶¶ 19, 105.) However, Lead Plaintiff alleges, Mr. Vemuri did not disclose Conduent's underlying IT issues or suboptimal vendor performance, and instead falsely stated that the issues were isolated to a single client ("a tolling contract with a state government agency"). (*Id.* ¶¶ 20–21, 162.) At the same time, Mr. Vemuri continued to state that Conduent had "the capability to efficiently resolve these issues," and Mr. Webb-Walsh represented that Defendants "d[id]n't anticipate [the issue with the tolling contract] having an impact on our ability to meet our guidance." (*Id.* ¶¶ 105–06, 162–63.)

---

[6] Lead Plaintiff also alleges that on the May 9, 2018 earnings call, Defendants lowered their FY2018 guidance but attributed the reduction solely to a strategic divestiture, stating that Conduent "still expect[s] to show growth in [the Transportation business] in 2018 as a large tolling contract is expected to ramp by the end of Q2." (*Id.* ¶¶ 152–54.) Similarly, on the June 8, 2018 analyst day call, Defendants lowered FY2018 guidance, but Mr. Webb-Walsh misleadingly stated that "the only change we are making to guidance are as a result of [a strategic] . . . divestiture" and that Conduent "still expect[s] to grow organically in Q4 of this year." (*Id.* ¶¶ 157–58.)

In a November 7, 2018 press release announcing Conduent's third quarter financial results, Defendants finally revealed that the underlying issues affecting tolling client services had materially impacted Conduent's financial performance and caused the company to lower its FY2018 guidance.  (*Id.* ¶¶ 23, 165–67.)  On the ensuing earnings call, Mr. Vemuri blamed "continued suboptimal performance from an inherited legacy technology vendor" and that vendor's "inability to deliver on service level agreements," as well as disruptions to operations that impacted client delivery caused by the company's "outdated and historically under-invested legacy IT infrastructure."  (*Id.* ¶¶ 24, 169–71.)  As a result of these revelations, Lead Plaintiff alleges, on November 7, 2018, Conduent's common stock price fell over 29%.  (*Id.* ¶¶ 27, 176.)

## II.     **LEGAL STANDARD**

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (discussing the *Iqbal* standard).  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief" as required by Rule 8(a)(2).  *Iqbal*, 556 U.S. at 679.

Pursuant to Rule 9(b), plaintiffs alleging fraud must "meet a heightened pleading standard by 'stat[ing] with particularity the circumstances constituting fraud[.]'"  *N.Y. City Emps.' Ret. Sys.*

*v. Valeant Pharm. Int'l, Inc.*, Civ. No. 18-0032, 2018 WL 4620676, at *2 (D.N.J. Sept. 26, 2018) (quoting Fed. R. Civ. P. 9(b)). Plaintiffs can satisfy this heightened standard by alleging dates, times, places and other facts with precision. *Park v. M & T Bank Corp.,* Civ. No. 09-2921, 2010 WL 1032649, at *5 (D.N.J. Mar. 16, 2010).

Securities fraud claims are subject to two additional and distinct pleading requirements pursuant to the Private Securities Litigation Reform Act ("PSLRA"). *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017) ("All securities fraud claims are subject to Rule 9(b)[.]"); *Christian v. BT Grp. PLC*, Civ. No. 17-497, 2018 WL 3647218, at *4 (D.N.J. Aug. 1, 2018) ("Rule 9(b) . . . is both subsumed and supplemented by the requirements of . . . the PSLRA."). First, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B); *see also OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). Second, whereas "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" under Rule 9(b), the PSLRA requires that the applicable mental state, in this case scienter, be pled with particularity. *Id.*

### III.    DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe[.]" 15 U.S.C. § 78j(b). Promulgated thereunder, Rule 10b-5 makes it unlawful, in relevant part, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

7

circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance[;] . . . (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006) (emphasis and citations omitted) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). Here, Defendants argue that the Amended Complaint fails to adequately plead a material misrepresentation or omission, scienter, and loss causation. This Court addresses each element in turn.

**A.      Misrepresentations and Omissions**

The Amended Complaint alleges that while discussing Conduent's Strategic Transformation program with investors on February 21, 2018, Mr. Vemuri stated that "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships. Next we expect to see benefits from the platform rationalization work completed last year." (Am. Compl. ¶ 148.) On the same call, Mr. Vemuri further stated that "[d]uring the first year, we needed to inventory and rationalize our technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology." (*Id.* ¶ 149.) Similarly, during an earnings call with investors on May 9, 2018, Mr. Vemuri stated that "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well." (*Id.* ¶ 155.)

