# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CONDUENT INC., ASHOK VEMURI, and BRIAN WEBB-WALSH,<br><br>Defendants. | Case No.: 2:19-cv-08237-SDW<br><br>Hon. Susan D. Wigenton |

**EXPERT REPORT OF CHAD COFFMAN, CFA**

**October 15, 2020**

# Table of Contents

**Page**

I.    INTRODUCTION ........................................................................................................3

II.   QUALIFICATIONS.................................................................................................3

III.  SUMMARY OF OPINIONS .................................................................................4

IV.   OVERVIEW OF THE COMPANY AND ALLEGATIONS................................................5

V.    DISCUSSION OF RELIANCE ELEMENT .........................................................................7

VI.   *CAMMER* FACTORS ...............................................................................................10

VII.  APPLICATION OF EFFICIENCY FACTORS TO CONDUENT COMMON STOCK 11

    A.    OVERVIEW.........................................................................................................11

    B.    *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME.................................13

    C.    *CAMMER* FACTOR 2: ANALYST COVERAGE .............................................15

    D.    *CAMMER* FACTOR 3: MARKET MAKERS ........................................................18

    E.    *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY .........................................19

    F.    *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION.............................20

    G.    *KROGMAN* FACTOR 1: MARKET CAPITALIZATION .......................................30

    H.    *KROGMAN* FACTOR 2: THE BID-ASK SPREAD........................................................32

    I.     *KROGMAN* FACTOR 3: PUBLIC FLOAT AND INSTITUTIONAL OWNERSHIP...........33

    J.     INSTITUTIONAL OWNERSHIP ..........................................................................34

    K.    AUTOCORRELATION..........................................................................................34

    L.    OPTIONS ..........................................................................................................35

VIII. DAMAGES.........................................................................................................36

IX.   CONCLUSION ..................................................................................................39

## I.    INTRODUCTION

1.    I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of securities litigation. I have been asked by counsel for Lead Plaintiff Oklahoma Firefighters Pension and Retirement System, Plymouth County Retirement Association, Electrical Workers Pension Fund, Local 103, I.B.E.W., and Employees' Retirement System of the Puerto Rico Electric Power Authority in this matter to examine and opine on whether the market for Conduent Inc. ("Conduent" or the "Company") common stock ("Conduent Common Stock") was efficient during the period from February 21, 2018 through November 6, 2018, inclusive (the "Class Period").[1] In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $850 per hour for my work on this matter, and at rates between $190 and $450 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The

---

[1] Amended Class Action Complaint filed September 13, 2019, Case No.: 2:19-cv-08237-SDW, ("Complaint") ¶ 3.

CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.    I, along with several others, founded Global Economics Group on March 25, 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.    My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.    SUMMARY OF OPINIONS

6.    After analyzing Conduent's Common Stock during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Conduent's Common Stock was efficient during the Class Period.

---

[2] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

4

7.    I have also formed the opinion that damages in this action can be calculated on a class-wide basis using a common methodology. These opinions are based upon my analysis described below.

8.    The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Conduent's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the so-called *Cammer* factors and other factors that financial economists and courts, including in this Circuit, apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Conduent Common Stock during the Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

9.    I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    Conduent is incorporated in the state of New York with its headquarters in New Jersey.[3] Conduent described its business during the Class Period as follows:

> Conduent is a leading provider of business process services with expertise in transaction-intensive processing, analytics and automation. We serve as a trusted business partner in both the front office and back office, enabling personalized, seamless interactions on a massive scale that improve end-user experiences… We create value for our Commercial and Public Sector clients by applying our expertise, technology and innovation to help them drive customer and constituent satisfaction and loyalty, increase process efficiency and respond rapidly to changing market dynamics. Our portfolio includes

---

[3] Conduent Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, cover page.

industry-focused service offerings in attractive growth markets such as Healthcare and Transportation, as well as multi-industry service offerings such as Transaction Processing, Human Resources Solutions and Payment Services. Our strategy is to drive portfolio focus, operational discipline, sales and delivery excellence and innovation, complemented by tightly aligned investments. As a result, we aim to deliver profitable growth and margin expansion and to deploy a disciplined capital allocation strategy.[4]

11. For the fiscal year ended December 2017, Conduent reported revenue of $6,022 million, a net income of $181 million, and listed total assets of $7,548 million.[5] As of December 31, 2017, Conduent employed approximately 90,000 employees,[6] and its Common Stock traded on the NYSE under the ticker "CNDT."[7]

12. The Complaint alleges that Conduent and the Individual Defendants as defined in the Complaint,[8] made false and misleading statements during the Class Period, ultimately causing damages to purchasers of Conduent Common Stock who unknowingly bought Common Stock at artificially inflated prices and suffered economic loss when the stock price ultimately reflected the concealed information.[9]

13. More specifically, the Complaint alleges that throughout the Class Period, Conduent concealed information about their "Strategic Transformation" that started in early 2017, which would include evaluating third-party contracts and creating an inventory of the Company's IT infrastructure in order to transfer and consolidate Conduent's data from multiple data centers down to two consolidated centers.[10] At the start of the Class Period, Conduent stated

---

[4] Conduent Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 1.

[5] Conduent Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 26.

[6] Conduent Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 1.

[7] Conduent Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 1.

[8] Complaint ¶¶ 33, 35-38.

[9] Complaint ¶¶ 202-209.

[10] Complaint ¶ 8.

that the inventory of its IT infrastructure had been completed and the sub-optimized IT-related workforce and vendor relationships addressed.[11] However, the third-party IT vendor had not mapped Conduent's infrastructure and when Conduent attempted to consolidate the data, massive network issues occurred.[12] The network issues caused outages in Conduent's tolling platform, impacting Conduent's E-ZPass tolling clients and leading the clients to withhold revenue from and fine Conduent.[13] Conduent acknowledged the performance issues and modulated the response to the outages and client responses by assuring investors that there would be no impact on the financial forecast.[14]

14.    The Complaint then alleges that on a Corrective Disclosure, the market learned of the true impact of Conduent's IT issues when the Company announced EPS and revenue below analyst estimates and lowered FY2018 revenue, EBITDA, and adjusted free cash flow guidance.[15] Upon the market learning the truth of the Company's IT issues and their impact, the price of Conduent Common Stock fell, harming investors who bought at inflated prices.[16]

## V.    DISCUSSION OF RELIANCE ELEMENT

15.    Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims. Lead Plaintiff asserts the fraud on the market theory of reliance in this matter.[17]

---

[11] Complaint ¶ 10.

