# EXHIBIT 7

Page 1

                IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

EMPLOYEES' RETIREMENT)
SYSTEM OF THE PUERTO )
RICO ELECTRIC POWER  )
AUTHORITY,           )
individually and on  )
behalf of all others )
similarly situated,  )
     Plaintiff,      )
          vs.        ) No. 2:19-cv-08237-SDW-SCM
CONDUENT INC.,       ) Hon. Susan D. Wigenton
ASHOK VEMURI, and    )
BRIAN WEBB-WALSH     )
     Defendants,     )

          The deposition of CHAD WILLIAM COFFMAN
called for examination pursuant to Notice and
the Rules of Civil Procedure for the United
States District Courts pertaining to the taking
of depositions, taken before DENISE A. JOHNSON,
a certified shorthand reporter within and for
the State of Illinois, via video conference per
Executive Order 2020-14, on the 22nd day of
December, 2020, at the hour of 10:02 a.m.
Eastern Standard Time.

Reported By:   DENISE A. JOHNSON, C.S.R.
License No.:    084-004004

Page 178

problems that allegedly the company had known about for a long time and failed to disclose were causing the company to miss its guidance and its profits to be less than expected.

Q.    Mr. Coffman, how, if at all, is Section 8 of your report here different from similar sections of your other expert reports in securities class actions?

A.    I mean, the wording of the section and sort of the bases for the conclusion aren't any different.  And that's the whole point.  The whole point is there's a well-accepted methodology that when the allegation is that a stock price has been, you know -- that a stock price deviates from what it should have been because of material misstatements and then those misstatements are later corrected by later disclosures that provide the relevant truth that the out-of-pocket methodology is the appropriate methodology with which to calculate damages.

So that's sort of the whole point. There is a well-accepted way to do this.  And so the language in this section, you know, really doesn't change from report to report as long as

Coffman                                        December 22, 2020
In Re: Conduent Inc. Securities Litigation

Page 181

methodology and the fact that when there's an allegation of inflation of the stock, you know, how damages are calculated.  And that's the same from every case -- you know, in virtually every case I've been involved in, you know, that's the theory of liability and damages.

And then, you know, the subsequent paragraph provides some information about how, you know, separate and apart from that methodology some of the techniques that are often used to try to quantify what the inflation per share is.

And, you know, again, as I testified, I looked at the nature of what Plaintiffs were alleging.  But, you know, the whole point is you don't have to tailor this methodology for specific facts and circumstances of each case because there's a well-recognized methodology when this is the nature of the alleged liability.

BY MS. REZEK:

Q.    So it's accurate to say that there's nothing case specific in the language you've used in Section 8 of your report here?

Page 182

MR. BIGIN:  Objection, form, mischaracterizes the testimony.

THE WITNESS:  I don't think there's any language that's used in Section 8 that's specific or tailored to this case, but it relies upon the specific allegations that are being alleged in the complaint.

So it's based on -- my statements in that section are based on my review and understanding of the nature of Plaintiff's allegations.

BY MS. REZEK:

Q.    Mr. Coffman, are you aware of any securities class action cases where damages could not be calculated using the methodology that is consistent with the Plaintiff's theory of liability?

A.    Well, I'm not aware of a time where it was -- where it was unable to be done on a class-wide basis.  I can remember a couple of cases where plaintiff's theory went beyond the out-of-pocket methodology.  And I think we discussed that a little bit earlier in the day.

But when the allegations are

Page 192

of cases, plaintiffs typically hire an expert to give their opinion of what the artificial inflation per share is during the class period based on performing a detailed loss causation analysis and making certain assumptions given what plaintiffs expect to prove.

So that's my general understanding of how typically at least information reaches the jury about what a reasonable amount for artificial inflation would be.  But whether there's other possible ways, you know, plaintiffs could make their case and do it, I'm not going to speculate about that.

But certainly in my experience an expert providing a detailed loss causation analysis and describing their methodology of how they got to that is part of what's done, you know, at the merits phase of a litigation when someone is actually quantifying the inflation per share for the jury.

BY MS. REZEK:

Q.    And what is this methodology?  What tools should the jury use here in this case to decide how much artificial inflation existed?

Page 193

MR. BIGIN:  Objection to form.

THE WITNESS:  Again, I don't presume to know all the different components of that.  You know, again, I don't want to -- I really don't want to speculate about, you know, precisely how that would be done.

What I feel comfortable doing is talking about how I've seen it generally done and how if I were asked in this case to do it I would take as a first pass.  And, again, maybe there would be other relevant ways or things -- methodologies to think about.

