# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Employees Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh,<br><br>Defendants. | Case No. 2:19-cv-08237-SDW |

REBUTTAL REPORT OF

**RENÉ M. STULZ, PH.D.**
**EVERETT D. REESE CHAIR OF**
**BANKING AND MONETARY ECONOMICS**
**THE OHIO STATE UNIVERSITY, FISHER COLLEGE OF BUSINESS**

**January 21, 2021**

**Table of Contents**

I.    Qualifications ............................................................................................................. 2

II.   Assignment ................................................................................................................. 3

III.  Summary of Opinions ................................................................................................ 4

IV.   Background ................................................................................................................. 6

     A.    Company Overview ......................................................................................... 6

     B.    Conduent's Strategic Transformation ............................................................. 7

     C.    Summary of Allegations ............................................................................... 10

V.    Mr. Coffman Has Not Articulated a Reliable Class-wide Damages Methodology that is Consistent with Plaintiffs' Theory of Liability ................................................... 11

     A.    Damages from the Perspective of a Financial Economist and Mr. Coffman's Purported Damages Methodology ........................................................... 12

     B.    Mr. Coffman Has Not Proposed a Scientific and Reliable Methodology to Account for the Fact that the Stock Price Drop Following the Alleged Corrective Disclosure at Least Partly Reflected Realizations of Risks Described Prior to and Throughout the Proposed Class Period ................................................... 16

          1.    Risks Regarding Conduent's Use of Subcontractors Were Disclosed Prior to November 7, 2018 ................................................................... 20

          2.    Possible Execution Risks Related to the Company's Strategic Transformation Were Disclosed Prior to November 7, 2018 ................... 21

          3.    Mr. Coffman's Methodology Does Not Account for the Realization of the Risks Stemming from Conduent's IT Transformation ............................ 27

     C.    Mr. Coffman Has Not Proposed a Scientific and Reliable Methodology to Disentangle the Stock Price Impact of the Alleged Corrective Disclosure from the Impact of Other Confounding News Released on the Same Day ........................ 31

          1.    There Were Multiple Pieces of Confounding Information Affecting Conduent's Stock Price on November 7, 2018 ........................................ 33

     D.    Mr. Coffman Has Not Proposed a Scientific and Reliable Methodology for Measuring Time-varying Inflation Throughout the Proposed Class Period ......... 38

## I.    Qualifications

1.    I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.    I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland.  I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.

3.    I belong to the editorial boards of more than 10 academic and practitioner publications. Further, I am a member of the Asset Pricing and Corporate Finance Programs and the director of the Risks of Financial Institutions Group of the National Bureau of Economic Research.  I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (these are two of the top three journals in the field of financial economics). Thomson Reuters has included me in its list of the world's most influential scientific minds,

which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

4.    I have published more than 100 studies in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*. I am a co-author of *The Squam Lake Report: Fixing the Financial System*, and have edited several books, including the *Handbook of the Economics of Finance* and *International Capital Markets*.

5.    I have taught in executive development programs in North America, Europe, and Asia. I have consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank. I also served as a member of an advisory board of the U.S. Treasury and as a director of several banks and of an asset management firm. I also held the function of vice-chairman of the Board of Trustees of the Global Association of Risk Professionals and of chair of the governance committee of that Board.

6.    A copy of my curriculum vitae is attached as **Appendix A**, which includes a list of my publications over the last ten years. **Appendix B** contains a list of my testimony over the last four years.

## II.    Assignment

7.    I have been retained by counsel for Conduent Inc. ("Conduent" or "the Company"), Ashok Vemuri, and Brian Webb-Walsh (collectively, "Defendants") to review the report of Plaintiffs' expert Mr. Chad Coffman dated October 15, 2020 (the "Coffman Report"), and to assess the

---

[1] See, e.g., "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, p. 46.

opinions expressed and analyses conducted therein.  Specifically, I have been asked to determine whether Mr. Coffman has put forth a damages methodology that is capable of reliably measuring class-wide damages attributable to Plaintiffs' theory of liability in this matter.

8.      The analyses and opinions expressed in this report are my own.  I am compensated for my time and services on this case at my regular hourly rate of $1,000 for engagements initiated before the end of 2020.  I am assisted in this matter by staff of Cornerstone Research, who work under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

9.      A list of the materials I considered in preparing this report is attached as **Appendix C**. My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that Plaintiffs or their experts submit additional analyses or information.

## III.    Summary of Opinions

10.     Based on the documents and data I have reviewed, I have reached the conclusion that:

      a.  Mr. Coffman provides only a generic, boilerplate overview of a damages approach that he claims to be "standard and well-accepted."[2]  The overview he provides amounts only to high-level references to certain tools and techniques an economist could potentially apply (such as an event study or valuation methods) in measuring

---

[2] Coffman Report, ¶79.

Page 4

the value impact of information in general, without accounting for the theory of liability or the fact pattern of this case.

b. The price impact of the alleged corrective disclosure at the end of the Proposed Class Period (February 21, 2018 through November 6, 2018),[3] which Mr. Coffman focuses on as a measure of inflation, at least partly reflects the financial impact of the realization of risks associated with Conduent's multi-year transformation of its historically under-invested legacy information technology ("IT") infrastructure. Before and throughout the Proposed Class Period, risks related to the strategic transformation, including specific risks related to vendor performance and IT issues that would impact the tolling business, were disclosed to and discussed by market participants. To the extent that Conduent did not provide the market with an accurate understanding of the true level of risks related to its strategic transformation, from an economics perspective, price inflation would result from the degree of risk (if any) that was concealed. Yet Mr. Coffman has not described a methodology that could distinguish the stock price impact from concealed risk being disclosed versus the impact from disclosed risk materializing into reality, which would have no bearing in measuring inflation.

c. Mr. Coffman has not proposed a reliable methodology for measuring the stock price impact of the alleged corrective disclosure on November 7, 2018 from the impact of other confounding news released on the same day. Mr. Coffman admitted he has not determined whether there was confounding information on the

---

[3] See Amended Class Action Complaint, *Employees' Retirement System of the Puerto Rico Electric Power Authority v. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh*, September 13, 2019 ("Complaint"), ¶3.

alleged corrective disclosure date and offers no fact or case-specific details as a basis for his conclusion that a reasonable methodology exists for disentangling the effect of confounding information in this matter.

d.  Mr. Coffman has not provided a scientific and reliable methodology for measuring time-varying inflation throughout the Proposed Class Period.  Despite acknowledging the need to estimate inflation *throughout* the Proposed Class Period, Mr. Coffman fails to describe a reliable methodology that could be used to account for the facts that (1) what Defendants could have disclosed may have evolved over the Proposed Class Period, and (2) the market circumstances facing Conduent may have changed during the Proposed Class Period.

## IV.    Background

### A.  Company Overview

11.    Conduent is a global provider of business process services that operated in 26 countries in 2018 with expertise in transaction-intensive processing, analytics and automation.[4]  Its primary service categories are customized business process services for commercial clients ("Commercial Industries Segment"), government-centric business process services for government agencies ("Government Services Segment"), and systems and support to transportation departments and agencies ("Transportation Segment").[5]

---

[4] Conduent Incorporated, Form 10-K for FY 2018, filed February 28, 2019 ("Conduent 2018 10-K"), pp. 7, 16.

[5] Conduent 2018 10-K, p. 3.  In FY 2018, Conduent derived 47.2% of total revenue from the Commercial Industries Segment, 25.1% of total revenue from the Government Services Segment, and 13.5% of total revenue from the Transportation Segment.  The other 14.2% of total revenue came from divestitures and the Student Loan business, which Conduent exited in the third quarter of 2018.  See Conduent 2018 10-K, p. 3.

12.     On December 31, 2016, Conduent spun off from Xerox to focus its resources on its business process services,[6] while Xerox focuses primarily on print technology services and digital solutions.[7]

13.     Conduent's Transportation Segment includes toll collection, public transit, as well as parking and photo enforcement.[8]  The Transportation Segment provides transportation services to government clients in 24 countries and had $729 million in total revenue in 2018, representing 13.5% of the $5.4 billion total revenues for the Company.[9]  In 2018, Conduent's global tolling business reported $300 million in revenue, representing 5.6% of its total revenues.[10]

### B. Conduent's Strategic Transformation

14.     As part of its spin-off from Xerox, the Company announced before the Proposed Class Period that it would undertake a three-year "strategic transformation."  Specifically, in 2016 Conduent launched a "companywide program focusing on both cost savings, as well as operational optimization."[11]  Key elements of the initiative included an internal reorganization of the Company; divesting business lines that were not believed to have a competitive advantage; increased use of automation in service delivery; and cost reductions, including through a reduced

---

[6] Conduent 2018 10-K, p. 1.
[7] Xerox Corporation, Form 10-K for FY 2018, filed February 25, 2019, p. 1.
[8] Conduent 2018 10-K, p. 3.
[9] Conduent 2018 10-K, pp. 3, 39.
[10]  Conduent Incorporated, 2019 Annual Report, February 26, 2020, p. 63.  In 2017, Conduent's global tolling business reported $331 million in revenue, representing 5.5% of its total revenues.  See "CNDT_4Q19_Investor_Metrics_File FINAL.xlsx," "Horizontal Revenue" Tab, February 20, 2020, https://investor.conduent.com/static-files/5869564e-02ef-4200-9872-65e2ee770c5c; "CNDT-Q1_2019_Earnings-Metrics_File  updated.xlsx," "Horizontal Revenue" Tab, May 8, 2019, https://investor.conduent.com/static-files/7e25430b-f299-48d3-a2d3-e295a9c0cb79.
[11] Conduent Incorporated, "Q4 and FY 2016 Earnings Call," February 22, 2017, p. 4.

real estate footprint, reduced IT infrastructure costs by "streamlining" operations, and reduced selling, general and administrative expenses.[12]

15.     The Company characterized the transformation initiative as a "multi-year transformation journey" with "aggressive goals" spanning multiple elements and phases.[13]  Conduent projected that the strategic transformation would result in cumulative cost savings of roughly $700 million through 2018, of which IT savings including workforce/contractor savings and IT infrastructure savings comprised an estimated $70 million.[14]  Conduent also announced a $200 million "platform modernization" investment over three years—of which 21% was earmarked for transportation services—to improve the Company's "historically under-invested legacy IT infrastructure."[15]

16.     The 2017 10-K (filed during the Proposed Class Period) describes the "Transformation" with an emphasis on a range of business reorganization and divestiture initiatives to achieve cost savings, rather than on the IT issues that the Complaint focuses on.[16]  In its discussion of

---

[12] Conduent Incorporated, Form 10-K for FY 2017, filed March 1, 2018 ("Conduent 2017 10-K"), p. 1.