The Amended Complaint also alleges that Defendants omitted the following information from statements to investors during the Class Period: (1) known issues with the legacy IT infrastructure and vendor performance that were impacting Conduent's financial guidance and

growth, (2) service issues experienced by multiple tolling clients that were caused by Conduent's deficient IT infrastructure and sub-optimal vendor performance, and (3) IT issues that caused the company to accrue material penalties and revenue losses for failing to perform under tolling clients' contracts. (*Id.* ¶¶ 114–19, 121–34, 151, 156, 160, 162–64.)

### 1. Materiality

To be actionable, a misrepresentation or omission "must have been materially misleading at the time it was made." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). A misrepresentation or omission is material if it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." *Fan* v. *StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019) (citation omitted). Because "[m]ateriality is a mixed question of law and fact, . . . . [o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n.11 (3d Cir. 1992) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

The Amended Complaint alleges that Defendants' misrepresentations and omissions, summarized *supra*, were material because they created the misleading impression that Conduent would be able to achieve profitable growth based on its progress with the Strategic Transformation. The value of this information is reflected in Defendants' efforts to routinely inform investors about Strategic Transformation milestones, such as curing legacy IT inefficiencies by addressing the company's sub-optimal vendor relationships and progressing with the company's data center consolidation. (Am. Compl. ¶¶ 8, 10–11, 68-72, 92–93, 155). Without these misrepresentations, investors could only assume that the Strategic Transformation remained on track, despite

Defendants' alleged knowledge to the contrary. (*Id.* ¶¶ 153, 158, 163.) Thus, the statements and omissions "significantly altered the total mix of information available" to the reasonable investor. *Fan*, 927 F.3d at 716. *See also In re CIGNA Corp Sec. Litig.*, Civ. No. 02-8088, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (holding that defendants' statement about the progress of a "Transformation project" was actionable). That Conduent's progress with the Strategic Transformation was material and impacted investment decisions is also reflected in the sharp drop in the company's stock price following Defendants' revelations that issues with Atos and legacy IT infrastructure negatively impacted financial performance. (Am. Compl. ¶¶ 27, 165–71, 176.) It is clear, therefore, that reasonable minds could differ on the question of materiality, and Lead Plaintiff's factual allegations are therefore sufficient.[7]

### 2. Specificity

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Lead Plaintiff does so here.

During the February 21, 2018 earnings call, Mr. Vemuri stated, "In 2017, we addressed our sub-optimized IT-related workforce and vendor relationships," and further stated, "During the first year [2017], we needed to inventory and rationalize our technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology." (Am. Compl. ¶¶ 148–49.) Lead Plaintiff alleges that these statements were misleading because Conduent's inventory of its technology portfolio was not in fact completed in 2017, and in fact

---

[7] To the extent Defendants argue that all misrepresentations related to Conduent's tolling business were immaterial because the tolling business itself was not a significant source of revenue, (D.E. 33-1 at 27–28), the argument is overcome by Lead Plaintiff's allegations that Defendants identified the tolling business as one of Conduent's "core business" segments in statements to investors. (Am. Compl. ¶¶ 5, 48-49, 63, 85-86.)

was only 14% completed by the summer of 2018, leading to major disruptions to operations. (*Id.* ¶¶ 138, 151, 165–71.) Lead Plaintiff further alleges that the incomplete systems inventory was the direct result of the sub-optimized vendor relationships (specifically, Atos) that Mr. Vemuri claimed had been addressed in 2017. (*Id.*)

During the May 9, 2018 earnings call, Mr. Vemuri stated that "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well." (*Id.* ¶ 155.) Lead Plaintiff alleges that this statement was misleading as Conduent's IT consolidation was not in fact progressing well—Lead Plaintiff alleges that Conduent lacked a systems inventory of its legacy IT infrastructure, which was critical to the company's data migration and keeping its existing operations such as the company's tolling operation running. (*Id.* ¶¶ 13, 138, 156.)

Throughout the Class Period, Defendants made various statements to investors regarding Conduent's financial guidance and expected growth. (*Id.* ¶¶ 147, 150, 152–54, 157–58, 161–63.) Lead Plaintiff alleges that each of these statements was misleading because Defendants had no reasonable basis to believe that Conduent could achieve these results in light of the issues that eventually caused Conduent to miss its projections—issues of which they were aware throughout the Class Period. Specifically, the issues relating to Conduent's legacy IT infrastructure and sub-optimal vendor eventually resulted in disrupted service for Conduent's tolling clients, subsequent material penalties, and a loss of anticipated revenue. (*Id.* ¶¶ 114–34, 137–39.)