[12] Complaint ¶¶ 15-16.

[13] Complaint ¶¶ 16-17.

[14] Complaint ¶¶ 19, 22.

[15] Complaint ¶ 23.

[16] Complaint ¶ 27.

[17] Complaint ¶¶ 198-201.

The fraud on the market theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[18]

16.    The Supreme Court reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[19]

17.    As stated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers

---

[18] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[19] *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398, 2418 (2014) ("*Halliburton II*").

implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or

deflated) price.

18.    It is an empirical exercise to determine whether the market for a security was "open

and developed" or "efficient" to the degree required for a presumption of reliance under the

"fraud on the market" theory.[20] The esteemed economist Dr. Eugene Fama, in his seminal

research, first outlined definitions of an "efficient market."[21] He described different levels of

efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[22]

19.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II*

as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-

strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available

information is reflected in a security's current market price. This implies that security prices

adjust to new publicly available information rapidly and in an unbiased fashion so that it is

impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and

developed securities market, the price of a company's stock is determined by the available

material information regarding the company and its business."[23] The Supreme Court's effective

---

[20] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

[21] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

[22] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[23] *Basic,* 485 U.S. at 241.

9

adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

20. In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

## VI. *CAMMER* FACTORS

21. In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[24]

22. The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

> An *efficient market* is one which rapidly reflects new information in price.

---

[24] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[25]

23.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

24.    In the subsequent sections, I evaluate the market for Conduent Common Stock during the Class Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by insiders, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading.

## VII.  APPLICATION OF EFFICIENCY FACTORS TO CONDUENT COMMON STOCK

### A.  OVERVIEW

25.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Conduent Common Stock was efficient throughout the Class Period. In addition to the discussion below,

---

[25] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

**Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Conduent Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays Conduent Common Stock's closing price and trading volume for each day throughout the Class Period.

26.    In summary, and as discussed more fully below, Conduent Common Stock traded in an efficient market during the Class Period. First, the average weekly trading volume of Conduent Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average weekly trading volume for Conduent Common Stock was 8.86 million shares, which represents 4.20% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or the NASDAQ Exchange. Second, there were a large number of securities analysts following and reporting on Conduent. Third, Conduent Common Stock was actively traded on the NYSE, fulfilling the *Cammer* factor regarding market makers. Fourth, Conduent met important eligibility criteria and was apparently eligible to file a Form S-3 throughout the Class Period. Fifth, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Conduent Common Stock during the Class Period as well as a broader time period (the "Analysis Period").[26] Sixth, Conduent Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Seventh, Conduent Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Eighth, insiders held, on average, only roughly 3.6% of the shares outstanding while institutions, which are considered

---

[26] The Analysis Period is from February 21, 2017 through November 7, 2019. For certain elements of my report, I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests. By analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, I conclude that the evidence supports efficiency during the Class Period (for the purpose of this analysis I consider the earnings announcement on November 7, 2018 as part of the Class Period).

generally to be well-informed investors, held the vast majority of the remaining public float of

Conduent Common Stock during the quarters of interest. Ninth, there was no evidence of

statistically significant autocorrelation during the Class Period. Finally, there was active trading

in Conduent options throughout the Class Period. My analyses of all of these factors support the

conclusion that Conduent Common Stock traded in an open, developed, and efficient market

throughout the Class Period.

### B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

27.     The first *Cammer* Factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the
> outstanding shares would justify a strong presumption that the market for the
> security is an efficient one; 1% would justify a substantial presumption.[27]

28.     Volume as a fraction of shares outstanding is an important indicator of market

efficiency for several reasons. First, volume is objectively quantifiable and comparable across

securities. Second, high volume is generally indicative of continuity, liquidity, and market depth

– which are highly indicative of market efficiency.[28] Third, substantial volume would indicate

there is likely a market for the collection and distribution of information about the security. As

Professors Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility

---

[27] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[28] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 44-45 (5th ed. 1995).

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005), 317.

standard because it affects information dissemination to the market and was an important criterion for investment analysts in deciding which stocks to follow."[29]

29.     Conduent Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for Conduent Common Stock during the Class Period was 4.20% of shares outstanding, compared to 1.98% for the average weekly trading volume on both the NYSE and NASDAQ exchanges. Based on this figure, the weekly trading volume for Conduent Common Stock far exceeds the 1% or 2% threshold cited by *Cammer*. **Exhibit 3** plots Conduent Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[30] Indeed, the average weekly trading volume for Conduent Common Stock during the Class Period was 8.86 million shares. This volume of trading supports the conclusion that the market for this security was efficient throughout the Class Period.

30.     Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[31] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.,* shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, Conduent Common Stock's turnover velocity

---

[29] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[30] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[31] Turnover velocity as a formula is:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

can be compared directly with other publicly traded stocks based on exchange-reported statistics.

For example, over the Class Period, the annualized turnover velocity ratio for Conduent

Common Stock was 210% compared with the NYSE and NASDAQ average of 103% for the

Class Period.[32] Thus, Conduent Common Stock had an average annualized turnover that was

substantially higher than the average stock trading on the NYSE and NASDAQ, further

supporting that it traded in an efficient market.

31.    In short, the relatively high trading volume in Conduent Common Stock throughout

the Class Period supports the conclusion that the market for Conduent Common Stock was

efficient.

## C.  *CAMMER* FACTOR 2: ANALYST COVERAGE

32.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities
> analysts followed and reported on a company's stock during the class period.
> The existence of such analysts would imply, for example, the [analyst]
> reports were closely reviewed by investment professionals, who would in
> turn make buy/sell recommendations to client investors.[33]

33.    Analyst coverage can be important evidence of efficiency. Significant analyst

coverage implies that there is sufficient interest in a company and its securities, that there is an

active market for information regarding the company and its securities, and that the information

is widely distributed.

34.    During the Class Period, there was consistent analyst coverage for Conduent.

**Exhibit 4** shows that there were at least 96 reports issued during the Class Period and lists 15

separate firms that had equity analysts issue reports on Conduent, including major firms such as

---

[32] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of
Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[33] *Cammer*, 711 F. Supp. at 1286.