But, you know, it would start from assumptions about what the plaintiff expects to prove in terms of what -- about which misstatements there were, what omissions there were, what information should have been disclosed or at least been part of any corrective disclosure and then, you know, performing an event study to determine how much the stock price moved upon the misstatement date potentially but also on the corrective disclosures or in this case I think there's only one corrective disclosure alleged here, you

Page 194

know, would perform an event study to determine how much the stock price moved on those dates and then perform a detailed loss causation analysis to determine how much of that price movement given the full mix of information that was available on those dates it made sense to causally tie to either the misstatements or the corrective disclosure.  And that could involve potentially disaggregating between different pieces of information, some that were fraud related and some that were not fraud related.

I don't know precisely to what extent there is confounding information in this case. But if there was, you know, applying some form of valuation principle to try to disaggregate or looking at analysts' reports to see how they valued different pieces of the information, looking at internal documents to see if there's any evidence as to how the information might be parsed or, you know, doing some sort of detailed financial analysis to try to disaggregate that information.

So there's -- and, you know, that's a very fact specific, circumstance specific

Page 195

analysis that, you know, I've done in many
cases, you know, with respect to different types
of information.  But until you dig into it, it's
not entirely clear exactly how you would do that
analysis.

BY MS. REZEK:

Q.    Just to be clear, everything you just
described was hypothetical and what you might do
in a case similar to this.  But you haven't
confirmed specifically what you would do in this
case under these facts.  Is that fair?

A.    I think that's fair because, I mean,
like I said, that would require a detailed loss
causation analysis.  And that's not something
I've done.

Q.    Mr. Coffman, can your proposed damages
methodology account for the potential for a
non-constant inflation band?

A.    Yes, absolutely.

Q.    And how so?

A.    Well, again, as I describe in
Paragraph 79 and 80, the damages formula and
methodology looks at the amount of artificial
inflation at the time of purchase versus the

Page 196

amount of artificial inflation at the time of
sale.  And to the extent the inflation changed
over time, that formula could take that into
account.

Q.    So abstracting away from the issue of
whether using stock price drops as a sound
method for estimating inflation, is it the
resulting inflation estimate only as of the
time alleged corrective disclosure?

MR. BIGIN:  Objection to form.

THE WITNESS:  No.  I think the ultimate
opinion provides an estimate of the inflation at
all times during the class period.  I think what
you're saying is that the event study itself,
when it measures the stock price decline due to
specific information, that's obviously occurring
at a moment in time.  And then a separate
analysis is required to say how would the value
of that particular information have evolved over
time.

So is it the case that the value of
that information might have increased over time
or decreased over time so that a corrective
disclosure at a different point in time would

Page 201

A.     That's certainly plausible, yes, unless you are talking about the value of cash.

Q.     Is it possible that the same corrective disclosure could have different value implications at different points in a class period?

A.     That's plausible, yes.

Q.     And if this were the case, then would it be correct that the magnitude of stock price inflation would also change over time?

A.     It's certainly plausible that the amount of stock price inflation could change over time depending on the facts and circumstances.

Q.     So, therefore, the stock price inflation at the end of the class period may not equal the inflation at the beginning of the class period even if there's only been one corrective disclosure.  Is that fair?

MR. BIGIN:  Objection to form.

THE WITNESS:  That's plausible, yes.

BY MS. REZEK:

Q.     Based on your understanding of the facts in this case, do you believe that

Page 202

inflation did evolve over the span of the class period?

MR. BIGIN:  Objection to form.

THE WITNESS:  I don't have an opinion about that.

BY MS. REZEK:

Q.   Mr. Coffman, when is a constant inflation band appropriate?

A.   I don't know if I can characterize all the times it's appropriate.  But certainly if the nature of the alleged concealed information didn't change over time and the value relevance of that information -- there is no evidence to suggest the value relevance of it changed over time, then the cost of dollar inflation might make sense.

To the extent there's evidence that the stock price inflation actually came down over time so that the movement at the end of the class period was sort of an underestimate or a conservative estimate of what the inflation was at all points during the class period, then the dollar inflation would be appropriate.

So those are just a couple of examples.

Page 203

I'm sure you can construct others.  But if the nature and value relevance of the concealed information didn't change over time and there weren't, you know, substantial changes in the facts and circumstances surrounding the company or how much it would be worth, then constant dollar inflation would make sense.

Q.   So when then is a varying inflation band appropriate?

A.   If there's clear evidence that the value of the concealed information increased over time, that would be a time where, you know, some kind of increasing inflation was necessary; or if there was a clear day during the class period where upon an additional misstatement that the stock price increased and it was clear through an event study methodology that some degree of the inflation was introduced at that time, then the inflation might increase over time.  So there's several circumstances under which that would be appropriate.

Q.   And which do you propose to use here, the constant inflation band or the varying inflation band?

Page 204

MR. BIGIN:  Objection to form.