[13] Conduent Incorporated, 2017 Annual Report, March 1, 2018, p. 7; Conduent Incorporated, Analyst Day Presentation, June 8, 2018, p. 92; Conduent Incorporated, "Q4 and FY 2016 Earnings Call," February 22, 2017, p. 4 ("We are making steady progress on identifying and prioritizing on the aggressive goals in the program.").

[14] Conduent Incorporated, "Q4 and FY 2016 Earnings Call," February 22, 2017, p. 4; "Conduent to Present Business Strategy at Investor Event Today," *Conduent Incorporated Press Release*, December 5, 2016, https://www.news.conduent.com/news/Conduent-Investor-Event-2016; "Conduent Inc.: Good Value If They Can Execute; Initiating with a Positive Rating," *Susquehanna*, March 6, 2018, p. 3.

[15] Conduent Incorporated, Analyst Day Presentation, June 8, 2018, transcript p. 10, presentation slides, p. 33; Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018, pp. 4–5.

[16] "We have a portfolio of businesses that we are optimizing and effectively targeting attractive growth areas in a rapidly evolving business process services industry. We have taken significant actions to improve our profitability and drive growth with a more focused portfolio of services.
Key initiatives include:
• *Realigned Delivery.* During 2017 we reorganized the business to better align to our vertical go-to-market strategy and to our global delivery capabilities. We believe this operating structure will allow us to better integrate and tailor business solutions for our customers.
• *Divested Non-Core Assets.* We divested five businesses in 2017 for aggregate proceeds of $56 million in cash. These sales enabled us to increase our focus on areas where we have a competitive advantage.

technology, the 2017 10-K says, "We continue to execute on our strategic transformation program to deliver cost savings through infrastructure optimization…."[17] Indeed, at the beginning of the Proposed Class Period analysts also focused on cost savings initiatives when discussing the Company's strategic transformation. For example, a JP Morgan report on February 21, 2018 noted:

> Strategic Transformation Program on track. CNDT ended CY17 with ~$475M in cumulative gross savings from its cost actions, ahead of its targeted S430M in savings, driven by outperformance in cutting real estate and overhead costs. While contract remediation was slightly below plan, CY18 target of S700M was maintained.[18]

17. At the same time, analysts recognized that the strategic transformation program was risky and realization of these risks could adversely affect the company's financial performance. For instance, a report from Cowen noted:

> We expect the road to be bumpy as CNDT progresses on its transformation and restructuring, with the largest unknown on top-line trajectory.[19]

18. In addition to the IT infrastructure overhaul as part of its strategic transformation, the Company disclosed that it was simultaneously ramping up a large and complex tolling contract in Florida, starting in Q2 2018.[20]

---

• ***Increased Use of Automation.*** We have developed and deployed a set of advanced software-based automation tools as part of our service delivery operations. These tools reduce the amount of repetitive, manual labor required to deliver many of our services and improve service quality through lower error rates and faster processing times.
• ***Real Estate, Infrastructure and Selling, General and Administrative (SG&A).*** We have significantly reduced the number of leased and owned properties from 462 to 339, reduced our information technology infrastructure costs by streamlining our operations and reduced our SG&A costs from $686 million in 2016 to $615 million in 2017." See Conduent 2017 10-K, p. 1 (emphasis in original).

[17] Conduent 2017 10-K, p. 2.
[18] "4Q First Look- Solid Quarter, FY18 EBITDA Guidance Could Be Conservative at Low End - ALERT," *JP Morgan*, February 21, 2018, p. 1.
[19] "Clearing the Air," *Cowen*, November 8, 2017, p. 2.
[20] Conduent Incorporated, "Q1 2018 Earnings Call," May 9, 2018, p. 7; Conduent Incorporated, "Q2 2018 Earnings Call," August 8, 2018, p. 2; "Takeaways from Management Meeting- Positive," *JP Morgan*, April 3, 2018, p. 1; "Conduent Inc.: NDR Reveals a Bright Path; Raising Margins," *Susquehanna*, October 3, 2018, p. 2.

## C. Summary of Allegations

19.    Plaintiffs allege that during the Proposed Class Period Defendants made misrepresentations and omissions "about the status of Conduent's so-called 'Strategic Transformation' pertaining to its information technology ("IT") infrastructure."[21]

20.    In particular, Plaintiffs allege that Defendants misrepresented the extent of progress on the IT-related elements of Conduent's strategic transformation during an earnings call on February 21, 2018, and subsequent earnings calls.[22]  Plaintiffs allege that Conduent made materially false and misleading statements and omissions of material facts concerning "its sub-optimized IT vendor relationship" and that "the Company lacked the systems inventory of the Company's legacy IT infrastructure that Defendants misled investors to believe had been completed during 2017."[23]

21.    Plaintiffs also "allege[] that Defendants omitted the following information from statements to investors during the Class Period:  (1) known issues with the legacy IT infrastructure and vendor performance that were impacting Conduent's financial guidance and growth, (2) service issues experienced by multiple tolling clients that were caused by Conduent's deficient IT infrastructure and sub-optimal vendor performance, and (3) IT issues that caused the company to accrue material penalties and revenue losses for failing to perform under tolling clients' contracts."[24]

---

[21] Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, *Employees Retirement System of the Puerto Rico Electric Power Authority et al. v. Conduent Inc., et al.*, ("Class Cert Motion"), December 7, 2020, p. 3.  See also Opinion, *Employees Retirement System of the Puerto Rico Electric Power Authority et al. v. Conduent Inc., et al.*, June 5, 2020 ("Motion to Dismiss Opinion"), p. 2 "Defendants [allegedly] overstated progress that Conduent was making in modernizing the IT infrastructure supporting its electronic toll collection business."
[22] Motion to Dismiss Opinion, p. 8.
[23] Complaint, ¶12.
[24] Motion to Dismiss Opinion, pp. 8–9.

22.     Plaintiffs allege the following corrective disclosure at the end of the Proposed Class

Period:

> In a November 7, 2018 press release announcing Conduent's third quarter financial results, Defendants finally revealed that the underlying issues affecting tolling client services had materially impacted Conduent's financial performance and caused the company to lower its FY2018 guidance.  On the ensuing earnings call, Mr. Vemuri blamed 'continued suboptimal performance from an inherited legacy technology vendor' and that vendor's 'inability to deliver on service level agreements,' as well as disruptions to operations that impacted client delivery caused by the company's 'outdated and historically under-invested legacy IT infrastructure.'[25]

23.     Plaintiffs further allege that "[w]hen the truth was disclosed… that the 'Strategic

Transformation' was failing and had caused significant disruptions to the Company's core tolling

business clients," Conduent's stock price dropped.[26]

## V.     Mr. Coffman Has Not Articulated a Reliable Class-wide Damages Methodology that is Consistent with Plaintiffs' Theory of Liability

24.     I understand that, at the class certification stage, plaintiffs need to establish the existence

of a methodology for calculating class-wide damages that is consistent with their theory of

liability.  It is also my understanding that plaintiffs would need to put forth a methodology that is

able to isolate damages attributable only to allegedly misrepresented or omitted information given

the specific facts and circumstances of the case.

---

[25] Motion to Dismiss Opinion, p. 6.  The extent to which the impact of the IT-related service disruptions that were disclosed on November 7, 2018 stems from the issues that Defendants allegedly claimed had been "addressed" versus other IT-related problems that are unrelated to the Plaintiffs' allegations is unclear.  I take Plaintiffs' claim that the November 7, 2018 IT-related disclosures were at least partially the result of vendor management issues that Defendants allegedly claimed had been "addressed" as given.
[26] Class Certification Motion, p. 3.

25.     However, as I discuss below, Mr. Coffman provides only a generic, boilerplate overview of a damages approach that he claims to be "standard and well-accepted,"[27] which amounts to only high level references to certain tools and techniques an economist could potentially apply (such as an event study or valuation methods) in measuring the value impact of information in general, without accounting for the fact pattern of this case.  The key challenges that Plaintiffs face, and which Mr. Coffman fails to address, in constructing a damages methodology consistent with Plaintiffs' theory of liability are discussed in turn below.

### A.  Damages from the Perspective of a Financial Economist and Mr. Coffman's Purported Damages Methodology

26.     A damages methodology should measure artificial price inflation and investor losses attributable only to the alleged misrepresentations and/or omissions for which Plaintiffs claim Defendants are liable (and only those for which they are ultimately found liable).  When inflation can be reliably measured using price drops following the alleged corrective disclosures, which is not always the case and as discussed below has not been shown to be the case in this litigation, any price drops attributable to other causes (i.e., confounding factors unrelated to the alleged misrepresentations and/or omissions or price drops that do not represent removal of early price inflation) should be excluded.

27.     However, it is necessary to examine Plaintiffs' theory of liability and the fact pattern of a case in order to demonstrate that a damages methodology that is economically sound can be used to estimate damages on a class-wide basis consistent with this theory.  Mr. Coffman does not conduct any such assessment.  Indeed, Mr. Coffman's discussion of damages does not include a single reference to Conduent or the facts in this case.  He admitted during his deposition that "the

---

[27] Coffman Report, ¶79.

wording of the section and… the bases for the conclusion aren't any different" from his previous securities class action expert reports.[28]  Instead, Mr. Coffman proposes the following general steps.

- First, Mr. Coffman states that the "standard and well accepted" methodology for calculating damages is the "out-of-pocket" method, in which damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale."[29]

- Second, he asserts that "the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations."[30]

- Third, Mr. Coffman then states that "such an event study would also need to consider whether and to what extent any non-fraud related information (i.e. "confounding information") contributed to the observed price movement."[31]  He states that "disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques."[32]

- Fourth, he states that "an analysis of how inflation per share may have evolved over the class period" is required and that possible methods to determine this are "constant dollar inflation bands," "constant percentage inflation bands," inflation adjusted on a daily basis based on "internal documents obtained in discovery" or relying on other "valuation techniques."[33]  These valuation techniques could include "event studies,

---

[28] Deposition of Chad Coffman, December 22, 2020 ("Coffman Deposition"), 178:5–11.
[29] Coffman Report, ¶79.
[30] Coffman Report, ¶82.
[31] Coffman Report, ¶82.
[32] Coffman Report, ¶82.
[33] Coffman Report, ¶83.

Page 13

fundamental valuation, contemporaneous valuations or documents, or some combination of the above."[34]

- Lastly, once he has calculated the inflation per share on each day during the Proposed Class Period, Mr. Coffman asserts that "the computation of damages for each class member is formulaic based upon information collected in the claims process."[35]

28.     Mr. Coffman describes several of his methodological choices as being based on an "inherently case-specific question that depends on specific facts and circumstances,"[36] yet his purported damages methodology does not address the facts and circumstances of this specific case.