Finally, on Conduent's August 8, 2018 call with investors, Mr. Vemuri addressed performance problems on "a tolling contract with a state government agency," the Florida Department of Transportation. (*Id.* ¶ 162.) During the call, when questioned by analysts about the potential impact of the issue with this tolling client, Mr. Webb-Walsh stated, "We typically don't comment on the financials around one specific contract," and that "we just confirmed our

11

guidance in revenue, free cash flow and adjusted EBITDA" so "we don't anticipate it having an impact on our ability to meet our guidance." (*Id.* ¶ 163.) Lead Plaintiff alleges that these statements were misleading because Defendants omitted that Conduent's service issues were not isolated to one state government agency, and in fact encompassed multiple clients, including agencies in New York, New Jersey, Michigan, California, Texas, New Hampshire, and Maryland. (*Id.* ¶¶ 114–19, 121–22, 125–26, 137–39.) Notably, Lead Plaintiff alleges that Defendants knew or should have known of the widespread toll processing issues at the time they made these statements. (*Id.* ¶¶ 113–19.) Lead Plaintiff further alleges that these statements were misleading because Defendants omitted that the technological issues could have a significant financial impact on the company, as Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required under the contracts with those state agencies. (*Id.* ¶¶ 121–34, 164.)

The Court has reviewed these detailed allegations and the other factual allegations in the Amended Complaint and finds that Lead Plaintiff has met its heightened burden under the PSLRA to plead its allegations of misrepresentations and omissions with particularity.[8]

### 3. PSLRA Safe Harbor

Defendants argue that even if such statements were otherwise sufficiently pled, they fall within the PSLRA's safe harbor. Under the PSLRA, "forward-looking" statements are not actionable if they are "(1) identified as such, and accompanied by meaningful cautionary

---

[8] To the extent the Defendants argue that liability cannot ensue for any of these alleged misrepresentations or omissions because the market was aware of curative information (a "truth on the market" defense), this Court notes that such a defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, Civ. No. 17-10467, 2019 WL 3451523, at *9 (D.N.J. July 31, 2019) (citation and internal quotation marks omitted). Furthermore, none of the information that Defendants point to informed investors (1) that Conduent lacked the inventory of its IT infrastructure that was necessary to complete its planned data center consolidation, (2) that the then-present IT infrastructure was insufficient to support Conduent's core business segments in the interim and could create service delivery issues, (3) that Conduent took control of tasks from its sub-optimal vendor Atos because of Atos's failure to create the critical systems inventory, or (4) the severity of the tolling service issues and the resulting penalties and revenue loss.

statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna Sec. Litig.*, 617 F.3d 272, 278-79 (3d Cir. 2010). The PSLRA's definition of "forward-looking statement" includes, *inter alia*, "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance." *Id.* at 279 (citing 15 U.S.C. § 78u–5(i)(1)).

The Amended Complaint alleges that Defendants stated that: (1) "[i]n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships," (Am. Compl. ¶¶ 10, 92, 148); (2) "[d]uring [2017], we needed to inventory and rationalize our technology portfolio," (*id.* ¶¶ 11, 93, 149); and (3) Conduent's Strategic Transformation was "progressing well," (*id.*, ¶¶ 97, 155). Such statements purport to describe historical facts or a then-present state of affairs and are not forward-looking statements entitled to PSLRA's safe harbor. *See In re Enzymotec Sec. Litig.*, Civ. No. 14-5556, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (finding that statements about progress such as "well positioned for future growth" and "achieving rapid penetration" were actionable because they related to "then-existing conditions as opposed to future projections"); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 545–46, 556–57 (D.N.J. 2002) (ruling that "experiencing" growth and "is growing" are not forward-looking statements); *see also Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) ("A mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (citation and some punctuation omitted)).

Additionally, the Amended Complaint alleges that Defendants made several public statements in which they omitted material information. For example, it alleges that when Mr. Vemuri stated "[w]e've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance

13

by ourselves," he omitted that Conduent was experiencing massive problems at the time due to the company's lack of an IT systems inventory. (Am. Compl. ¶ 138.) Additionally, when Mr. Vemuri claimed that Defendants were dealing with an IT issue with one state government agency, he omitted that several of the government company's tolling clients were experiencing the same service issues, caused by the failure to map the IT systems inventory and sub-optimal performance by Atos. (*Id.* ¶¶ 113–19, 162, 164, 187.) Defendants also omitted that as a result of the IT issues, Conduent had accrued significant penalties and lost anticipated revenue. (*Id.* ¶¶ 120–34, 164.) However, material omissions are not forward-looking statements and therefore do not qualify for safe harbor protection. *See Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, Civ. No. 00-4285, 2002 WL 33934282, at *11 (D.N.J. June 26, 2002) (citation omitted). Accordingly, the Amended Complaint sufficiently alleges actionable and material misrepresentations and omissions with the required specificity.