JPMorgan, Morgan Stanley, and BMO.[34] These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of Conduent by securities analysts supports the conclusion that Conduent Common Stock traded in an efficient market throughout the Class Period.

35.   Since 1989, when the *Cammer* decision was issued, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[35] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

36.   Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of Conduent,

---

[34] I obtained Conduent analyst reports from Investext, which is a part of Thomson Reuters, and from Seeking Alpha. I also received a collection of analyst reports from Plaintiff's Counsel. Investext is a database that collects and disseminates analyst reports issued by investment banks and independent research firms. (See https://www.mergentonline.com/login.php). The number of analyst reports I identify is likely understated because many analyst reports are not available through third party data providers such as Investext. For example, it is clear that analysts from Needham & Company, LLC, Cross Research LLC, and Citi Group Inc. participated on earnings conference calls during the Class Period, but I did not have access to research reports of those firms through Investext in connection with preparing this report. (*See*, "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 9, 2018).

[35] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (*see* http://www.rss-specifications.com/, and http://www.rss-specifications.com/what-is-rss.htm).

there were many other sources of public information dissemination. For example, there was substantial public press regarding Conduent. A search for articles classified as related to Conduent by Factiva over the Class Period resulted in 387 unique articles (and 1,184 articles over the Analysis Period).[36] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Conduent in the public arena throughout the Analysis Period, and thus the Class Period.

37.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Conduent provides evidence of a robust and active market for public information about the Company and evidence that Conduent's Common Stock traded in an efficient market during the Class Period.

---

[36] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. The 387 unique articles for the Class Period ("February 21, 2018 – November 6, 2018") were identified as a result of two searches. The first search included "All Sources" with the company field "Conduent Inc." and the second search included "Major News and Business Sources" with the keyword field "Conduent," excluding the company fields "Conduent Inc." and "Xerox" and keyword field "Fitch." The 1,184 unique articles for the Analysis Period ("February 21, 2017 – November 7, 2019") were identified as a result for the same two searches. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

I remove articles with "Xerox" because a number of articles focus only on Conduent as a former part of Xerox. As background, on December 31, 2016 Conduent spun off from Xerox and without excluding company field Xerox, numerous articles that focus on Xerox but merely mention Conduent are included. For example, "Icahn, Deason join forces to demand Xerox explore options," *Reuters*, January 22, 2018 reports "Jacobson became CEO in January last year after Xerox split itself in two. One part retained the legacy name and printer operations, and the other became a publicly listed business process outsourcing company called Conduent Inc."

In addition, Conduent is a loan servicer, so without excluding keyword field "Fitch," Fitch bond rating affirmations and changes, for which Conduent is cited as a servicer, are included. For example, "Fitch Affirms Nelnet Student Loan Trust 2012-6; Outlook Stable," *Reuters,* June 7, 2018 reports "Operational Capabilities: National Education Loan Network, Inc. is the master servicer. Day-to-day servicing is provided by Nelnet, Pennsylvania Higher Education Assistance Agency, Great Lakes Educational Loan Services and Conduent."

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

38.  A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[37] The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[38]

39.  The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (*i.e.*, the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[39]

40.  Conduent Common Stock traded on a major exchange (*i.e.*, the NYSE) with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[40] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be

---

[37] *See* http://www.sec.gov/answers/mktmaker.htm.

[38] *Cammer*, 711 F. Supp. at 1293.

[39] Barber, B., et al., The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, 19 J. CORP. L. 285 (1994), 291.

[40] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[41]

41.     The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[42] The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

42.     Nevertheless, according to Bloomberg, throughout the Class Period, there were 85 market makers for Conduent Common Stock.[43] Therefore, Conduent Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

### E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

43.     The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[44]

---

[41] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee Section 102* at http://wallstreet.cch.com/LCM/Sections/. *See also*, William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 45-53 (5th ed. 1995); Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Chapter 18 – Appendix A (4th ed. 2010).

[42] For NYSE, see https://www.nyse.com/market-model. For NASDAQ, see https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

[43] Bloomberg RANK function.

[44] *Cammer*, 711 F. Supp. at 1287.

44.     Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[45] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

45.     I have found no evidence that Conduent was not S-3 eligible throughout the Class Period. Throughout the Class Period, Conduent had been subject to SEC filing requirements for more than one year, had filed all documents in a timely manner over the preceding twelve months, and did not fail to meet its debt obligations, to my knowledge. Therefore, Conduent meets this *Cammer* efficiency factor, which supports the conclusion that Conduent Common Stock traded in an efficient market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

46.     The fifth *Cammer* Factor relates to how the price of a security reacts to new, company-specific information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[46]

---

[45] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

[46] *Cammer,* 711 F. Supp. 1291.

47.   Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[47] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[48]

48.   An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

49.   To analyze cause and effect, I performed an event study to determine whether Conduent Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Conduent-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about Conduent and the market price of Conduent Common Stock. I now describe in further detail the event study methodology, the events I tested, and the results.

---

[47] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 13 (1997).

[48] John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT., 111 (1998).

50.    A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[49] I have performed such an analysis in this matter where I evaluate the relationship between Conduent Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "Market Index") and the S&P Software & Services Total Return Index, hereafter referred to as the "Industry Index."[50, 51, 52]

51.    For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[53,54] By using a "rolling" estimation window, it allows for the relationship between Conduent Common Stock, industry and market factors, as

---

[49] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the daily percentage change in Conduent Common Stock (the Conduent daily return) is the dependent variable and the contemporaneous daily returns for a market and industry index are the independent variables. For a general discussion of regression analysis, see Damodar N. Gujarati, *Basic Econometrics*, McGraw Hill, Chapters 1-3 (3rd ed. 1995).

[50] The Industry Index is the S&P Software & Services Total Return Index. Conduent compares itself against the S&P Software and Services Index in its 2017-2019 10-Ks. Conduent was a member of the Industry Index during the Analysis Period. According to Bloomberg, during the Analysis Period, the Industry Index had between 121 and 161 members. Given that Conduent had a very small weight in the index throughout the relevant period, I did not reconstruct the index without Conduent.