THE WITNESS:  I have not -- sorry.  I have not evaluated which method would be appropriate here or if some other hybrid method is appropriate here.  I just have not analyzed loss causation in this case yet, so I don't know.

BY MS. REZEK:

Q.   Mr. Coffman, I believe in your report it reflects that you consider the court's opinion on Defendant's motion to dismiss, and you also testified earlier that you reviewed that order in preparation for your deposition today; is that correct?

A.   Yes.

Q.   Are you aware that the court has found that the misrepresentations and omissions alleged in this case straddle three separate issues, first being known issues with Legacy IT infrastructure and vendors, the second being service issues experienced by clients, and third being IT issues that led to penalties and revenue loss?  Is that something you're familiar with?

Page 243

BY MS. REZEK:

Q.    Do you agree that under a materialization of the risk theory of liability inflation should be measured by how the price would have changed if the risk was not allegedly concealed rather than if the risk turned into a certainty?

MR. BIGIN:  Objection, calls for a legal conclusion, objection, mischaracterizing, foundation.

THE WITNESS:  Yes.  When you say under the materialization of a risk theory, you know, to the extent that's implying it's different than the out-of-pocket methodology, my understanding is that's inconsistent with what Plaintiffs are alleging and what they're -- what remedy they're seeking and how damages would ultimately be calculated.

You know, to the extent a company misrepresents a risk either the nature or existence or degree of a risk in some material way, that can cause a divergence between the market price and what the market price would have traded at had there been a fuller

Page 244

disclosure of what the nature, magnitude, or existence of that risk was.

You know, the event -- or the loss causation analysis would have to figure out how different the price would be upon disclosure of what they could have disclosed at each point in time.

So I don't see Plaintiff's use of this phrasing as changing in any way the fact that they're pursuing the out-of-pocket methodology that is explicitly described earlier in the report and is explicitly described in my report.

BY MS. REZEK:

Q.    Have you ever performed a methodology to determine inflation where a materialization of the risk theory was being pursued?

A.    Well, again, I think I've seen plaintiffs often make reference to this materialization of the risk theory in multiple different ways under multiple different circumstances, so I don't think there's one specific way to look at it.

I only recall one case where reference to the materialization of the risk theory

Page 256

STATE OF ILLINOIS        )

                         )   SS:

COUNTY OF W I L L        )

I, DENISE A. JOHNSON, a certified shorthand reporter within and for the State of Illinois, do hereby certify that heretofore, to-wit, on the 22nd day of December 2020, personally appeared before me CHAD WILLIAM COFFMAN, a witness in a certain cause now pending and undetermined in the United States District Court, District of New Jersey, wherein EMPLOYEES' RETIREMENT SYSTEM OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, individually and on behalf of all others similarly situated is are the Plaintiff and CONDUENT INC., ASHOK VEMURI, and BRIAN WEBB-WALSH are the Defendants.

I further certify that the said CHAD WILLIAM COFFMAN was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of said witness and afterwards reduced

Page 257

to typewriting by Computer-Aided Transcription,
and the foregoing is a true and correct
transcript of the testimony so given by said
witness as aforesaid.

I further certify that the signature to
the foregoing deposition was not waived by
counsel for the respective parties.

I further certify that the taking of this
deposition was pursuant to Notice and that there
were present at the deposition the attorneys
hereinbefore mentioned.

I further certify that I am not counsel
for nor in any way related to the parties to
this suit, nor am I in any way interested in the
outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto
set my hand and affixed my notarial seal this
28th day of December, 2020.


DENISE A. JOHNSON

CERTIFIED SHORTHAND REPORTER

MICHAEL BIGIN


                            12/28/20

RE:    In Re: Conduent Inc. Securities Litigation v.
       12/22/2020, Chad Coffman (#4374125)

     The above-referenced transcript is available for
review.

     Within the applicable timeframe, the witness should
read the testimony to verify its accuracy. If there are
any changes, the witness should note those with the
reason, on the attached Errata Sheet.

     The witness should sign the Acknowledgment of
Deponent and Errata and return to the deposing attorney.
Copies should be sent to all counsel, and to Veritext at
litsup-ga@veritext.com


  Return completed errata within 30 days from
receipt of testimony.

   If the witness fails to do so within the time
allotted, the transcript may be used as if signed.


                    Yours,

                    Veritext Legal Solutions

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination

4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a certified shorthand reporter, the witness shall not sign the deposition. If the officer is not a certified shorthand reporter, then unless reading and signing of the deposition are waived by stipulation of the parties, the officer shall request the deponent to appear at a stated time for the purpose of reading and signing it. At that time or at such later time as the officer and witness agree upon, the deposition shall be submitted to the witness for examination and shall be read to or by the witness, and any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness. If the witness fails to appear at the time stated or if the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the witness' failure or

refusal to sign, together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under R. 4:16-4(d) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.