29.     Mr. Coffman offers, as a general reference for calculating damages, that he would use an event study to quantify inflation as a "starting point."[37] Inflation is the difference between the observed market price of the stock and the stock's "true" value, i.e., the price at which the stock would have traded had it reflected the allegedly concealed information—also referred to as the "but-for price." Determining this "but-for" price (and hence inflation) requires determining what the company should have disclosed at each point in time to correct the alleged fraud, and the value implications of such a disclosure for the company's stock price.

30.     Here, Mr. Coffman proposes calculating inflation by first estimating Conduent's residual (or company-specific) stock price change following the alleged corrective disclosure.[38] He proposes to then employ a "back-casting" methodology to determine inflation on each day of the

---

[34] Coffman Report, ¶83.
[35] Coffman Report, ¶80.
[36] Coffman Report, ¶82.
[37] Coffman Deposition, 200:8–20.
[38] Coffman Report, ¶82 ("For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e. a 'corrective disclosure').").

Proposed Class Period.[39] Under a "back-casting" methodology, the residual stock price change measured on the alleged corrective disclosure day using an even study is "back-cast," or applied as the measure of inflation on each preceding day of the Proposed Class Period.

31.     As I explain in more detail below, Mr. Coffman's proposed methodology using an event study to measure the residual stock price drop on the alleged corrective disclosure day is incapable of measuring the price inflation, or damages, arising from realizations of allegedly concealed or understated risks. Moreover, Mr. Coffman has not described a scientific and reliable methodology to account for (1) the impact of other confounding information released on the alleged corrective disclosure day and (2) the possibility that the value of inflation would have varied throughout the Proposed Class Period. For these reasons and those described in more detail below, Mr. Coffman has not proposed a damages methodology that can be applied on a class-wide basis and that is consistent with Plaintiffs' theory of liability.

32.     Importantly, I am not faulting Mr. Coffman for failing to actually measure or calculate damages at this point, nor am I faulting him for not conducting a loss causation analysis (which I understand is not required at this stage). My point is that the generic approach that Mr. Coffman proposes to employ to measure damages at a later phase of the case is not responsive to case-specific circumstances, and therefore cannot purport to measure the damages that are attributable to Plaintiffs' theory of liability.

---

[39] Coffman Report, ¶83 ("For example, an often-used method is to assume 'constant dollar inflation,' which implies that the artificial inflation was the same dollar amount during the class period.").

**B. Mr. Coffman Has Not Proposed a Scientific and Reliable Methodology to Account for the Fact that the Stock Price Drop Following the Alleged Corrective Disclosure at Least Partly Reflected Realizations of Risks Described Prior to and Throughout the Proposed Class Period**

33. As discussed in Section IV.C, Plaintiffs allege that Conduent misrepresented the progress it had made in terms of the IT-related elements of the strategic transformation and, throughout the Proposed Class Period, failed to disclose the seriousness of the vendor and legacy IT infrastructure issues that were impacting client services. However, the price impact of the alleged corrective disclosure at the end of the Proposed Class Period, which Plaintiffs and Mr. Coffman focus on as a measure of inflation, at least partly reflects, in addition to many other non-allegation related items, the financial impact of the realization of risks associated with Conduent's "multiyear" and "aggressive" transformation of its historically under-invested legacy IT infrastructure.[40]

34. As an initial matter, companies with a business model heavily dependent on IT functions are subject to a variety of risks that are extensively discussed from the popular press to specialized IT and risk management publications. IT systems can fail both for external reasons (e.g., they can be hacked) and internal reasons such as programming errors, incompatibilities, hardware issues, and so on.[41] As suggested by risk management professionals, large-scale and complex IT projects undertaken by a company are inherently risky.[42] For example, early in 2018,

---

[40] As discussed in Section IV.B, the Company characterized the transformation initiative as a "multi-year transformation journey" with "aggressive goals" spanning multiple elements and phases.

[41] "Top 10 Operational Risks for 2018," *Risk.net*, February 22, 2018, https://www.risk.net/risk-management/5424761/top-10-operational-risks-for-2018 ("IT disruptions—whether from a disabling cyber attack, or the more mundane causes of human error or failure of aging hardware—are considered the top threat to financial services firms for 2018 by senior operational risk practitioners.").

[42] "Top 10 Operational Risks for 2018," *Risk.net*, February 22, 2018, https://www.risk.net/risk-management/5424761/top-10-operational-risks-for-2018. Likewise, as discussed in popular press articles, a recent study by the Boston Consulting Group found that "70% of all digital transformation efforts fall short of their targets." A study by Geneca found that "75 percent of business and IT executives surveyed admitted that their projects were

a publication that focuses on risk management ranked IT disruptions as the number one risk out of the top ten risks for financial services firms. The publication mentioned that among the risks of IT disruption were "failure of aging hardware" and "faulty software." The fifth highest risk was outsourcing, stating that outsourcing can lead to disruptions of a firm's IT environment and can potentially impact the "day-to-day continuity in business."[43]

35.      It is also known that IT functions are more likely to face issues when systems are being changed or software updated. Indeed, a senior U.S. banking regulator has commented that:

> Where firms are making changes to live systems and processes—updating one version of software to another—those are where we see a lot of issues with outages. They find it didn't go right, and the next thing they know, their online banking platform goes down.[44]

36.      Likewise, academic research has found that large IT investments "are risky and are often considered runaway, because they do not meet original expectations of cost, time, or benefits" and, even with attentive management, "some risk in IT projects cannot be eliminated."[45] For example, a 2012 study by the University of Oxford and McKinsey of 5,400 large (i.e., exceeding $15 million) IT projects found that, on average, "large IT projects run 45 percent over budget and 7 percent over time while delivering 56 percent less value than predicted."[46] Risks in IT projects

either 'always' or 'usually 'doomed' right from the start.'" See "How to Get Stakeholders to Join Forces and Realize Successful Digitization Projects," *Forbes*, January 4, 2021, https://www.forbes.com/sites/forbestechcouncil/2021/01/04/how-to-get-stakeholders-to-join-forces-and-realize-successful-digitization-projects/?sh=7b1cc942fe14; "Why Software Projects Fail, and the Traps You Can Avoid That Could Spell Disaster," *Entrepreneur*, February 27, 2019, https://www.entrepreneur.com/article/329019.

[43] "Top 10 Operational Risks for 2018," *Risk.net*, February 22, 2018, https://www.risk.net/risk-management/5424761/top-10-operational-risks-for-2018.

[44] "Top 10 Op Risks 2018: IT Disruption," *Risk.net*, February 22, 2018, https://www.risk.net/risk-management/5423331/top-10-op-risks-2018-it-disruption.

[45] Kumar, R. (2002), "Managing Risks in IT Projects: An Options Perspective," *Information and Management*, 40, 63–74 at pp. 63, 72.

[46] "Delivering Large-Scale IT Projects on Time, on Budget, and on Value," McKinsey on Business Technology, No. 27, Fall 2012.

include "specification uncertainty (due to uncertain business conditions or lack of knowledge), incorrect understanding of specifications, overlooked specifications, unrealistic schedules and budgets, shortfalls in externally furnished components or services, real-time performance shortfalls, and technical uncertainty due to innovative nature of the project."[47]

37.     Given the inherent risk of IT disruptions for any business heavily dependent on IT and the potential additional risks of disruption caused by an infrastructure transformation, the market would already have incorporated some likelihood of the operational and execution risks affecting Conduent, including those related to the IT-related elements of the Company's strategic transformation, in their valuation of the Company throughout the Proposed Class Period. However, the market's assessed likelihood might have purportedly been "underestimated" due to the alleged misrepresentations and omissions, if Plaintiffs' allegations are true.

38.     Notably, it does not follow, and Mr. Coffman has not shown, that but-for the Company's alleged misstatements regarding its transformation progress at the start of the Proposed Class Period, the market's assessed likelihood of operational and execution problems occurring, as experienced by the Company, would have been 100%.  In other words, the market would still not have known with certainty that significant tolling business client service disruptions, the resulting penalties, and loss of tolling revenue would occur if the Company's statements had not been misrepresented at the beginning of the Proposed Class Period.[48]

---

[47] Kumar, R. (2002), "Managing Risks in IT projects: An Options Perspective," *Information and Management*, 40, 63–74 at p. 64.

[48] For example, Plaintiffs allege that "[u]nbeknownst to investors… Defendants had not addressed its suboptimized IT vendor relationship and the Company lacked the systems inventory of the Company's legacy IT infrastructure that Defendants misled investors to believe had been completed during 2017."  See Complaint, ¶12.  Even if the Plaintiffs were correct about the alleged concealment or misrepresentation of potential deficiencies in Conduent's vendor management and infrastructure upgrade, had Conduent told the "truth" sooner, it does not follow that the market would have expected that client service disruptions of the same (or similar) nature and magnitude would have

39.    Mr. Coffman proposes using the Company's residual return on the alleged corrective disclosure day to quantify inflation.[49]  However, as discussed below, tolling-related IT events that developed starting in the summer of 2018 represent, either partially or completely, the realization of operational and execution risks that were previously disclosed by the Company.  The realization of such risks would be expected to lead to stock price declines even absent allegedly concealed or misleading statements.  On the other hand, disclosures of the alleged misrepresentations and omissions that the Company could allegedly have made early in the Proposed Class Period could have affected the market's assessment of the *likelihood* of negative events (i.e., IT disruptions) occurring, but that is not equivalent to the market learning about the precise nature of the realization of such events.

40.    Specifically, as I discuss in the remainder of this section, the risk of Conduent's use of subcontractors and operational and execution risk related to the Company's strategic transformation were disclosed by the Company and reiterated by market participants throughout the Proposed Class Period.  Plaintiffs and Mr. Coffman claim that Conduent's stock traded in an efficient market during the Proposed Class Period.[50]  In such an efficient market, disclosed risks would be fully and quickly incorporated into the stock price.[51]  To the extent that Conduent did not provide the market with an accurate understanding of the true probability of risks related to its strategic transformation, inflation would result from the degree of risk (if any) that was concealed.

---

occurred with certainty within a specific time frame, or that the corresponding response of government agencies would have been what it was.

[49] Coffman Report, ¶82.

[50] Complaint, ¶198; Coffman Report, ¶6.

[51] Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25(2), pp. 383–417 at pp. 413–416.  See also Berk, J., P. DeMarzo, and J. Harford, *Fundamentals of Corporate Finance*, 2nd ed. (New Jersey: Prentice Hall, 2011), p. 298 ("[Market efficiency] implies that securities will be fairly priced, based on their future cash flows, given *all information that is available to investors*….  Information that is available to all investors includes information in news reports, financial statements, corporate press releases, or other public data sources." (emphasis added)).

Yet, Mr. Coffman has not described a methodology that could distinguish the stock price impact from concealed risk being disclosed versus the impact from disclosed risk materializing into reality, which would have no bearing in measuring inflation.