      **B.**    **Scienter**

The PSLRA's "scienter standard requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Avaya*, 564 F.3d at 267 (citation omitted). It also requires that plaintiffs plead § 10(b) scienter with particularity. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007). This means that plaintiffs must "specify the role of each defendant, demonstrating each defendant's involvement in the misstatements and omissions." *Winer Family Trust v. Queen*, 503 F.3d 319, 335–36 (3d Cir. 2007).

To determine whether a plaintiff has sufficiently pled the scienter element of a § 10(b) claim, a court must review the complaint in its entirety. *Tellabs*, 551 U.S. at 322–23. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis

in original).  Under *Tellabs*, "[a] complaint will survive [a Rule 12(b)(6) motion] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### 1. Individual Defendants

The Amended Complaint includes specific allegations that Mr. Vemuri supervised the Strategic Transformation, met with customers who told him about data management problems, and affirmatively spoke about the problems with Conduent's tolling platform.  (Am. Compl. ¶¶ 109–10, 162, 187.)  For example, on June 8, 2018, at Conduent's Analyst Day, Mr. Vemuri advised investors that Conduent was moving critical network infrastructure and client-facing applications in-house in connection with the data center consolidation.  (*Id.* ¶102.)  Similarly, on an August 8, 2018 earnings call with investors, Mr. Vemuri brought up the issues with Conduent's tolling platform, stating that he "want[ed] to address a matter that has been in the press recently around our performance on a tolling contract with a state government agency. . . . We have the capability to efficiently resolve these issues[] and are dedicating all necessary resources to meet our contractual commitments." (*Id.* ¶¶ 162, 187.)  The Amended Complaint also alleges that on the same call, in response to an analyst's pointed question on the issue, Mr. Webb-Walsh denied that the problems with Conduent's tolling platforms would have an effect on its ability to meet its guidance.  (*Id.* ¶¶ 163, 187.)  These allegations, "taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323; *see also In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("[T]he most powerful evidence of scienter is the content and context of the statements made by [the defendants], which were made 'in response to . . . analysts['] questions." (internal quotation marks omitted) (quoting *Avaya*, 564 F.3d at 269)).

Furthermore, it seems implausible that Conduent's CEO and CFO were not aware of the problems with its tolling platform during the Class Period, in view of (1) their identification of Conduent's tolling operations as a "core" business segment, (Am. Coml. ¶¶ 5, 48–49, 63, 85–86); (2) the frequency and duration of the outages that its tolling platform experienced, including problems throughout 2018 in New York and a month-long outage in Florida, (*id.* ¶¶ 114, 116, 189–92); and (3) the number and amount of penalties that Conduent incurred as a result of those issues, including millions of dollars in fines from the Texas DOT, the NJ Turnpike Authority, and the Florida DOT, (*id.* ¶¶ 122–26, 192). *See Urban Outfitters*, 103 F. Supp. 3d at 653–54 ("misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give[] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge" (quoting *Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237, 246–47 (3d Cir. 2013))). These circumstances, while not conclusive, tend further to bolster the inference that the Individual Defendants "knew at the time [their] statements were false or [were] reckless in disregarding the obvious risk of misleading the public." *Avaya*, 564 F.3d at 272.

### 2. Conduent

There are three ways to allege corporate scienter: "(1) apparent authority, (2) *respondeat superior*, and (3) through an inference based on alleged misconduct that is attributable only to management level corporate officials." *MTB In*v. *Partners, LP* v. *Siemens Hearing Instruments, Inc.*, Civ. No. 12-340, 2013 WL 12149253, at *5 (D.N.J. Feb. 19, 2013) (citations omitted).[9] Here,

---

[9] The Third Circuit has not directly addressed whether collective scienter is a viable pleading option in a § 10(b) claim. Nonetheless, the Third Circuit has implied that it may be possible to plead corporate scienter provided that the alleged misrepresentation is "so dramatic [that it] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the [misrepresentation] was false." *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x. 672, 676 (3d Cir. 2011) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702,

the Amended Complaint alleges that the Individual Defendants' conduct, *supra*, is imputable to Conduent under *respondeat superior* and apparent authority because of their roles as CEO and CFO of the company.