[51] For robustness, I also tested an alternative Industry Index using an equal-weighted model comprised of the 19 competitors identified in the 2017 and 2018 Conduent 10-Ks and that traded on a major US exchange. The use of this alternative Industry Index did not alter the predictive power of the model and did not change any conclusions.

[52] The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements (including the alleged corrective disclosure), guidance updates, and six outlier dates have been removed from estimation. The outliers include the following dates: 2/23/2017 – a potential continued market reaction to the 2/22/2017 earnings announcement; 4/12/2018 – Conduent Board Member Michael Nevin resigns amongst disagreements on the board; 6/22/2018 – Seeking Alpha calls for investors to short Conduent; 11/12/2018 – a potential continued market reaction to the 11/7/2018 earnings announcement; 2/19/2019 – an agreement announced between Conduent and Texas in health and human services litigation; and 5/10/2019 – a potential continued market reaction to the 5/9/2019 earnings announcement.

[53] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

[54] Conduent spun off from Xerox on December 31, 2016, so a fixed regression was run for the first 120 trading days.

22

well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[55]

52.     The model indicates that there is a positive correlation between Conduent Common Stock and the control variables. In other words, the movement of the Market Index and Industry Index helps explain the price movements of Conduent Common Stock during the broader Analysis Period (of which the Class Period is a subset). For instance, choosing a day in the Class Period purely as an example, July 27, 2018, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 0.83 which means that a 1% rise in the S&P 500 predicts a 0.83% increase in returns for Conduent Common Stock. The estimated coefficient for the Industry Index is 0.72, meaning that the expected return for Conduent Common Stock is about a 0.72% increase for every 1% increase in the Industry Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Analysis Period (of which the Class Period is a subset), and it demonstrates there is a generally consistent positive relationship between the general market, the Industry Index, and the price of Conduent Common Stock.

53.     Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much unexplained price movement remains in the price movement of Conduent Common Stock after controlling for the Market Index and Industry Index. For instance, on the example date, July 27, 2018, the model predicted that absent any value relevant new firm-specific information, the price of Conduent Common Stock would

---

[55] Phillip A. Braun, *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

decline by 1.99% because the S&P 500 was down 0.66% and the Industry Index was down

1.98%.[56] Because of the inherent randomness observed in stock price returns, I do not expect the

model to predict returns exactly. In this example, I observe an actual return of -2.47%. Thus, the

"abnormal return" for this day is -0.48% (the actual return of -2.47% minus the predicted return

of -1.99%). I then rely on the standard deviation of the errors from the regression model to tell if

this abnormal return of -0.48% is sufficiently large that I can reject random movement as the

explanation.

54.    The test for whether randomness can be rejected is done by calculating what is

known as a "t-statistic," which represents the number of standard deviations between the actual

observation and the prediction. For the example date, an abnormal return of -0.48% represents

0.45 standard deviations or a t-statistic of -0.45 (abnormal return of -.48% divided by the

standard deviation of the errors of 0.11).[57] Using the standard assumption that, in the absence of

new value relevant company-specific news, abnormal returns will be normally distributed around

zero, probability theory implies that based on randomness alone, using a 95% confidence level

and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than

---

[56] The predicted return of -1.99% is found as follows: 0.83 * -0.66% (Coefficient on Market Index *times* Market Index return) + 0.72 * -1.98% (Coefficient on Industry Index *times* Industry Index return) + -0.02% (constant term from regression).

[57] The standard deviation of the errors are plotted in **Exhibit 6**. The standard deviation of the error is also known as the standard error. "An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates." The National Academies Press, *Reference Manual on Scientific Evidence,* Third Edition, 2011, p. 243.

-1.96) only 5% of the time.[58,59] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of -0.45, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

55.    **Exhibit 6** shows that the standard deviation of the errors for Conduent Common Stock varied over the Analysis Period (of which the Class Period is a subset). By adopting the rolling regression model, my event study explicitly adjusts for the changing Company-specific volatility.

56.    To analyze cause-and-effect, I examined the price response of Conduent Common Stock to the thirteen earnings announcements during the Analysis Period. This includes the five earnings announcements that occurred during the Class Period as well as the four quarters prior

---

[58] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean. "The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area." The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011, p. 342.

[59] The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well. David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, Ch. 19, (3rd ed. 2001).

to the start of the Class Period and the four quarters after the end of the Class Period in order to have a more robust set of observations.[60,61] *See* **Exhibit 7**.

57.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[62] Also, newly released earnings reports by a company are an objective set of news to identify and test. Considering the twelfth earnings release listed in **Exhibit 7** as an example, on August 8, 2019 the Company announced quarterly results for the fiscal quarter ending June 30, 2019, announcing EBITDA of $114 million that missed Street estimates by $13 million and EPS of $0.13, $.04 below consensus.[63] In response, the market price of Conduent Common Stock decreased by 26.33%, compared to the predicted return of -1.18%. Thus, the abnormal return on August 9, 2019 was -25.14%. With a t-statistic of -13.80, this abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that Conduent Common Stock reacted rapidly to this new information.

58.     Similar to this example, I analyzed the market reaction to Conduent's other earnings announcements I identified above. In total, of the thirteen earnings announcements Conduent

---

[60] For purposes of this analysis, I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests. After analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, I conclude that the evidence supports efficiency during the Class Period.

[61] For the purpose of this analysis I consider the earnings announcement on November 7, 2018 as part of the Class Period.

[62] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 67-92 (1968); Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 119-163(1971); Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, 1-12 (1980).

[63] *See*, "Strategic Review Underway as Challenging Conditions Persist," *Cowen,* August 9, 2019; "Conduent Incorporated," *CFRA*, August 9, 2019.

issued during the Analysis Period, eleven resulted in statistically significant price movements above the 99% confidence (twelve above the 95% confidence).[64]

59.   **Exhibit 7** presents a summary of the earnings releases during the Analysis Period.

60.   I then compared these results against the 172 days during the Analysis Period where I identified no Conduent-related news from the Factiva database and when there were no analyst reports or SEC filings issued. Of these 172 days, there were only 8 statistically significant price movements. Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level or greater on 92.31% of the earnings announcements, but when compared to days with no Conduent-related news, I observed only 4.65% of the days having statistically significant reactions.[65, 66] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Conduent Common Stock.