### 1. Risks Regarding Conduent's Use of Subcontractors Were Disclosed Prior to November 7, 2018

41.     Market participants were aware of the possible risks related to the Company's use of subcontractors.  For example, in the discussion of risk factors included in its 2017 10-K (filed during the Proposed Class Period) Conduent disclosed that:

> We rely to a significant extent on third-party providers, such as subcontractors, a relatively small number of primary software vendors, utility providers and network providers; if they cannot deliver or perform as expected or if our relationships with them are terminated or otherwise change, our results of operations and financial condition could be materially adversely affected.[52]

42.     Analysts reiterated this risk.  A Cowen report described the risk as follows:

> Subcontractor reliance—The company relies to a significant extent on 3rd party IT Services subcontractors. The company could be materially adversely affected and may incur significant additional liabilities if any of its 3rd party providers do not meet client obligations or if they terminate or refuse to renew their existing relationships.[53]

43.     Of note, this identical risk described by Cowen was included in its reports both prior to and post the alleged misrepresentation on February 21, 2018.[54]

---

[52] Conduent 2017 10-K, p. 12.

[53] "Getting the Message Back on Track," *Cowen*, August 8, 2018, p. 4.

[54] See "On the Road with CDNT," *Cowen*, December 19, 2017, p. 5; and "Management Meeting Reflects Progress on Plan and Confidence Entering 2018," *Cowen*, February 26, 2018, p. 6.

44.     Further, a GlobalData report in June 2018 characterized the "dependence on subcontractors" as a "threat"—noting that the "company depends on the third party providers including subcontractors, software vendors, network providers and utility providers" and "[d]ependence on subcontractors and suppliers might affect the company's operational performance."[55]

### 2. Possible Execution Risks Related to the Company's Strategic Transformation Were Disclosed Prior to November 7, 2018

45.     As stated above in Section IV.B, when the Company first introduced its strategic transformation objectives it characterized the initiative as a multiyear "journey."  In its earnings slides on February 21, 2018 (the start of the Proposed Class Period), the Company described its progress and outlook for the IT transformation as ongoing, stating that "standardization and simplification **continues** to be a meaningful opportunity in FY 2018."[56]

46.     Conduent advised investors of the risks related to its transformation and spin-off from Xerox.  In the Q1 2017 earnings call, the company warned that "[c]onsolidation across our real estate and IT infrastructure is yielding tangible savings, but we have a long way to go."[57]  The 2017 10-K also states:

> We may be unable to achieve some or all of the benefits that we expect to achieve from the spin-off.  We believe that, as an independent, publicly traded company, we will be able to, among other things… better focus our financial and operational resources on our specific business… However,… we may be unable to achieve some or all of the benefits that we expected to achieve as an independent company in the time we expect, if at all.[58]

---

[55] "Conduent Inc. (CNDT): Financial and Strategic SWOT Analysis Review," *GlobalData*, June 2018, p. 20.
[56] Conduent Incorporated, Form 8-K for Q4 and FY 2017, filed February 21, 2018, Exhibit 99-2, p. 4 (emphasis added).
[57] Conduent Incorporated, "Q1 2017 Earnings Call," May 10, 2017, p. 4.
[58] Conduent 2017 10-K, p. 21.

47.    In general, as reflected in analyst report commentary, market participants were aware that the strategic transformation was an ongoing program and that there were operational and execution risks the Company faced.  In early 2017 a Morgan Stanley report commented on the transformation being in the early stages, yet noted that "as evidenced by historical performance, we see meaningful risk as well," and that "[Conduent] appears to be appropriately setting the stage for an effort that will span years rather than quarters."[59]  Another Morgan Stanley report on February 22, 2018 (the second day of the Proposed Class Period and the day after the 2017 fourth quarter earnings call) also viewed "[e]levated execution risk with restructuring initiatives associated with the spin" as a risk to the Company's outlook, a view that was reiterated by Morgan Stanley throughout the Proposed Class Period.[60]  A Cowen report a few days later noted "[s]imultaneous divestiture and tuck in acquisition intentions, while it also focuses on the transformation presents elevated execution risk" and "[w]e expect the road to be bumpy as CNDT progresses on its transformation and restructuring, with the largest unknown on top-line trajectory."[61]  Conduent stated on its Q3 2018 earnings call that the client IT disruptions occurred following a data center migration that had been planned for Q3.[62]  A Suntrust Robinson Humphrey report on November 7, 2018 stated that "[l]arge business transformation take time in our view and this was not a smooth quarter, but the strategy remains intact."[63]

---

[59] "Keeping Expectation in Check After Bumpy Start," *Morgan Stanley,* February 23, 2017, p. 1.

[60] "Pointed in the Right Direction," *Morgan Stanley*, February 22, 2018, p. 3; "A Lot of Moving Pieces to Digest," *Morgan Stanley*, May 10, 2018, p. 3.

[61] "Management Meeting Reflects Progress on Plan and Confidence Entering 2018," *Cowen*, February 26, 2018, pp. 1–2.

[62] Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018, p. 4 ("We had our first planned data center migration in Q3 and during this migration we uncovered issues that caused significant disruption to our client delivery and operations and resulted in penalties to Conduent.").

[63] "Quick Thoughts on 3Q18 Results; Margins and Margin Guidance Solid; Revenue Weak," *Suntrust Robinson Humphrey*, November 7, 2018, p. 1.

48.     Similarly, Conduent disclosed that certain complexities in the Company's projects made them inherently risky.  For example, Conduent's 2017 10-K states:

> [W]e incur significant expenditures for the development and construction of system software platforms needed to support our clients' needs. Our failure to fully understand client requirements or implement the appropriate operating systems or databases or solutions which enable the use of other supporting software may delay the project and result in cost overruns or potential impairment of the related software platforms, which could materially adversely affect our results of operations and financial condition.[64]

49.     Conduent's 2017 10-K also states:

> If we fail to successfully develop new service offerings, including new technology components… we may be unable to retain current customers and gain new customers and our revenues would decline. **The process of developing new service offerings, including new technology components, is inherently complex and uncertain**… We must make long-term investments and commit significant resources before knowing whether these investments will eventually result in service offerings that achieve customer acceptance and generate the revenues required to provide desired returns.[65]

50.     A May 2018 CFRA report noted that "Risks to our recommendation and target include potential hang-ups with restructuring activities and delays with upcoming client ramps."[66] Consistent with these risks highlighted by market participants, in its 2018 2Q earnings call on August 8, 2018, the Company updated investors regarding problems with the ramp up of the Florida toll contract and noted that "issues tend to arise in the implementation phase of the startup and ramp of a new tolling system, particularly one that involves transitioning multiple legacy

---

[64] Conduent 2017 10-K, p. 12.
[65] Conduent 2017 10-K, p. 21 (emphasis added).
[66] "Conduent Incorporated," *CFRA*, May 15, 2018, p. 1.

systems to a new and updated integrated state-wide system."[67] A JP Morgan report following the earnings call stated that "concerns over potential contract issues (Texas and Florida toll contracts) could limit near-term multiple expansion."[68]

51.    The potential for operational failures to impact the Company's financial outlook was discussed by market participants as well. Indeed, a March 2018 Susquehanna report noted that "[s]hould a client be unsatisfied with the quality of work, CNDT could incur additional costs in order to remedy the situation. Additionally, clients who are unsatisfied may seek to terminate contracts."[69] At the June 2018 Analyst Day, the Company described how poor performance on its part could result in contracts not being renewed.[70] Conduent's 2017 10-K also explains that if the Company did not deliver on their contracts properly they could face penalties, stating that:

> [a] significant portion of our revenues is derived from contracts with U.S. federal, state and local governments and their agencies… Additionally, if the government discovers improper or illegal activities or contractual non-compliance (including improper billing), we may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions or debarment from doing business with the government. Any resulting penalties or sanctions could materially adversely affect our results of operations and financial condition.[71]

52.    Furthermore, Conduent's 2017 10-K also states:

---

[67] Conduent Incorporated, "Q2 2018 Earnings Call," August 8, 2018, p. 2; "Getting the Message Back on Track," *Cowen*, August 8, 2018, p. 1.

[68] "2Q Recap: Encouraging Progress on Divestitures," *JP Morgan*, August 9, 2018, p. 1. The "multiple" the report refers to is a ratio similar to the price/earnings ratio. With such a ratio, "multiple expansion" means that the market price increases relative to earnings, so that the corporation's equity is worth more for any given level of earnings.

[69] "Conduent Inc.: Good Value If They Can Execute; Initiating with a Positive Rating," *Susquehanna*, March 6, 2018, p. 11.

[70] Conduent Incorporated, Analyst Day Transcript, June 8, 2018, p. 52.

[71] Conduent 2017 10-K, p. 11.

> If a client is not satisfied with the quality of work performed by us or a subcontractor, or with the type of services or solutions delivered, then we could incur additional costs to address the situation, the profitability of that work might be impaired and the client's dissatisfaction with our services could damage our ability to obtain additional work from that client or obtain new work from other potential clients.[72]

53.     Indeed, in an efficient market, the stock price would have fully incorporated information about the operational and execution risks described above, and it would also have incorporated information about potential performance penalties in Conduent's publicly-available contracts with government agencies.  For example, Conduent's tolling contract with the state of Michigan reserves a "Withhold Remedy," stating:

> In addition and cumulative to all other remedies in law, at equity and under this Contract, the State may, without waiving any other rights under this Contract, elect to withhold from the payments due to Contractor under this Contract such amounts that are in dispute for Deliverables or services that do not comply with the performance requirements or standards set forth in the Contract. Upon Contractor's cure of the non-conforming Deliverable or service item, the State will cause the withheld payments to be paid to Contractor, without interest.[73]

54.     Further, the risk that a failure to perform might result in penalties was also disclosed to the market through various announcements made by government authorities, starting in the summer of 2018, that disclosed that Conduent was having issues with its tolling business.[74]  For example,

> a.  On July 17, 2018, two New York state lawmakers were reported to be calling for the cancellation of Conduent's contract regarding its cashless tolls.  In response,

---

[72] Conduent 2017 10-K, p. 12.

[73] "State of Michigan Enterprise Procurement: Contract Change Notice," Michigan Department of Technology, Management, and Budget, July 10, 2017, p. 29, https://www.michigan.gov/documents/micontractconnect/7700141_576068_7.pdf.