The Amended Complaint also alleges corporate scienter through an inference based on alleged misconduct that is attributable only to management level corporate officials. Specifically, it alleges that, during the Class Period, a confidential witness ("CW1")[10] attended monthly meetings with personnel from Atos to discuss incidents that impacted multiple customers or had significant impact on Conduent's business—about six to twelve such incidents each month. (Am. Compl. ¶ 137.) These meetings were attended by various Conduent executives including the Vice President and Head of the Business Information Office, IT Strategy, and Process; the Senior Vice President of IT Solutions; and the Chief Technology and Product Officer. (*Id.*) These factual allegations, in view of the other allegations contained in the Amended Complaint regarding the importance of the data migration, the impact of infrastructure problems on the tolling business, and the core nature of the tolling business, support an inference of corporate scienter.

### C. Loss Causation

The loss causation element of a § 10(b) claim "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) (emphasis in original). To satisfy this requirement, "the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price,

---

710 (7th Cir. 2008)); *see also MTB*, 2013 WL 12149253, at *5 (discussing the Third Circuit's stance, or lack thereof, in the context of the circuit split on the issue).

[10] CW1 was Conduent's Vice President of Enterprise Architecture from approximately March 2017 until March 2019. (Am. Compl. ¶ 136.) CW1 reported to Conduent's Senior Vice President of IT Solutions, who in turn reported to Conduent's Chief Information Officer. (*Id.*)

thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425–26 (3d Cir. 2007) (citations omitted). Such an inquiry can be "highly factual," and thus the Third Circuit has noted that it is often unsuited to disposition based on the pleadings alone. *Id.* at 427 n.4 (citations omitted). Loss causation is adequately alleged if it meets Rule 8(a)'s standard by giving a "short and plain statement" of economic loss and its causal connection to the alleged misrepresentations and/or omissions. *Id.* (quoting *Dura Pharm.*, 544 U.S. at 346–47).

The Amended Complaint alleges that on November 7, 2018, Conduent revealed that it missed revenue expectations for the third quarter of 2018 and revised its revenue guidance for FY2018; Conduent blamed these events on Atos's sub-optimal performance and its own sub-standard IT infrastructure, issues which Mr. Vemuri admitted that Conduent had been aware of for some time. (Am. Compl. ¶¶ 165–73.) Mr. Vemuri also disclosed that these underlying IT issues had caused disruptions to Conduent's operations and impacted delivery to core business clients. (*Id.* ¶¶ 24, 169–71.) That same day, following these revelations, Conduent's stock price fell over 29%. (*Id.* ¶¶ 27, 207.) The Amended Complaint alleges that this decline was a direct result of Defendants' misrepresentations and omissions being revealed to investors. (*Id.* ¶¶ 204, 209.)[11] Multiple analyst reports addressed the disclosures, including BMO Capital Markets, which noted vendor problems and IT infrastructure as two of Conduent's issues and stated that the IT provider issues had likely been a problem for some time and could have been shared with investors earlier. (*Id.* ¶¶ 26, 144–45, 174–75.) Taken together, these allegations are sufficient to meet Rule 8(a)'s standard requirement of a "short and plain statement" of economic loss and its causal connection to alleged misrepresentations and/or omissions. *See Dura Pharm.*, 544 U.S. at 346–47. Because

---

[11] To the extent Defendants argue that the stock drop was only a result of disappointing results and lowered guidance, (D.E. 33-1 at 37–39), the Amended Complaint alleges that these were both direct results of Conduent's misrepresentations and omissions regarding its IT infrastructure and vendor performance. (Am. Compl. ¶¶ 147–51, 165–74.)

the Amended Complaint sufficiently pleads the elements of a § 10(b) claim, this Court will deny Defendants' Motion to Dismiss Count I.[12]

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED**. An appropriate order follows.

/s/ Susan D. Wigenton<br>**SUSAN D. WIGENTON, U.S.D.J.**

Orig:     Clerk
cc:       Steven C. Mannion, U.S.M.J.
            Parties

---

[12] Defendant's sole argument against Count II is that it must be dismissed with Count I because a § 10(b) violation is a predicate for a control person claim under § 20(a). (D.E. 33-1 at 10 n.5); *see City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) ("Section 20(a) of the Exchange Act creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, who has committed a section 10(b) violation." (citations omitted)). Because the Amended Complaint states a § 10(b) claim, its control person claims under § 20(a) will also survive Defendants' Motion to Dismiss.