61.   Furthermore, on the 172 days with no news, the average change in price of Conduent Common Stock was only 1.06% after controlling for market and industry factors, while the average change in Conduent Common Stock on earnings announcement dates after controlling for market and industry factors was 11.91%. In other words, the average magnitude of stock price movement on earnings announcement days was over 11 times higher than on no news days.[67] Again, this demonstrates that on days when important company-specific

---

[64] It is not unusual to observe many earnings announcements that are not statistically significant. This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

[65] This difference between 92.31% and 4.65% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

[66] Based on randomness alone, one would expect 5% of the no news days to be statistically significant. The observed rate of 4.65% is not statistically significantly different than 5%.

[67] This difference between 11.91% and 1.06% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

information is released to the market, the stock price moves much more than on days where there is no company-specific news. This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of Conduent Common Stock, and thus an efficient market.

62.    The bar charts below summarize this analysis while **Exhibit 8** gives more detail.



**Percentage of Days Significant at the 95% Confidence Level**



63.    Finally, when important Company-specific news is released to the market (*e.g.*, earnings announcements), the daily trading volume of Conduent Common Stock also tends to be much higher[68] than on days where there is no news. For instance, the average daily trading volume of the eleven days with earnings announcements was 7.0 million. Compare this to the average daily trading volume of 2.2 million for days where there is no news in the Analysis Period.[69] The bar chart below summarizes this analysis.

---

[68] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 69, 84 (1968).

[69] This difference between 7.0 million and 2.2 million is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

**Average Daily Trading Volume**



64.    The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Conduent Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news.

65.    In conclusion, the event study analysis presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of Conduent Common Stock during the Analysis Period, and thus the Class Period.

### G.  *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

66.    In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

*Cammer* factors.[70] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[71] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[72] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

67.    Conduent Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 210.5 million and 211.3 million shares of Conduent Common Stock outstanding throughout the Class Period.[73]

68.    Based on the market price, the market capitalization for Conduent Common Stock averaged $4.18 billion during the Class Period. **Exhibit 9** shows Conduent's market capitalization over the Class Period. **Exhibit 10** shows that during the Class Period, Conduent Common Stock market capitalization ranged from the 72nd to 79th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[74] In other words, over the Class Period, Conduent Common Stock had a higher market capitalization than at least 72% of the firms on the combined NYSE and NASDAQ exchanges.

---

[70] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) the percentage of stock not held by insiders (the float) and 3) bid-ask spread.

[71] *Krogman*, 202 F.R.D. at 478.

[72] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 117 (2000).

[73] Conduent Inc. SEC filings submitted throughout the Class Period. *See* **Exhibit 12**.

[74] Bloomberg EQS Function.

31

69.    Given that the market capitalization for Conduent Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Conduent Common Stock.

## H.  *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

70.    The *Krogman* court's second additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[75] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency. Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

71.    I analyzed bid-ask spreads for Conduent Common Stock during the Class Period. **Exhibit 11** shows that during this period, the time-weighted average percentage bid-ask spread for Conduent Common Stock in each month was between 0.014% and 0.030%.[76] This is well

---

[75] *Krogman*, 202 F.R.D. at 478.

[76] This does not include February or November 2018, because only 6 and 4 days are included in the Class Period during those months, respectively, and therefore, there are an insufficient number of data points to create statistically meaningful results. However, were one to include data for the months of February and November 2018, the average monthly bid-ask spreads were .016 and 0.025%, respectively, which is fully consistent with my conclusions set forth below that the bid-ask differential during the Class Period is supportive of market efficiency for Conduent Common Stock. The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the

below the average and median bid-ask spread of a random sample of 100 other common stocks

trading on the NYSE and NASDAQ in July 2018 (the full month during the Class Period when

Conduent had the largest percentage bid-ask spread).[77,78] **Exhibit 11** demonstrates that Conduent

Common Stock had a monthly average bid-ask spread of 0.030% in July 2018, while a randomly

selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask

spread of 1.76%. Accordingly, Conduent Common Stock's bid-ask spread was low during the

Class Period, and this factor further supports market efficiency for Conduent Common Stock.

## I.  *KROGMAN* FACTOR 3: PUBLIC FLOAT AND INSTITUTIONAL OWNERSHIP

72.    The final factor that the *Krogman* Court identified as being indicative of market

efficiency is the public float (i.e., the amount of shares not held by insiders). As shown in

**Exhibit 12**, during the Class Period, insiders held, on average, only 3.57% of all outstanding

shares of Conduent Common Stock, meaning that approximately 96% of Conduent's shares were

held by non-insiders. This large percentage of shares held by non-insiders – a substantial

percentage of which were purchased and held by institutional investors – supports a finding of

market efficiency.

---

next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[77] Quote data for Conduent and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[78] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ for July 2018 and then randomly generated a list of 100 common stock securities. I then calculated the time-weighted average monthly bid-ask spread for July 2018.

### J.  INSTITUTIONAL OWNERSHIP

73.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 12** shows, 543 institutions reported owning Conduent Common Stock during the Class Period, holding a vast majority of the public float.[79] This substantial level of institutional ownership of Conduent Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

### K.  AUTOCORRELATION

74.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

75.    Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Inefficiency would only be indicated, however, if the

---

[79] S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are only available every quarter; therefore, occasionally the time difference in data updates may cause institutional holdings to appear to exceed shares outstanding and the public float. Furthermore, while third-party providers of institutional holdings data attempt to prevent double-counting of shares, the fact that the reported institutional holdings exceed the estimated public float suggests that some double counting may be present. This does not affect or undermine my primary point that sophisticated institutions held a large percentage of Conduent Common Stock.

autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[80]

76.   A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[81] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

77.   **Exhibit 13** displays the autocorrelation coefficient for Conduent Common Stock for the Class Period using the abnormal returns from the event study model described above. The coefficient is not statistically different than zero, meaning there is no evidence of autocorrelation in the trading of Conduent Common Stock during the Class Period.[82] These results are consistent with the notion that an investor could not consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that Conduent Common Stock traded in an efficient market throughout the Class Period.

### L.  OPTIONS

78.   In addition to the factors analyzed above, there was also considerable option trading in Conduent Common Stock during the Class Period.[83] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the

---

[80] Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).