[74] The Complaint acknowledges these public statements about tolling issues that were disclosed over the summer of 2018.  See, e.g., Complaint, ¶¶ 114–119, 129–130.

the Thruway Authority stated that, "Under the existing contract, Conduent has been—and will continue to be—penalized financially each and every time they underperform."[75]

b.  Also in July 2018, the Florida Department of Transportation ("FDOT") "announced it is suspending all future payments to the contractor who was hired to oversee a failed system and was supposed to fix that problem."[76]

c.  On July 30, 2018 Senators from the Senate Commerce Committee requested that the Federal Trade Commission initiate an investigation into "Conduent's pattern of mismanaging cashless tolls."[77]

d.  In August 2018, FDOT announced it was "requesting that Florida's Chief Inspector General launch an investigation into Conduent's mismanagement of the SunPass system transition" and "assessing nearly $800,000 in damages" against Conduent.[78]

e.  On October 19, 2018, an article mentioned that Conduent has had issues in at least seven states: California, Maryland, Michigan, New Hampshire, New York, Rhode Island, and Texas.[79]

---

[75] "HV Lawmakers to NYS Thruway Authority: Cancel Cashless Tolling Contract," *WAMC*, July 17, 2018, https://www.wamc.org/post/hv-lawmakers-nys-thruway-authority-cancel-cashless-tolling-contract.

[76] "Four Years After Trucker's Lawsuit, SunPass Still Having Significant Problems," *Land Line*, July 20, 2018, https://landline.media/four-years-after-truckers-lawsuit-sunpass-still-having-significant-problems/.

[77] Letter to the Honorable Joseph Simons, Federal Trade Commission, from Bill Nelson, Senate Committee on Commerce, Science and Transportation, and Gary Peters, Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety and Security, July 30, 2018, https://www.commerce.senate.gov/services/files/de85078d-5589-40aa-9f17-fa96ceb85aa6.

[78] "FDOT: SunPass Transaction Backlog Successfully Cleared," *Florida Department of Transportation*, August 14, 2018, https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/info/info/co/news/newsreleases/08142018-backlog.pdf?sfvrsn=caacb60e_0.

[79] "Rick Scott has Financial Link to Botched SunPass Contract," *Miami Herald*, October 19, 2018, https://www.miamiherald.com/latest-news/article220309175.html.

55.     In other words, potential risks regarding various tolling service issues and resulting penalties and revenue loss were disclosed and discussed by the Company and securities analysts prior to November 7, 2018.  Such risks appear to have become exacerbated through a series of events in 2018 3Q.  Indeed, during its analyst conference call on November 7, 2018 the Company stated that "the impact or the nonperformance of [the subcontractor issues] has become serially amplified…This is not a new issue.  We've been addressing this for a while.  The impact of this has suddenly accelerated and got amplified."[80]

### 3.  Mr. Coffman's Methodology Does Not Account for the Realization of the Risks Stemming from Conduent's IT Transformation

56.     While potential risks regarding various tolling service issues and resulting penalties and revenue loss were discussed by the Company and analysts prior to November 7, 2018, I understand from the Motion to Dismiss Opinion that the Court has not found evidence that public information existed prior to this date that informed investors of the following:

> (1) that Conduent lacked the inventory of its IT infrastructure that was necessary to complete its planned data center consolidation, (2) that the then-present IT infrastructure was insufficient to support Conduent's core business segments in the interim and could create service delivery issues, (3) that Conduent took control of tasks from its sub-optimal vendor Atos because of Atos's failure to create the critical systems inventory, or (4) the severity of the tolling service issues and the resulting penalties and revenue loss.[81]

57.     Thus, to the extent that Conduent did not provide the market with an accurate understanding of the true nature and probability of risks related to its strategic transformation, Mr. Coffman would need a methodology that could distinguish the simultaneous stock price impact

---

[80] Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018, pp. 12, 15.
[81] Motion to Dismiss Opinion, p. 12 footnote 8.

from concealed risk being disclosed versus the impact from disclosed risk materializing into reality.

58. As a simplified example, suppose first that the market believes the likelihood of IT-related client service disruptions at Company A within the next two years is 10% and the expected cost associated with the problems is $10 million.[82] Assume that Company A has 5 million shares outstanding. It follows then that the expected loss of Company A due to the potential vendor management issues is equal to 10% * $10 million = $1 million (decreases the stock price by $1 million / 5 million shares outstanding, or 20c per share). In an efficient market the stock price would incorporate this expected loss in the market value of Company A's equity.

59. Suppose now that because of Company A's misstatements about its vendor management and IT infrastructure, it "maintained" the market's belief that the probability of IT-related client service disruptions and resulting loss of revenue was 10% when in fact the likelihood was 20%. In this case, had the market known the true status of Company A's performance on vendor and IT infrastructure management, the *true* expected loss of equity value due to IT-related client service disruptions before they occurred should be higher by (20% - 10%) * $10 million = $1 million (or by 20c per share). The market value of the equity would not reflect this true expected loss if Company A had concealed the true degree of risk. In this simplified example, the difference between the market's expected loss and the true expected loss would be the starting point for a measure of inflation (i.e., the difference between the current market price and what the market price would have been if the true probability of the risk of IT-related client service disruptions was known).

---

[82] I ignore discounting for simplicity as introducing it would only complicate the analysis without changing my conclusions.

Page 28

60.    If the IT-related client service disruptions and resulting revenue losses in fact occur, the *actual* drop in the value of the equity for Company A will be equal to the cost of the problems, less what had already been anticipated by the market.  An important simplification in my example is that the market knows the actual cost.  If so, though the actual cost when the disruptions occur could differ from the *ex ante* expected cost (i.e., $10 million), assuming that the actual cost is equal to the expected cost, the residual drop in the value of equity would be $10 million - $1 million = $9 million (or $1.80 per share).

61.    Note that an event study in this case would only show that the value of equity fell by $9 million.[83]  The loss of $9 million represents the incremental difference between the company's actual loss and the *ex ante* expected loss.[84]  It would, however, provide no information about what the market would have believed had there been no alleged omissions and misrepresentations. Instead, to measure inflation, it is necessary to measure the difference between the market's expected loss and the true expected loss.  In this example, the true expected loss could be anywhere between $1 million (i.e., the market's expected loss) and $9 million and the stock price drop would still be $9 million.  This is because the market's surprise at the announcement of the loss is relative to what the market actually believed before the announcement and not relative to what the market *would have believed* absent alleged misrepresentations and omissions.  Hence, the event study based on the price drop upon the corrective disclosure day would provide no information about the amount of inflation, if any.

---

[83] The price drop from the event study would reflect the residual price movement after controlling for market and industry factors.

[84] Ross, S. A., R. W. Westerfield, and J. Jaffe, *Corporate Finance*, 7th ed. (Boston: McGraw-Hill Irwin, 2005), pp. 27, 86 ("In finance the value of the firm is its ability to generate financial cash flow…One way to think about the question of how much a firm is worth is to calculate the present value of its future cash flows.").  See also Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25(2), pp. 383–417 at 413–416.

62.     Even assuming that Conduent could have disclosed information at an earlier date that made clear that the "true" risks of vendor subpar performance and client service disruptions were greater than what had previously been implied by its public statements (as discussed above), from an economic perspective, only that incremental degree of risk purportedly concealed by the alleged misstatements should be included in inflation.  However, because the stock-price drop cannot be used to assess the degree of risk anticipated, a traditional event study approach that uses price declines on days when the market learns about the realization of the risks stemming from Conduent's IT transformation cannot serve as a basis for estimating inflation caused by the alleged misstatements.  Instead, inflation should reflect how a set of "but-for" disclosures of the Company's "true" vendor and IT infrastructure management situation would cause the market to revise its assessment of the risk of client service disruptions.  Mr. Coffman provides no methodology whatsoever to address this.

63.     Specifically, Mr. Coffman has not explained how his proposed damages approach can reliably estimate the price effect (if any) of the concealed degree of risk based on the price movements that reflect the materialization of previously disclosed risks.  Mr. Coffman acknowledged that "to the extent a company misrepresents a risk either the nature or existence or degree of a risk in some material way, that can cause a divergence between the market price and what the market price would have traded at had there been a fuller disclosure of what the nature, magnitude, or existence of that risk was," and "the loss causation analysis would have to figure out how different the price would be upon disclosure of what they could have disclosed at each point in time."[85]

---

[85] Coffman Deposition, 243:19–244:7.

64.     Yet Mr. Coffman does not describe a methodology that would allow him to "figure out how different the price would be upon disclosure."  Nor has Mr. Coffman considered whether the risks that became exacerbated or maybe even partially realized in the summer and 2018 3Q could in fact have been disclosed at the start of the Proposed Class Period.[86]  He merely asserts that his generic approach is suitable, without even attempting to establish how it can possibly deal with the complex issue at hand.

### C. Mr. Coffman Has Not Proposed a Scientific and Reliable Methodology to Disentangle the Stock Price Impact of the Alleged Corrective Disclosure from the Impact of Other Confounding News Released on the Same Day

65.     An event study of the type that Mr. Coffman uses in his report measures the overall stock price impact of all new information entering the market on the event day.  A scientific and reliable damages methodology must be able to disentangle the stock price effects of allegedly corrective information from the stock price effects of other confounding information.[87]  Given that Mr. Coffman proposes estimating stock price inflation using the stock price decline on the day of alleged corrective disclosure, it is essential for him to present a scientific and reliable methodology capable of measuring the stock price effects of only the allegedly corrective disclosure and not of confounding information released on this day.

---

[86] Coffman Deposition, 241:10–23 ("Q. Do you understand the complaint as alleging that the company knew with certainty about the full impact of the performance of the subcontractor and its IT infrastructure issues on its tolling services at the beginning of the class period? A. I don't recall having explicitly read anything that suggests that. But, you know, what the company knew or should have known or should have disclosed that, you know, in any level of detail over time is not something I've evaluated nor was it necessary to give the opinions I'm giving.").

[87] According to the Supreme Court decision in *Dura Pharmaceuticals*, plaintiffs cannot recover losses caused by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events…." Opinion of the Court, *Dura Pharmaceuticals, Inc., et al., v. Michael Broudo et al.*, 544 U.S. 336, April 19, 2005, p. 343.

66.     In his deposition, Mr. Coffman admitted that he had not analyzed whether there was confounding information that could explain why Conduent's stock price moved on the corrective disclosure date.[88]  He conceded this by stating: "I have not taken the step of looking precisely at what, if any, confounding information there was or how I might disaggregate in this specific case."[89]  Mr. Coffman further explained that disentangling a stock price reaction into different components is "not always easy to do precisely," but asserted that his "understanding of the standard for damages estimates is that it needs to be reasonable.  And in every case [he has] ever been involved in where, you know, a client has asked [him] to look at potential disaggregation issues, there's been a way to at least reasonably address it."[90]  Given that Mr. Coffman admitted he has not determined whether there was confounding information on the alleged corrective disclosure date, it is not clear how he can conclude that such a "reasonable" methodology exists specifically in this matter in light of his admission that a precise methodology "is not always easy to do."