[81] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

[82] There was also no evidence of autocorrelation during the Analysis Period.

[83] For instance, according to iVolatility, there were 21,363 Conduent Common Stock put contracts and 28,847 Conduent Common Stock call contracts that traded during the Class Period.

contingencies that are covered by the market.[84] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[85] Thus, this factor also supports that Conduent Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

79.     Counsel for the Lead Plaintiff also asked me to opine on whether per-share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[86] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

---

[84] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[85] Raman Kumar, Atulya Sarin & Kuldeep Shastri, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, 53 J. FIN. 717 (1998).

[86] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

80.    Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

81.    Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[87] Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

82.    For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e. a "corrective disclosure").[88] Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.* "confounding information") contributed to the observed price movement. If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and

---

[87] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[88] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (i.e. price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

83.    The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation", which implies that the artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation", which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

84.     Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.    CONCLUSION

85.     In sum, every factor analyzed supports my opinion that Conduent Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

86.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 15, 2020


_____
Chad Coffman

**Exhibit 1**
**Summary of Efficiency Factors for Conduent Inc.**

| Factor | Summary of Factor | Conduent |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 4.20%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 8.86 million shares traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 15 securities analysts issued 96 analyst reports which implies that important information relevant to trading Conduent Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Conduent's shares were exchange-traded on the NYSE during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 85 market makers for Conduent Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • I have found no evidence to believe that Conduent was not S-3 eligible throughout the Class Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Conduent Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 3/31/2018 and 12/31/2018, Conduent's market capitalization was $3.92 billion and $2.25 billion, respectively, which is at least the 72nd percentile of all NYSE and NASDAQ stocks. Conduent Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for Conduent Common Stock in each full month ranged from 0.014% to 0.030%. Conduent's average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in July 2018 (the full month when Conduent had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • On average over 96% of Conduent shares were held by non-insiders. 543 institutions held the vast majority of the public float throughout the Class Period which further supports the finding that Conduent Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Conduent Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 21,363 Conduent Common Stock put contracts and 28,847 Conduent Common Stock call contracts that traded during the Class Period. Conduent Common Stock therefore easily meets this criterion. |

**Exhibit 2**
**Conduent Common Stock Price & Volume**
**2/21/2018 - 11/30/2018**



Sources: Complaint and S&P Capital IQ.

**Exhibit 3**
**Conduent Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**2/21/2018 - 11/6/2018**



Source: S&P Capital IQ.

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on February 21, 2018 through November 6, 2018. The last week consists of one trading day (i.e., 11/6/2018), and therefore, the average of the daily trading volume on this day is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding. The last week is excluded from the average and median calculations.

# Exhibit 4
# Summary of Securities Analyst Reports Issued for Conduent

| | Analyst Name | Reports Issued During the Class Period: 2/21/2018 - 11/6/2018 |
|---|---|---|
| [1] | COWEN AND COMPANY | 14 |
| [2] | JPMORGAN | 13 |
| [3] | SUNTRUST ROBINSON HUMPHREY CAPITAL MARKETS | 13 |
| [4] | CFRA EQUITY RESEARCH | 9 |
| [5] | MORGAN STANLEY | 8 |
| [6] | SUSQUEHANNA FINANCIAL GROUP LLLP | 8 |
| [7] | BMO CAPITAL MARKETS | 6 |
| [8] | WRIGHT INVESTORS SERVICE | 5 |
| [9] | BUYSELLSIGNALS RESEARCH | 4 |
| [10] | GLOBALDATA | 3 |
| [11] | SEEKING ALPHA | 3 |
| [12] | VALIDEA | 3 |
| [13] | VALUENGINE, INC. | 3 |
| [14] | CORPORATE WATCHDOG REPORTS | 2 |
| [15] | SADIF ANALYTICS | 2 |
| | **Total** | **96** |

Sources: Investext, Counsel, and Seeking Alpha.

Note: Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for Conduent**
**2/21/2017 - 11/7/2019**



Note: The results are based on a fixed-to-rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the S&P Software & Services Total Return Index. Conduent compares itself against the S&P Software and Services Index in its 2017-2019 10-Ks. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and guidance, which include the alleged corrective disclosure dates, and six outlier dates have been removed from estimation. The outliers include the following dates: 2/23/2017 – a potential continued market reaction to the 2/22/2017 earnings announcement; 4/12/2018 – Conduent Board Member Michael Nevin resigns amongst disagreements on the board; 6/22/2018 – Seeking Alpha calls for investors to short Conduent; 11/12/2018 – a potential continued market reaction to the 11/7/2018 earnings announcement; 2/19/2019 – an agreement announced between Conduent and Texas in health and human services litigation; and 5/10/2019 – a potential continued market reaction to the 5/9/2019 earnings announcement.

**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for Conduent Common Stock**
**2/21/2017 - 11/7/2019**



Note: The results are based on a fixed-to-rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the S&P Software & Services Total Return Index. Conduent compares itself against the S&P Software and Services Index in its 2017-2019 10-Ks. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and guidance, which include the alleged corrective disclosure dates, and six outlier dates have been removed from estimation. The outliers include the following dates: 2/23/2017 – a potential continued market reaction to the 2/22/2017 earnings announcement; 4/12/2018 – Conduent Board Member Michael Nevin resigns amongst disagreements on the board; 6/22/2018 – Seeking Alpha calls for investors to short Conduent; 11/12/2018 – a potential continued market reaction to the 11/7/2018 earnings announcement; 2/19/2019 – an agreement announced between Conduent and Texas in health and human services litigation; and 5/10/2019 – a potential continued market reaction to the 5/9/2019 earnings announcement.