67.     In terms of what this "reasonable" methodology would be, Mr. Coffman offers only the vague possibility that it might involve "applying some form of valuation principle to try to disaggregate or looking at analysts' reports to see how they valued different pieces of the information, looking at internal documents to see if there's any evidence as to how the information might be parsed, or, you know, doing some sort of detailed financial analysis to try to disaggregate that information."[91]  Mr. Coffman stressed such an analysis is "very fact specific,

---

[88] Coffman Deposition, 217:5–10, 220:11–18.
[89] Coffman Deposition, 219:5–11.
[90] Coffman Deposition, 218:4–17.
[91] Coffman Deposition, 192:22–195:5.  See also Coffman Deposition, 92:17–93:4 ("… if there's a corrective disclosure with multiple pieces of new information and all those pieces of information are identified simultaneously or when the market is closed at least so that you can't observe how the stock price is moving over time with different

Page 32

circumstance specific."[92]  Yet, Mr. Coffman offers no fact or case-specific details as a basis for his conclusion that a reasonable methodology exists for disentangling the effect of confounding information in this matter.  Indeed, he did not have a valuation methodology "in mind" and had not "analyzed what would be necessary" in this case.[93]

68.      Mr. Coffman did not substantiate the basis for his understanding that the "standard for damages estimates is that it needs to be reasonable."  Mr. Coffman does not define what makes a methodology "reasonable" and whether such a methodology is one that is scientific and has a known error rate.  He has not shown that a scientific methodology with a known error rate exists given the facts of this case.  He also has not provided any support in the academic literature or otherwise for the view that such a methodology exists irrespective of the facts of the case.

69.      As discussed below, based on my review of public press and analyst reports, there was confounding information released on the alleged corrective disclosure date.  Mr. Coffman has not proposed a reliable methodology for measuring the stock price impact of the alleged corrective disclosure on November 7, 2018 from the impact of other confounding news released on the same day.

   **1.  There Were Multiple Pieces of Confounding Information Affecting Conduent's Stock Price on November 7, 2018**

70.      Mr. Coffman has not proposed a methodology for measuring the stock price impact of the alleged disclosure on November 7, 2018 separately from the impact of other confounding news released on this day.  In particular, as I discuss below: (1) the November 7, 2018 alleged

---

pieces of that information, then the event study itself can only tell you how much the stock price moved as a result of the total mix of new information.").
[92] Coffman Deposition, 194:23–24.
[93] Coffman Deposition, 221:21–222:2 ("Q. What valuation methodology do you propose to use here in this case? A. I don't have one in mind that I would be proposing to use in this case. I haven't analyzed what would be necessary.").

corrective disclosure coincided with Conduent's 3Q 2018 earnings announcement where its reduced outlook was attributed to several factors that were unrelated to the allegations; and (2) the Company announced an increase in litigation reserves for Texas litigation issues that was also unrelated to the allegations.

71.     On November 7, 2018 Conduent announced its 2018 3Q earnings results in a press release before trading hours followed by a conference call with analysts at 10 AM ET.[94]  During the earnings call, Conduent attributed the reduced outlook for FY 2018 as a whole to five separate factors: (1) lower sales activity, (2) "continued suboptimal performance from an inherited legacy technology vendor," (3) "major" operational disruptions due to "historically underinvested legacy IT infrastructure," (4) slower than expected European business, and (5) "slippage of deal signings into latter quarters."[95]

72.     Analysts noted that the financial results announced on November 7, 2018 included quarterly earnings below expectations and reduced guidance for the financial year as a whole due to multiple factors.  For example, Cowen noted that "3Q revenue and EBITDA miss consensus and CNDT guides lower on FY18 EBITDA" and "[e]xpect shares to be weak given uncertainty surrounding **multiple moving pieces**."[96]

73.     Of such "moving pieces," analysts did not appear to view the IT issues Conduent had experienced as the primary driver of Conduent's below-expectations earnings performance in the

---

[94] "Conduent to Report Third-Quarter 2018 Financial Results on November 7, 2018," *Conduent Incorporated Press Release*, October 24, 2018, https://www.news.conduent.com/news/releases-20181024; "Conduent Reports Third Quarter 2018 Results with Strong Adjusted EPS and EBITDA Growth; Healthier Balance Sheet Driven by Transformation and Divestitures," *Conduent Incorporated Press Release*, November 7, 2018, https://www.news.conduent.com/news/conduent-reports-third-quarter-2018-results-with-strong-adjusted-eps-and-ebitda-growth-healthier-balance-sheet-driven-by-transformation-and-divestitures.

[95] Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018, pp. 4–5.

[96] "Mixed 3Q Results & Lowered Outlook," *Cowen*, November 7, 2018, p. 1 (emphasis added).

quarter, which is perhaps not surprising given Conduent's total tolling business—both in the U.S. and the rest of the world—business accounted for only 5.5% of the Company's revenues as of 2017.  For example:

a. Suntrust Robinson Humphrey noted that "Revenue missed by approximately 3%, EBITDA missed by mid-single digit % and adjusted EPS was in line. Guidance was light by 2% on revenue, light by 4% on EBITDA and margin guidance was light by 20 bps at the midpoint - so why was the stock down 30%? - We believe there are three potential reasons :1) increase in the reserve for litigation signaling Texas litigation issues; 2) loss of credibility in management and guidance as a more positive tone was conveyed at recent investor events; 3) implications of re-defining the 'Core', higher investments, and its impact on F2019 EBITDA and cash flow dynamics. **In our view, factors #1 and #3 were the largest drivers**."[97] Note that neither reason "1)" nor reason "3)" seem related to Plaintiffs' allegations.

b. JP Morgan noted that "CNDT's 3Q results missed expectations, which, along with a meaningful guidance cut, drove ~30% drop in the stock price yesterday (vs. S&P 500 up 2%). We attribute the guidance cut to 2 broad issues: 1) lower sales activity and 2) operational challenges in the [information technology outsourcing] business… **Perhaps the much larger contributor to revenue weakness this year** was weak new business signings for most of the year (3Q TCV down 20% including 22% decline in new signings) and contract slippage/timing issues."[98]

---

[97] "Sell-off Overdone; Making Progress on Key Drivers; Lowering Estimates but Reiterate Buy," *Suntrust Robinson Humphrey*, November 8, 2018, p. 1 (emphasis added).
[98] "3Q Recap- Stock Sell-off De-risks NT Outlook as Management Re-establishes its Track Record; Remain OW," *JP Morgan*, November 8, 2018, pp. 1–2 (emphasis added).

74.    Mr. Coffman stated in deposition that "at the end of class period, [his] understanding is there was an earnings announcement that disclosed lower than expected earnings, earnings that were lower than guidance," and stated that "**at least part of the reason** it was described that they were unable to meet guidance was that they were having software problems and problems with vendors."[99]  Apart from a vague reference to "applying some form of valuation,"[100]  Mr. Coffman does not explain how his damages methodology could account for the stock price impact from the "part" of the guidance reduction that was not allegation-related (or any other confounding news).

75.    As described in Section V.B above, several public statements made by government authorities during the Proposed Class Period disclosed that Conduent was having issues with its tolling business; Mr. Coffman has not described how he would assess the extent to which the tolling disclosures on November 7, 2018 had been anticipated by the market.  Likewise, to the extent that the stock price impact from tolling issues was the result of factors beyond the systems inventory that Defendants allegedly "misled investors to believe had been completed during 2017,"[101] Mr. Coffman has not described how his methodology can disentangle IT problems resulting from developments that were allegedly concealed from IT problems that may have occurred during the rollout of a complex IT infrastructure project irrespective of any alleged misrepresentations.[102]

---

[99] Coffman Deposition, 177:11–178:4 (emphasis added).

[100] Coffman Deposition, 192:22–195:5.  See also Coffman Deposition, 92:17–93:4 ("… if there's a corrective disclosure with multiple pieces of new information and all those pieces of information are identified simultaneously or when the market is closed at least so that you can't observe how the stock price is moving over time with different pieces of that information, then the event study itself can only tell you how much the stock price moved as a result of the total mix of new information.").

[101] Complaint, ¶¶11–12.

[102] For example, to the extent that issues encountered in the ramp up of its Florida contract in Q2 and Q3 2018 did not stem from the problems that Plaintiffs allege were portrayed as "addressed" at the start of the Proposed Class Period, Mr. Coffman would need to disentangle the Q3 impacts related to the Florida project from other projects affected by the strategic transformation.

76.      With respect to the Texas litigation, the Company announced that, in the wake of unsuccessful settlement discussions, it was increasing its litigation reserve for this issue by $72 million.[103]  The Company viewed the increased reserve cost as a primary contributor to the pre-tax loss for the quarter.[104]  The suit involved alleged problems with Conduent's authorization of Medicaid orthodontic claims, with alleged damages of $2 billion.[105]  Analysts viewed Conduent's increase in its litigation reserve as increasing risk and uncertainty for the Company.  For example, BMO Capital Markets noted that "Conduent provided an update on its Texas litigation and provisioned an additional $72 million (total: $110 million) this quarter...  we think this at a minimum **raises the risk potential with investors**."[106]  Likewise, Cowen noted that the "[i]ncremental reserve on Texas litigation of $72MM ($110MM total) **may drive increased uncertainty**."[107]

77.      Mr. Coffman claimed in deposition that whatever "level of increased uncertainty there is, you know, changes in uncertainty can be measured by looking at changes in the discount rate."[108]  However, he has neither explained why the uncertainty should lead to an increased discount rate (e.g., does not represent an idiosyncratic risk that is diversifiable) nor provided any support for his vague reference to this approach, including how to obtain reliable inputs to quantify the higher litigation risk and then translate that into "changes in the discount rate" in performing the discounted cash flow analysis that he suggested could be applied in this case.  In other words, Mr. Coffman has not shown that a scientific methodology with a known error rate exists given the

---

[103] Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018, p. 3.
[104] Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018, pp. 8–9.
[105] Conduent Incorporated, Form 10-Q for FY 2018 Q1, filed May 9, 2018, p. 18.
[106] "Continued Cost Improvement Overshadowed by Revenue," *BMO Capital Markets*, November 7, 2018, p. 3 (emphasis added).
[107] "Mixed 3Q Results & Lowered Outlook," *Cowen*, November 7, 2018, p. 1 (emphasis added).
[108] Coffman Deposition, 226:3–21.

facts of this case, and has not provided any support in the academic literature or otherwise for the view that such a methodology exists irrespective of the facts of the case.

78.     Further, his proposed methodology would not be able to separate out increases in uncertainty unrelated to, versus those related to, the allegations.  If changes in the discount rate for the Company's future cash flows reflect changes in uncertainty, they would reflect the total effect.

**D. Mr. Coffman Has Not Proposed a Scientific and Reliable Methodology for Measuring Time-varying Inflation Throughout the Proposed Class Period**

79.     Mr. Coffman has not provided a scientific and reliable methodology for measuring time-varying inflation throughout the Proposed Class Period.  This is particularly important in this matter if it is determined that the events that evolved during the course of the Proposed Class Period, and which Plaintiffs claim as alleged omissions, could not have been disclosed at the start of the Proposed Class Period.