**Exhibit 7**
**Event Study Analysis of Conduent Earnings Announcements**

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-----------------|------------------------|--------|-----------|
| | | | | | | | | Rolling Regression Model (120-day | | | |
| 1 | 2/22/2017 | 7:00 AM | 2/22/2017 | Q4 2016 Earnings | Conduent Announces Fourth Quarter and Full-Year 2016 Results; Reaffirms Long-Term Outlook *Source - Pr Newswire* | $16.38 | 8.55% | 8.71% | $1.31 | 5.83 | *** |
| 2 | 5/10/2017 | 6:57 AM | 5/10/2017 | Q1 2017 Earnings | Conduent Reports First Quarter 2017 Financial Results; Grows Adjusted EBITDA; Unveils Disciplined Go-to-Market Strategy *Source - Pr Newswire* | $16.92 | -3.31% | -3.50% | -$0.61 | -2.34 | ** |
| 3 | 8/9/2017 | 6:53 AM | 8/9/2017 | Q2 2017 Earnings | Conduent Reaffirms 2017 Guidance and Reports Second Quarter 2017 Financial Results; Grows New Business Signings and Improves Profitability *Source - Pr Newswire* | $16.58 | 5.27% | 5.36% | $0.84 | 4.44 | *** |
| 4 | 11/8/2017 | 6:54 AM | 11/8/2017 | Q3 2017 Earnings | Conduent Reports Third Quarter 2017 Results; Operating Income and Adjusted EBITDA Rise; Strong Cash Flow and Adjusted EPS; Healthy Renewal Rate *Source - Pr Newswire* | $16.22 | 3.31% | 3.37% | $0.53 | 2.86 | *** |
| 5 | 2/21/2018 | 6:45 AM | 2/21/2018 | Q4 2017 Earnings | Conduent Reports Fourth Quarter and FY 2017 Results; In-line Revenue and Strong Performance on Adjusted EBITDA and Free Cash Flow; FY 2018 Guidance Reaffirms Long-Term Goals *Source - Pr Newswire* | $17.86 | 11.69% | 12.05% | $1.93 | 11.67 | *** |
| 6 | 5/9/2018 | 7:00 AM | 5/9/2018 | Q1 2018 Earnings | Conduent Reports First Quarter 2018 Results; Strong Operational and Financial Performance Led by Commercial Segment; Executing on Portfolio Strategy with Improvement in Core Business *Source - Pr Newswire* | $18.78 | -2.69% | -3.35% | -$0.65 | -3.21 | *** |
| 7 | 6/8/2018 | 10:00 AM | 6/8/2018 | FY 2018 Guidance Update | Conduent Analyst Day Presentation *Source - Conduent* | $20.10 | 1.77% | 1.35% | $0.27 | 1.28 | |
| 8 | 8/8/2018 | 6:45 AM | 8/8/2018 | Q2 2018 Earnings | Conduent Reports Second Quarter 2018 Results; Strong Earnings Growth; Executing on Digital Interactions Strategy and Meaningful Progress on Portfolio Actions *Source - Pr Newswire* | $19.74 | 5.39% | 5.26% | $0.99 | 5.13 | *** |
| 9 | 11/7/2018 | 6:50 AM | 11/7/2018 | Q3 2018 Earnings | Conduent Reports Third Quarter 2018 Results With Strong Adjusted EPS and EBITDA Growth; Healthier Balance Sheet Driven by Transformation and Divestitures *Source - Pr Newswire* | $13.62 | -29.14% | -32.05% | -$6.16 | -29.95 | *** |
| 10 | 2/20/2019 | 6:50 AM | 2/20/2019 | Q4 2018 Earnings | Conduent Reports Fourth Quarter and Full Year 2018 Results; Improved New Business Signings, Strong Cash Generation and Overachieved on Transformation Initiative *Source - Pr Newswire* | $15.29 | 5.23% | 5.32% | $0.77 | 3.69 | *** |
| 11 | 5/8/2019 | 4:06 PM | 5/9/2019 | Q1 2019 Earnings | Conduent Reports First Quarter 2019 Results; Achieves Continued Margin Expansion, Strong Renewal Rate and Closes First Acquisition *Source - Pr Newswire* | $7.65 | -38.80% | -38.27% | -$4.78 | -25.89 | *** |
| 12 | 8/8/2019 | 4:15 PM | 8/9/2019 | Q2 2019 Earnings | Conduent Reports Second Quarter 2019 Results *Source - Pr Newswire* | $6.38 | -26.33% | -25.14% | -$2.18 | -13.80 | *** |
| 13 | 11/6/2019 | 4:05 PM | 11/7/2019 | Q3 2019 Earnings | Conduent Reports Third Quarter 2019 Results *Source - Pr Newswire* | $7.38 | 11.48% | 11.15% | $0.74 | 4.35 | *** |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a fixed-to-rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the S&P Software & Services Total Return Index. Conduent compares itself against the S&P Software and Services Index in its 2017-2019 10-Ks. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and guidance, which include the alleged corrective disclosure dates, and six outlier dates have been removed from estimation. The outliers include the following dates: 2/23/2017 – a potential continued market reaction to the 2/22/2017 earnings announcement; 4/12/2018 – Conduent Board Member Michael Nevin resigns amongst disagreements on the board; 6/22/2018 – Seeking Alpha calls for investors to short Conduent; 11/12/2018 – a potential continued market reaction to the 11/7/2018 earnings announcement; 2/19/2019 – an agreement announced between Conduent and Texas in health and human services litigation; and 5/10/2019 – a potential continued market reaction to the 5/9/2019 earnings announcement.
(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**

**Comparison of Statistical Significance and Abnormal Returns**
**for Conduent Earnings Announcements**
**vs. Days with No News during the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 13 | 172 |
| Significant Days at 95% Confidence Level | 12 | 8 |
| % Significant Days at 95% Confidence Level [2] | 92.31% | 4.65% |
| Average Absolute Abnormal Return [3] | 11.91% | 1.06% |
| Average Volume (Millions) [4] | 7.0 | 2.2 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 172 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 92.31% rate of statistical significance is statistically significantly different than 4.65% at the 99% confidence level using a Chi-Square test.

(3) 11.91% absolute return is statistically significantly different than 1.06% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 7.0 million and 2.2 million is statistically significant at the 99% confidence level.

**Exhibit 9**
**Conduent Common Stock Market Capitalization**
**2/21/2018 - 11/30/2018**



Sources: Complaint, S&P Capital IQ, and Conduent Inc. SEC Filings.

# Exhibit 10
## Conduent Common Stock
## Market Capitalization Rankings

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q1 2018 | $3.92 | 77% |
| Q2 2018 | $3.82 | 76% |
| Q3 2018 | $4.76 | 79% |
| Q4 2018 | $2.25 | 72% |

Source: Bloomberg, S&P Capital IQ, and Conduent, Inc. SEC Filings.