80.     Mr. Coffman states that estimating damages "would also require an analysis of how inflation per share may have evolved over the class period."[109]  He asserted that inflation "measures the difference between the actual stock price observed and the hypothetical price that would have occurred… if a full disclosure were made **at any given point during the class period.**"[110]

81.     However, despite acknowledging the need to estimate inflation *throughout* the Proposed Class Period, Mr. Coffman fails to describe a reliable methodology that could be used to account

---

[109] Coffman Report, ¶83.
[110] Coffman Deposition, 187:18–188:4 (emphasis added).  See also Coffman Deposition, 188:5–10 ("So you're not trying to construct a world where the misrepresentations never existed.  You're trying to construct a but for world that at each point in time had they told the full truth… what would the stock price reaction be.").

Page 38

for the facts that (1) what Defendants could have disclosed evolved over the Proposed Class Period, and (2) the market circumstances facing Conduent may have changed during the Proposed Class Period.

82.    First, what Defendants could have disclosed likely evolved over the Proposed Class Period.  As noted above, in addition to alleging that Defendants misrepresented the extent of progress on Conduent's strategic transformation, Plaintiffs also "allege[] that Defendants omitted the following information from statements to investors during the Class Period:  (1) known issues with the legacy IT infrastructure and vendor performance that were impacting Conduent's financial guidance and growth, (2) service issues experienced by multiple tolling clients that were caused by Conduent's deficient IT infrastructure and sub-optimal vendor performance, and (3) IT issues that caused the company to accrue material penalties and revenue losses for failing to perform under tolling clients' contracts."[111]

83.    Plaintiffs allege that Defendant Vermuri's statement on February 21, 2018 that "[i]n 2017, we addressed our suboptimized IT-related workforce and vendor relationships" was false and misleading because "Defendants had not 'addressed' the Company's sub-optimized IT-related workforce and vendor relationships, as evidenced by Atos's inability to create a critical inventory of Conduent's legacy IT infrastructure."[112]  Plaintiffs do not allege that Defendants failed to disclose in the February 21, 2018 earnings call the client service disruptions that the Complaint alleged had occurred over the summer of 2018, the penalties and revenue losses that Conduent supposedly incurred in 2018 due to IT-related problems with the strategic transformation, or the financial impact thereof.

---

[111] Motion to Dismiss Opinion, pp. 8–9.
[112] Complaint, ¶¶148, 151.

84.    However, despite the fact that Plaintiffs' claims appear to inherently involve the disclosure of information that could not have been disclosed at the beginning of the Proposed Class Period, and despite claiming to offer a damages methodology that is tied to Plaintiffs' theory of liability, Mr. Coffman does not "have an opinion" about whether inflation specifically in this case evolved over the span of the Proposed Class Period.[113]  When asked in deposition about the three elements of alleged omissions outlined in the Court's Opinion on the Motion to Dismiss (which Mr. Coffman relied upon for his report), Mr. Coffman claimed:  "I would be completely speculating about whether or not things could have—whether things did or didn't change over time about what they knew about those things.  I just have no basis to give any opinion whatsoever."[114]

85.    Moreover, even if the information the Company could have disclosed over the course of the Proposed Class Period was constant, the value impact of that information may have varied over time.  As discussed in Section V.B above, several public announcements were made by government agencies or elected officials starting in May 2018 that detailed operational problems with Conduent's tolls and, in some cases, potential penalties.[115]  The value implications of a but-for disclosure earlier in the Proposed Class Period may have changed alongside this evolving business environment.  Indeed, Mr. Coffman agreed it is possible that the same corrective disclosure could have different value implications at different points in a class period.[116]

86.    In terms of a methodology to address time-varying inflation, Mr. Coffman acknowledged that "the event study itself, when it measures the stock price decline due to specific information,

---

[113] Coffman Deposition, 201:23–202:5.
[114] Coffman Deposition, 204:9–15, 207:10–21; Coffman Report, Appendix A.
[115] Complaint, ¶¶114–119, 129–130.
[116] Coffman Deposition, 201:3–7 ("Q. Is it possible that the same corrective disclosure could have different value implications at different points in a class period? A. That's plausible, yes.").

that's obviously occurring at a moment in time.  And then a separate analysis is required to say how would the value of that particular information have evolved over time."[117]  Yet he did not specify what "separate analysis" would be required.  In his report, Mr. Coffman suggested either a constant inflation band or time-varying inflation band could be used but has not "evaluated which method would be appropriate here or if some other hybrid method is appropriate here."[118]  He claimed in deposition that "whatever the inflation is, the methodology [he] lay[s] out in Paragraph 79 and 80 [of his report] could accommodate for it."[119]

87.     Given that Mr. Coffman admitted he has not determined whether there was time-varying inflation over the course of the Proposed Class Period, it is not clear how he can conclude that he would be able to "accommodate for it."  Mr. Coffman stressed "[a]gain, the nature of this analysis is intensely factual, case-specific."[120]  Yet, Mr. Coffman once again offers no fact or case-specific details as a basis for his conclusion that a reasonable methodology exists that could "accommodate" potentially different but-for disclosures over the course of the Proposed Class Period and/or the possibility that the value of the disclosure would have varied earlier in time.

Executed this 21st day of January, 2021

René M. Stulz, Ph.D.

---

[117] Coffman Deposition, 196:5–20.
[118] Coffman Report, ¶83; Coffman Deposition, 203:22–204:7.  See also Coffman Deposition, 198:11–17 ("I think you're asking me… have I determined that a constant dollar inflation would make sense in this particular case.  That's not something I've evaluated.  I don't know.").
[119] Coffman Deposition, 198:8–19.
[120] Coffman Report, ¶83.

**Appendix A**

**René M. Stulz**

Fisher College of Business

Home Address:

806 Fisher Hall

3419 River Seine Street

2100 Neil Avenue

Columbus, OH 43221

Columbus, OH 43210-1144

Phone: (614) 771-1110

Phone:  (614) 292-1970

Cell:    (614) 206-0265

Fax:     (614) 292-2359

E-mail: stulz.1@osu.edu

https://u.osu.edu/stulz.1/

**UNDERGRADUATE STUDIES**

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

**GRADUATE STUDIES**

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

**ACADEMIC APPOINTMENTS**

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


## OTHER POSITIONS

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to present.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to present.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020 to present; vice-chair, 2017-2019.

**Appendix A**

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.  to present.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to present.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, Financial Management Association, European Financial Management Association, Financial Management Association European Conference, FDIC Annual

**Appendix A**

Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

**Appendix A**

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.


## CONGRESSIONAL TESTIMONY

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.


## BOOKS

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

**Appendix A**

## PUBLISHED PAPERS

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, v36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, v9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, v12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, v10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, v38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, v15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, v19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, v16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, v14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, v20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, v41(1), 209-224.

**Appendix A**

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, v6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, v17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, v3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, v42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, v95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, v20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, v7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, v22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, v8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, v24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, v24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, v3, 247-262.

**Appendix A**

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, v9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, v45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, v26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, v16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, v29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, v65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, v32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, v32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, v6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, v3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, v25(3), Part 2, 585-601.

**Appendix A**

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, v102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, v37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, v30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, v8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, v8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, v40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, v9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, v20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, v42(2), 159-185,reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, v51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in

**Appendix A**

Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, v46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, v113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, v52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001 v14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, v54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, v12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, v12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, v73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, v8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, v90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, v1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, v29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, v14(1), 215-241.

**Appendix A**

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, v64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, v38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, v93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, v70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, v16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, v71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, v86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, v73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, v18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, v2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, v60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, v18(3),795-829.

**Appendix A**

"The Limits of Financial Globalization," Journal of Finance, 2005, v60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, v19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, v61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, v19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, v81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, v18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, v20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, v21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, v85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, v86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, v20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008 v88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, v89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, v20, No. 4, 39-48.

**Appendix A**

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, v64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, v91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, v22(8), 3171-3209.

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, v92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, v35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, v47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, v64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, v47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, v95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, v97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, v24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, v.65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, v65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, v99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

**Appendix A**

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, v24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, v105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, v67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, v104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, v67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, v110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, v110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, v27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, v116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, v71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, v29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, v29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, v22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, v.27(1), 8-18).

**Appendix A**

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, 2016, Management Science 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

"Do Independent Director Departures Predict Future Bad Events?" with Rüdiger Fahlenbrach and Angie Low, 2017, The Review of Financial Studies, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Fred Schlingemann, and Chad Zutter, Journal of Corporate Finance, 2017, v46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, 2017, The Review of Financial Studies, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei Gonçalves, 2018, The Review of Financial Studies, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, 2018, Journal of Applied Corporate Finance, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, 2018, Journal of Finance, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, 2019, Journal of Financial Economics, 133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, 2019, Review of Financial Studies, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," 2019, Journal of Applied Corporate Finance, 31(4), 86-97.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

**Appendix A**

 "Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, 2020, Journal of Financial Economics, forthcoming.

"Public Versus Private Equity," 2020, Oxford Economic Policy Review, 36(2), 275-290.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" Journal of International Money and Finance, forthcoming.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Lee and Han Shin, Review of Financial Studies, forthcoming.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, forthcoming.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, forthcoming.

"Why Are Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, forthcoming.

"Where there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, forthcoming.


**PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS**

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

**Appendix A**

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, v87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.


**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why Has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Greg Brown.

"Are Analyst Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

**Appendix A**

"Who Benefits from Analyst 'Top Picks?'" with Justin Birru, Sinan Gokkayaa, and Xi Liu.

"Has the Stock Market Become Less Representative of the Economy," with Fred Schlingemann.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Does Joining the S&P 500 Index Hurt Firms?" with Benjamin Bennett and Zexi Wang.


**EDITORIAL AND REFEREEING ACTIVITIES**

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to present.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

**Appendix A**

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

# Deposition and Trial Testimony of René M. Stulz During the Past Four Years

**Case Name:** Nancy Goodman, et al., v. J.P. Morgan Investment Management, Inc., et al.;
Campbell Family Trust, et al., v. J.P. Morgan Investment Management, Inc., et al.