**Exhibit 11**
**Conduent Common Stock Average Monthly Bid-Ask Percentage Spread**
**2/21/2018 - 11/6/2018**



Source: Thomson Reuters Eikon and TICK Data.
Note: February 2018 and November 2018 data are limited to the Class Period.

**Exhibit 12**
**Conduent Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2018 | 210,469 | 404 | 7,560 | 10,299 | 213,207 | 3.59% | 199,656 | 94.86% | 93.64% |
| 6/30/2018 | 210,506 | 402 | 7,568 | 11,360 | 214,298 | 3.60% | 197,846 | 93.99% | 92.32% |
| 9/30/2018 | 211,173 | 405 | 7,535 | 6,929 | 210,568 | 3.57% | 191,183 | 90.53% | 90.79% |
| 12/31/2018 | 211,306 | 377 | 7,436 | 5,415 | 209,285 | 3.52% | 191,464 | 90.61% | 91.48% |
| Total Institutions over Class Period: | | 543 | | | Class Period Average: | 3.57% | | 92.50% | 92.06% |

Sources: S&P Capital IQ and Conduent Inc. SEC filings.

## Exhibit 13
## Conduent Common Stock
## Test for Autocorrelation During the Class Period[1]

| Quarter | Coefficient on Previous Day's Abnormal Return[2] | t-Statistic | Significance [3] |
|---|---|---|---|
| Q1 2018 | 0.05 | 0.23 | |
| Q2 2018 | 0.09 | 0.72 | |
| Q3 2018 | -0.06 | -0.48 | |
| Q4 2018 | -0.11 | -0.52 | |
| **Class Period[3]** | **0.06** | **0.87** | |

Source: S&P Capital IQ.
Notes:
(1) I also found no evidence of autocorrelation during the Analysis Period.
(2) For each quarter, I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.
(3) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

# Appendix A
# Documents Considered

**Court Documents**

Amended Class Action Complaint filed September 13, 2019, in *Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh*, Case No.: 2:19-cv-08237-SDW.

Opinion filed June 05, 2020, in *Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh*, Case No.: 2:19-cv-08237-SDW.

**Court Decisions and Securities Law**

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**SEC Filings**

- Conduent, Inc. SEC Form 10-K filings submitted throughout the Analysis Period.
- Conduent, Inc. SEC Form 10-Q filings submitted throughout the Analysis Period.
- Conduent, Inc. SEC Form 8-K filings submitted during the Analysis Period.
- Conduent, Inc. Def 14-A Proxy Statements for the fiscal years in the Analysis Period.

**Security Data**

- Historical data for Conduent, Inc. Common Stock, is the S&P Software & Services Total Return Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- S&P Software & Services Index membership obtained from Bloomberg.
- Trade and quote data for Conduent, Inc. Common Stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for July 2018 were obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for July 2018 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Conduent, Inc. Common Stock options data was obtained from iVolatility.
- Conduent, Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.

- Conduent, Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## Conduent, Inc. News

- Conduent, Inc. news headlines and select articles downloaded from Factiva for the Class Period and Analysis Period. The 387 unique articles for the Class Period ("February 21, 2018 – November 6, 2018") were identified as a result of two searches. The first search included "All Sources" with the company field "Conduent Inc." and the second search included "Major News and Business Sources" with the keyword field "Conduent," excluding the company fields "Conduent Inc." and "Xerox" and keyword field "Fitch." The 1,184 unique articles for the Analysis Period ("February 21, 2017 – November 7, 2019") were identified as a result for the same two searches. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Conduent, Inc. earnings conference call and investor call transcripts during the Class Period, including but not limited to:
  - "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 9, 2018.
- Conduent, Inc. earnings and guidance update press releases during the Analysis Period.

## Conduent, Inc. Analyst Reports

- Conduent, Inc. analyst reports supplied by Investext via Thomson Reuters and Counsel for the Analysis Period, including but not limited to:
  - "Strategic Review Underway as Challenging Conditions Persist," *Cowen,* August 9, 2019.
  - "Conduent Incorporated," *CFRA*, August 9, 2019.
- Seeking Alpha articles or reports for Conduent, Inc. published during the Analysis Period under the site's "Analysis" section.

## Academic Articles

- Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).
- Avramov, D., et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).

- Beaver, William H., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995).
- Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).
- Greene, W., *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Huang, R., and Stoll, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).
- Jensen, M., *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).
- Kumar, R., et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).
- MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011
- Ross, S., *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).
- Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995.
- Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105 (2000).

**Other**

- http://www.sec.gov/answers/mktmaker.htm.
- http://wallstreet.cch.com/LCM/Sections/
- https://www.nyse.com/market-model
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities
- http://www.rss-specifications.com/.

- http://www.rss-specifications.com/what-is-rss.htm.
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.
- "Icahn, Deason join forces to demand Xerox explore options," *Reuters*, January 22, 2018.
- "Fitch Affirms Nelnet Student Loan Trust 2012-6; Outlook Stable," *Reuters,* June 7, 2018

**Appendix B**

**CHAD W. COFFMAN, MPP, CFA**

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
            Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995

Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa


**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  o In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed expert rebuttal report August 4, 2010. Filed declaration re: Plan of Allocation September 25, 2011**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009. Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>. Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February

17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division. Court testimony April 12, 2013.

- Testifying expert in City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert

report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018**.**

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019. Deposition April 8, 2019.

- Testifying expert in <u>Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division</u>. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

- Testifying expert in <u>Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York.</u> Filed expert report May 06, 2019.

- Testifying expert in <u>Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan</u>. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in <u>West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina.</u> Filed expert report June 28, 2019. Deposition August 16, 2019.

- Testifying expert in <u>Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee.</u> Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020.

- Testifying expert in <u>In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey.</u> Filed expert report July 19, 2019. Deposition September 10, 2019.

- Testifying expert in <u>Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado.</u> Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey</u>. Filed expert report March 20, 2020. Deposition July 16, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020.

- Expert declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York.</u> Filed expert report on October 6, 2020.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in <u>Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York</u>. Filed expert report May 29, 2018. Deposition July 24, 2018.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.

1993  Arnold Prize for Best Research Proposal.

1995  Knox College Economics Department Award.


**PERSONAL ACTIVITIES:**

• Pro bono consulting for Cook County State's Attorney's Office.

• Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.

• Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.