**Case No.:** No. 2.14-CV-414, United States District Court, Southern District of Ohio, Eastern Division;
No. 2:15-CV-2923, United States District Court, Southern District of Ohio, Eastern Division

**Date of Testimony:** August 2017 (Deposition)


**Case Name:** Dennis Wilson et al. v. LSB Industries, Inc. et al.

**Case No.:** No. 1:15-cv-7614, United States District Court, Southern District of New York

**Date of Testimony:** September 2017 (Deposition)


**Case Name:** In Re Eletrobras Securities Litigation

**Case No.:** No. 1:15-cv-05754-JGK, United States District Court, Southern District of New York

**Date of Testimony:** November 2017 (Deposition)


**Case Name:** Australian Securities and Investment Commission v. Westpac Banking Corporation

**Case No.:** No. VID282/2016, Federal Court of Australian Proceedings

**Date of Testimony:** December 2017 (Trial)


**Case Name:** William Sponn et al. v. Emergent Biosolutions, Inc. et al.

**Case No.:** No. 8:16-cv-02625-RWT, United States District Court, Southern District of Maryland

**Date of Testimony:** February 2018 (Deposition)


**Case Name:** In Re BHP Billiton Limited Securities Litigation

**Case No.:** No. 1:16-cv-01445-NRB, United States District Court, Southern District of New York

**Date of Testimony:** June 2018 (Deposition)

**Appendix B**

| | |
|---|---|
| **Case Name:** | Loreley Financing (Jersey) No. 28, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al. |
| **Case No.:** | No. 652732/2011, Supreme Court of the State of New York |
| **Date of Testimony:** | November 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re Flowers Foods, Inc. Securities Litigation |
| **Case No.:** | No. 7:16-CV-00222-WLS, United States District Court, Middle District of Georgia |
| **Date of Testimony:** | November 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | SSA Bonds |
| **Case No.:** | A.T.40346, European Commission |
| **Date of Testimony:** | July 2019 (Oral Hearing) |

| | |
|---|---|
| **Case Name:** | In Re Equifax, Inc. Securities Litigation |
| **Case No.:** | No. 17-CV-3463-TWT |
| **Date of Testimony:** | September 2019 (Deposition) |

| | |
|---|---|
| **Case Name:** | Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al. |
| **Case No.:** | No. 16-112-MN |
| **Date of Testimony:** | December 2019 (Deposition) |

| | |
|---|---|
| **Case Name:** | Joseph Prause v. TechnipFMC PLC et al. |
| **Case No.:** | No. 4:17-cv-02368 |
| **Date of Testimony:** | February 2020 (Depositions) |

| | |
|---|---|
| **Case Name:** | In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action") |
| **Case No.:** | MDL No. 2672-CRB (JSC), United States District Court, Northern District of California |
| **Date of Testimony:** | February 2020 (Deposition) |

| | |
|---|---|
| **Case Name:** | Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A. |
| **Case No.:** | No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York |
| **Date of Testimony:** | May 2020 (Deposition) |

**Appendix C**

# Documents Considered

## Legal Documents

- Amended Class Action Complaint, *Employees' Retirement System of the Puerto Rico Electric Power Authority v. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh*, September 13, 2019.

- Opinion, *Employees Retirement System of the Puerto Rico Electric Power Authority et al. v. Conduent Inc., et al.*, June 5, 2020.

- Opinion of the Court, *Dura Pharmaceuticals, Inc., et al., v. Michael Broudo et al.*, 544 U.S. 336, April 19, 2005.

- Expert Report of Chad Coffman, CFA, *Employees' Retirement System of the Puerto Rico Electric Power Authority v. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh*, October 15, 2020, and supporting materials.

- Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, *Employees Retirement System of the Puerto Rico Electric Power Authority et al. v. Conduent Inc., et al.*, December 7, 2020.

- Deposition of Chad Coffman, December 22, 2020.

## Academic Articles and Books

- Berk, J., P. DeMarzo, and J. Harford, *Fundamentals of Corporate Finance*, 2nd ed. (New Jersey: Prentice Hall, 2011).

- Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25(2), 383–417.

- Kumar, R. (2002), "Managing Risks in IT projects: An Options Perspective," *Information and Management*, 40, 63–74.

- Ross, S. A., R. W. Westerfield, and J. Jaffe, *Corporate Finance*, 7th ed. (Boston: McGraw-Hill Irwin, 2005).

## Analyst Reports

- "2Q Recap: Encouraging Progress on Divestitures," *JP Morgan*, August 9, 2018.

- "3Q Recap- Stock Sell-off De-risks NT Outlook as Management Re-establishes its Track Record; Remain OW," *JP Morgan*, November 8, 2018.

- "4Q First Look- Solid Quarter, FY18 EBITDA Guidance Could Be Conservative at Low End - ALERT," *JP Morgan*, February 21, 2018.

- "A Lot of Moving Pieces to Digest," *Morgan Stanley*, May 10, 2018.

- "Clearing the Air," *Cowen*, November 8, 2017.

- "Conduent Inc. (CNDT): Financial and Strategic SWOT Analysis Review," *GlobalData*, June 2018.

- "Conduent Inc.: Good Value If They Can Execute; Initiating with a Positive Rating," *Susquehanna*, March 6, 2018.

- "Conduent Inc.: NDR Reveals a Bright Path; Raising Margins," *Susquehanna*, October 3, 2018.

- "Conduent Incorporated," *CFRA*, May 15, 2018.

- "Continued Cost Improvement Overshadowed by Revenue," *BMO Capital Markets*, November 7, 2018.

- "Getting the Message Back on Track," *Cowen*, August 8, 2018.

- "Keeping Expectation in Check After Bumpy Start," *Morgan Stanley,* February 23, 2017.

- "Management Meeting Reflects Progress on Plan and Confidence Entering 2018," *Cowen*, February 26, 2018.

- "Mixed 3Q Results & Lowered Outlook," *Cowen*, November 7, 2018.

- "On the Road with CDNT," *Cowen*, December 19, 2017.

- "Pointed in the Right Direction," *Morgan Stanley*, February 22, 2018.

- "Quick Thoughts on 3Q18 Results; Margins and Margin Guidance Solid; Revenue Weak," *Suntrust Robinson Humphrey*, November 7, 2018.

- "Sell-off Overdone; Making Progress on Key Drivers; Lowering Estimates but Reiterate Buy," *Suntrust Robinson Humphrey*, November 8, 2018.

- "Takeaways from Management Meeting - Positive," *JP Morgan*, April 3, 2018.

- Other analyst reports during the Proposed Class Period authored by Cross Research, JP Morgan, Sun Trust Robinson Humphrey, and Susquehanna.

## SEC Filings

- Conduent Incorporated, Form 10-K for FY 2017, filed March 1, 2018.

- Conduent Incorporated, Form 10-K for FY 2018, filed February 28, 2019.

- Conduent Incorporated, Form 10-Q for FY 2018 Q1, filed May 9, 2018.

- Conduent Incorporated, Form 8-K for Q4 and FY 2017, filed February 21, 2018.

- Xerox Corporation, Form 10-K for FY 2018, filed February 25, 2019.

**Appendix C**

## Earnings Calls and Annual Reports

- Conduent Incorporated, "Q4 and FY 2016 Earnings Call," February 22, 2017.

- Conduent Incorporated, "Q1 2017 Earnings Call," May 10, 2017.

- Conduent Incorporated, 2017 Annual Report, March 1, 2018.

- Conduent Incorporated, "Q1 2018 Earnings Call," May 9, 2018.

- Conduent Incorporated, "Q2 2018 Earnings Call," August 8, 2018.

- Conduent Incorporated, "Q3 2018 Earnings Call," November 7, 2018.

- Conduent Incorporated, 2019 Annual Report, February 26, 2020.

- Conduent Incorporated, Analyst Day Presentation, June 8, 2018.

- Conduent Incorporated, Analyst Day Transcript, June 8, 2018.

## Public Press

- "Delivering Large-Scale IT Projects on Time, on Budget, and on Value," *McKinsey on Business Technology*, No. 27, Fall 2012.

- "Four Years After Trucker's Lawsuit, SunPass Still Having Significant Problems," *Land Line*, July 20, 2018, https://landline.media/four-years-after-truckers-lawsuit-sunpass-still-having-significant-problems/.

- "How to Get Stakeholders to Join Forces And Realize Successful Digitization Projects," *Forbes*, January 4, 2021, https://www.forbes.com/sites/forbestechcouncil/2021/01/04/how-to-get-stakeholders-to-join-forces-and-realize-successful-digitization-projects/?sh=7b1cc942fe14.

- "HV Lawmakers to NYS Thruway Authority: Cancel Cashless Tolling Contract," *WAMC*, July 17, 2018, https://www.wamc.org/post/hv-lawmakers-nys-thruway-authority-cancel-cashless-tolling-contract.

- "Rick Scott has Financial Link to Botched SunPass Contract," *Miami Herald*, October 19, 2018, https://www.miamiherald.com/latest-news/article220309175.html.

- "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015.

- "Top 10 Op Risks 2018: IT Disruption," *Risk.net*, February 22, 2018, https://www.risk.net/risk-management/5423331/top-10-op-risks-2018-it-disruption.

- "Top 10 Operational Risks for 2018," *Risk.net*, February 22, 2018, https://www.risk.net/risk-management/5424761/top-10-operational-risks-for-2018.

- "Why Software Projects Fail, and the Traps You Can Avoid That Could Spell Disaster," *Entrepreneur*, February 27, 2019, https://www.entrepreneur.com/article/329019.

**Appendix C**

**Press Releases**

- "Conduent Reports Third Quarter 2018 Results with Strong Adjusted EPS and EBITDA Growth; Healthier Balance Sheet Driven by Transformation and Divestitures," *Conduent Incorporated Press Release*, November 7, 2018, https://www.news.conduent.com/news/conduent-reports-third-quarter-2018-results-with-strong-adjusted-eps-and-ebitda-growth-healthier-balance-sheet-driven-by-transformation-and-divestitures.

- "Conduent to Present Business Strategy at Investor Event Today," *Conduent Incorporated Press Release*, December 5, 2016, https://www.news.conduent.com/news/Conduent-Investor-Event-2016.

- "Conduent to Report Third-Quarter 2018 Financial Results on November 7, 2018," *Conduent Incorporated Press Release*, October 24, 2018, https://www.news.conduent.com/news/releases-20181024.

- "FDOT: SunPass Transaction Backlog Successfully Cleared," *Florida Department of Transporation*, August 14, 2018, https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/info/info/co/news/newsreleases/08142018-backlog.pdf?sfvrsn=caacb60e_0.

**Data**

- "CNDT_4Q19_Investor_Metrics_File FINAL.xlsx," February 20, 2020, https://investor.conduent.com/static-files/5869564e-02ef-4200-9872-65e2ee770c5c.

- "CNDT-Q1_2019_Earnings-Metrics_File updated.xlsx," May 8, 2019, https://investor.conduent.com/static-files/7e25430b-f299-48d3-a2d3-e295a9c0cb79.

**Other**

- "State of Michigan Enterprise Procurement: Contract Change Notice," Michigan Department of Technology, Management, and Budget, July 10, 2017, https://www.michigan.gov/documents/micontractconnect/7700141_576068_7.pdf.

- Letter to the Honorable Joseph Simons, Federal Trade Commission, from Bill Nelson, Senate Committee on Commerce, Science and Transportation, and Gary Peters, Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety and Security, July 30, 2018, https://www.commerce.senate.gov/services/files/de85078d-5589-40aa-9f17-fa96ceb85aa6.

Note: In addition to the documents on this list, I considered all documents cited in my report to form my opinions.